## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| SANDRA HUNTER, Individually and On Behalf of All Others Similarly Situated,<br><br>               Plaintiff,<br><br>    v.<br><br>ELANCO ANIMAL HEALTH INCORPORATED, JEFFREY N. SIMMONS, and TODD S. YOUNG,<br><br>               Defendants. | Case No. 1:20-cv-01460-SEB-DML<br><br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

## TABLE OF CONTENTS

I.    NATURE OF THE ACTION AND OVERVIEW .......................................................... 1

II.   JURISDICTION AND VENUE ...................................................................................... 5

III.  PARTIES ......................................................................................................................... 6

    A.    Plaintiffs.................................................................................................................. 6

    B.    Corporate Defendant.............................................................................................. 6

    C.    Individual Defendants............................................................................................ 7

    D.    Securities Act Defendants...................................................................................... 8

IV.   CONFIDENTIAL WITNESS ("CW") FOUNDATION ALLEGATIONS ................... 10

V.    SUBSTANTIVE ALLEGATIONS ............................................................................... 12

    A.    Background of Elanco's Business: Its Products, Distributors, and the Aratana
        Merger................................................................................................................... 12

    B.    Elanco's Shifting Strategies to First "Clean Up" Its Inventory Channels and then
        Boost the Appearance of Sales and Growth Prior to the IPO .............................. 16

    C.    Elanco Continued to Rely On Concealed Channel Stuffing to Show Growth
        During the Class Period, Obscuring the Risks Posed By Increasing Channel
        Inventory............................................................................................................... 18

    D.    Further Undisclosed Distributor Changes and Channel Stuffing in 4Q 2019 Pose
        Additional Concealed Risks To Elanco's Operations and Results ...................... 21

    E.    Subtle Changes to Elanco's SEC Filings in 3Q 2019 Suggest that Defendants
        Understood—But Did Not Disclose to the Market—the Risks of Increasing
        Channel Inventory and Elanco's 4Q 2019 Distributor Changes.......................... 23

    F.    The Undisclosed Risks Materialize With Disappointing First Quarter 2020
        Results Announced on May 7, 2020...................................................................... 25

    G.    After the Class Period, Defendants' Concealed and Misleading Channel Stuffing
        Is Exposed and Defendants Announce Further "Channel Inventory  Reduction"
        for 2Q 2020 .......................................................................................................... 27

VI.   DEFENDANTS' VIOLATIONS OF THE EXCHANGE ACT...................................... 29

A.      Defendants' Materially False and Misleading Statements and Omissions In Violation of the Exchange Act ................................................................... 29

    1.      The IPO Registration Statement ................................................. 29

    2.      3Q 2018 Financial Results and Earnings Call ........................... 34

    3.      2019 Financial Guidance ........................................................... 39

    4.      4Q and Full Year 2018 Financial Results and Earnings Call .................. 42

    5.      1Q 2019 Financial Results and Earnings Call ........................... 49

    6.      Aratana Merger Registration Statement ..................................... 55

    7.      2Q 2019 Financial Results and Earnings Call ........................... 60

    8.      September 11, 2019 Morgan Stanley Global Healthcare Conference ...... 67

    9.      3Q 2019 Financial Results and Earnings Call ........................... 67

    10.     2020 Financial Guidance ........................................................... 76

    11.     January 14, 2020 JP Morgan Healthcare Conference ............................. 80

    12.     4Q and Full Year 2019 Financial Results and Earnings Call .................. 81

    13.     Defendants' Statement on COVID-19 ........................................ 87

B.      Additional Allegations Regarding Defendants' Scienter ..................................... 89

    1.      Individual Defendants' Knowledge of and Access to Information ......... 89

    2.      Corporate Scienter and *Respondeat Superior* ........................... 93

    3.      Executive Bonus Payments Based on Inflated Performance ................... 93

C.      Loss Causation ...................................................................................... 97

D.      Applicability of the Presumption of Reliance (Fraud-on-the-Market Doctrine) .. 99

VII.    VIOLATIONS OF THE SECURITIES ACT ............................................................... 101

VIII.   CLASS ACTION ALLEGATIONS ................................................................. 104

IX.     NO SAFE HARBOR ........................................................................... 105

X.      CLAIMS FOR RELIEF ................................................................ 106

XI.     PRAYER FOR RELIEF ............................................................... 113

Lead Plaintiff Sandra Hunter and plaintiff Marla Strappe ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge.  Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Elanco Animal Health Incorporated ("Elanco" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Elanco; (c) interviews of former Elanco employees and other witnesses; (d) review of reports issued by industry and securities analysts; and (e) review of other publicly available information concerning Elanco.

## I.      NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired Elanco securities between September 20, 2018 and May 6, 2020, inclusive (the "Class Period"), including persons or entities that acquired Elanco common stock pursuant to the Company's merger with Aratana Therapeutics ("Aratana") on or about July 18, 2019 (the "Aratana Merger"), and were damaged thereby.  Plaintiffs pursue claims under the Securities Act of 1933 (the "Securities Act") and Securities Exchange Act of 1934 (the "Exchange Act").

2.      Elanco was formed as a public company in a spin-off from Eli Lilly and Company ("Eli Lilly") in September 2018 (the "IPO").  Elanco's initial Form S-1 registration statement was filed with the SEC on August 2, 2018 (as amended on August 28, 2018 and September 6, 2018), and its final Form 424(b)(4) prospectus, incorporated by reference into the registration statement, was dated September 19, 2018 (collectively, the "IPO Registration Statement").  The IPO Registration Statement was declared effective on September 19, 2018 and Elanco shares began trading on September 20, 2018.  The IPO offered 62.9 million shares of common stock priced at $24 per share, and the net proceeds to Elanco were approximately $1.7 billion.

3.      Elanco develops, manufactures, and markets health products for companion and food animals.  Its four primary product categories are: Companion Animal Disease Prevention

("CA Disease Prevention"), which offers parasiticides for worms, fleas and ticks; Companion Animal Therapeutics ("CA Therapeutics"), offering treatments for pain, osteoarthritis, cardiovascular, and dermatology indications; Food Animal Future Protein & Health ("FA Future Protein & Health"), which includes vaccines, nutritional enzymes, and antibiotics; and Food Animal Ruminants & Swine ("FA Ruminants & Swine"), offering food animal products used in ruminant and swine production.   In general, the Companion Animal sector generates higher profit margins than Food Animal.   During the Class Period, Defendants sought to grow the Company's profitability and identified CA Disease Prevention, CA Therapeutics and FA Future Protein & Health as Elanco's primary "growth categories."   But still, at the time of the IPO and during the Class Period, Elanco was heavily reliant on the lower-margin Food Animal sector, with its top product Rumensin, a feed additive for cattle, constituting 11% of the Company's total revenue in 2018 and 10% in 2019.

4.     In its IPO Registration Statement, Elanco explained that a "key element of our targeted value creation strategy is to drive growth through portfolio development and product innovation, primarily in our three targeted growth categories."   Throughout the Class Period, Defendants sold Elanco to the market as a "growth" story, consistently touting Elanco's year-over-year and quarterly growth, and assuring the market that the Company's growth was "tracking" to expectations and that market fundamentals and underlying demand were strong. For example, on December 18, 2018, during the Company's 2019 guidance call, Elanco's CEO, Defendant Simmons, stated that "we expect to grow 2019 earnings at a double-digit pace" and insisted that "[t]he fundamentals of our industry are strong, and our strategy sets us up to grow revenue" and "expand margins" in 2019.   On May 9, 2019, during the 1Q 2019 earnings call, Simmons assured that "the fundamentals of our business are strong and we are tracking to our goals" and emphasized that "[t]he leading indicators of demand at the vet clinic are consistent with" Elanco's "longer term sales trajectory."   And during the Company's 3Q 2019 earnings call on November 6, 2019, Defendant Simmons specifically assured the market that "all 3 of our growth categories is tracking to our expectations. Underlying demand coming out of the clinics,

and the fundamentals in the market, it's tracking to our expectations." Elanco's CFO, Defendant Young, added that Defendants were "confident in the underlying growth of our core business."

5.      But rather than the steady growth reflective of strong market fundamentals and increasing underlying demand as represented to the market, Defendants were actually excessively stuffing distribution sales channels far in excess of end-user demand, and then concealing the increasing and highly unsustainable inventory levels at distributors—and the risks relating thereto—from the market.[1] Former insiders detail the lengths to which Defendants went to convince the market that Elanco was attaining its sales and growth targets. From deep discounts, increased rebates, and extended payment terms—to Elanco's most important distributor parking excess inventory in extra warehouse space and tractor-trailers in Amarillo, Texas—Elanco took extraordinary steps to induce excess inventory purchases in order to meet targets. During the Class Period, Defendants were well-aware of the risks of the ever-increasing and unsustainable distributor inventory levels. According to former employees, by September 2019, Elanco's three largest distributors were "bursting" with inventory—making Elanco increasingly vulnerable to even the slightest changes in economic or competitive pressures.

6.      Then, in or around November 2019, Defendants Simmons and Young, along with other members of Elanco's U.S. management team, decided to decrease the number of Elanco's major distributors from eight to four, with the apparent assumption that the remaining four would purchase more inventory to make up for the lost sales. Defendants misrepresented and failed to disclose the material risks relating to this important distributor change, including that both the eliminated and remaining distributors were sitting on significant amounts of excess inventory by 4Q 2019 that would need to be worked down before the remaining distributors could begin to make up the sales slack. At the same time, Defendants concealed additional changes to its distributor sales model for its remaining distributors, including reduced distributor incentives,

---

[1] "Channel stuffing" refers to the practice of selling substantially more product than the customer can reasonably use, or levels of inventory that substantially exceed end-user demand.

that Defendants knew or reasonably should have known would have a material negative impact on the Company's sales and results of operations going forward.

7. Still, Defendants continued to assure the market that Elanco's fundamentals were strong and the growth was reflective of actual strong demand into 1Q 2020. During the Company's 2020 guidance call on January 10, 2020, Defendant Simmons emphasized that "[o]ur growth is durable and resilient" and "we are confident in our growth because of the fundamentals driving this growth." As late as Elanco's 4Q and full-year 2019 earnings call on February 19, 2020, Defendant Simmons assured investors that "Elanco is well positioned on all fronts," reiterated that "[o]ur growth is durable and resilient," and concluded that based on "what we're doing with the channel, we believe our position has never been stronger holistically when you compare ourselves to our position in 2018 or 2017." During the same call, Defendant Young, Elanco's CFO, reiterated that the Company's top Companion Animal products "continue to perform well with strong underlying demand at the clinic level." Credit Suisse thus echoed Defendants' confidence on the fundamentals in its February 19, 2020 analyst report noting "Core growth guidance of +1-3% in 2020 reflects positive underlying fundamentals."

8. Thus, investors were stunned on May 7, 2020, when Elanco announced its 1Q 2020 financial results, reporting revenue of $657.7 million and earnings per share of -$0.12, reflecting "a reduction of approximately $60 million in channel inventory." Defendant Simmons blamed the disappointing results on "distributor performance," among other things, and stated that Elanco planned "to tighten [its] approach across many facets of [its] distributor relationships." Simmons admitted that "[t]he decrease in channel inventory [was] a structural change with [Elanco's] distribution partners" and further cited the COVID-19 pandemic as a cause of the poor "distributor performance," claiming that the pandemic "created significant working capital and liquidity pressures and uncertainty on near-term end customer demand for [Elanco's] distributors, prompting reductions in the amount of inventory they hold."

9. On this news, the Company's share price fell $3.05, over 13%, to close at $19.88 per share on May 7, 2020, on unusually heavy trading volume.

10.     But rather than the distributor liquidity crisis cited by Defendants, the financials of the major distributors paints a different picture.  In fact, each appears to have had a healthy cash balance during 4Q 2019 and 1Q 2020, which even continued into 2Q 2020.  After the Class Period, Evercore ISI analyst Umer Raffat, who covered Elanco since its IPO, conducted a "deep dive" into Elanco's inventory issues and examined Defendants' May 7, 2020 statements as to the cause of the 1Q 2020 miss.  Among other things, Mr. Raffat concluded: "I do think that *Elanco worked their inventories up to more than what was appreciated by the street* and that's what weighed in on their free cash flows, that theoretically weighed in on a bunch of different aspects of the company, including what the underlying growth looks like.  Because *the growth they've been reporting on volume does not mimic what the end user demand was*."

11.     Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that, before consolidating its distributors from eight to four, Elanco increased the amount of inventory, including companion animal products, held by each distributor in order to meet market expectations and project a façade of growth; (2) that Elanco's distributors were not experiencing sufficient end-user demand to sell through the inventory during the Class Period; (3) that, as a result, the Company's sales and revenue were reasonably likely to decline; (4) that, as a result of the foregoing, Elanco would reduce its channel inventory; and (5) that, as a result of the foregoing, Defendants' positive statements about Elanco's business, operations, and prospects, were materially misleading and/or lacked a reasonable basis.

12.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

13.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17

C.F.R. § 240.10b-5), as well as Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l, and 77o).

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

15.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

16.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including interstate telephone communications, and the facilities of a national securities exchange.

## III.   PARTIES

### A.   Plaintiffs

17.     Lead Plaintiff Sandra Hunter, as set forth in the previously-filed certification, incorporated by reference herein, purchased Elanco securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

18.     Plaintiff Marla Strappe as set forth in the concurrently-filed certification, incorporated by reference herein, acquired Elanco securities pursuant to the Aratana Merger, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

### B.   Corporate Defendant

19.     Defendant Elanco is incorporated under the laws of Indiana with its principal executive offices located in Greenfield, Indiana. Elanco's common stock trades on the New York

Stock Exchange ("NYSE") under the symbol "ELAN."

### C.     Individual Defendants

20.     Defendant Jeffrey N. Simmons ("Simmons") was the Company's President, Chief Executive Officer ("CEO"), and director at all relevant times.  Simmons is also a member of Elanco's Finance Committee, which assists the Company's board of directors with the oversight and management of financial policies, plans, and transactions, including mergers and strategic partnerships.  The Finance Committee also manages matters of balance sheets and financial strategy.  Prior to the IPO, Simmons served as the President of Elanco Animal Health Division of Eli Lilly from 2008 until Elanco's IPO.  Prior to 2008, Simmons held various leadership roles for Elanco, including District Sales Manager, International Marketing Manager, Country Director for Brazil, Area Director for Western Europe, and Executive Director for U.S. and Global Research & Development.  Simmons signed the IPO Registration Statement and the Aratana Merger Registration Statement.  In addition, Simmons signed the following Class Period financial statements and the Sarbanes-Oxley Certifications: 3Q 2018 Form 10-Q filed with the SEC on November 8, 2018; 2018 Form 10-K filed with the SEC on February 20, 2019; 1Q 2019 Form 10-Q filed with the SEC on May 14, 2019; 2Q 2019 Form 10-Q filed with the SEC on August 13, 2019; 3Q 2019 Form 10-Q filed with the SEC on November 8, 2019; 2019 Form 10-K filed with the SEC on February 28, 2020; and 1Q 2020 Form 10-Q filed with the SEC on May 7, 2020.

21.     Defendant Todd S. Young ("Young") has served as the Company's Chief Financial Officer ("CFO") and executive vice president since November 1, 2018.  Prior to joining Elanco, Young was executive vice president and CFO for ACADIA Pharmaceuticals Inc. Young also spent several years in varying financial leadership roles at Baxter International and worked on the spin-off of Baxalta.  Young signed the Aratana Merger Registration Statement.  In addition, Young signed the Sarbanes-Oxley Certification on the 3Q 2018 Form 10-Q filed with the SEC on November 8, 2018, and signed the following Class Period financial statements and Sarbanes-Oxley Certifications: 2018 Form 10-K filed with the SEC on February 20, 2019; 1Q

2019 Form 10-Q filed with the SEC on May 14, 2019; 2Q 2019 Form 10-Q filed with the SEC on August 13, 2019; 3Q 2019 Form 10-Q filed with the SEC on November 8, 2019; 2019 Form 10-K filed with the SEC on February 28, 2020; and 1Q 2020 Form 10-Q filed with the SEC on May 7, 2020.

22.     Defendants Simmons and Young (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.   The Individual Defendants were provided with copies of Elanco's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.   The Individual Defendants are liable for the false statements herein.

**D.     Securities Act Defendants**

23.     Defendant James M. Meer ("Meer") was, at all relevant times, the Company's executive vice president and Chief Account Officer.   Meer signed or authorized the signing of the Merger Registration Statement filed with the SEC.   Meer was Chief Financial Officer of Healthx, Inc. from 2017 until 2018.   Meer served as Senior Vice President of Finance at Appirio from 2014 to 2017 and as Vice President and Corporate Controller at Sales from 2011 to 2014.

24.     Defendant R. David Hoover ("Hoover") was, at all relevant times, Chairman of Elanco's Board of Directors.   Hoover signed or authorized the signing of the Merger Registration Statement filed with the SEC.   Hoover was Chairman of Ball Corporation from 2002 to 2013, Chief Executive Officer from 2010 to 2011, President and Chief Executive Officer from 2001 to 2010, Chief Operating Officer from 2000 to 2001 and Chief Financial Officer from 1998 to 2000.

25.     Defendant Kapila K. Anand ("Anand") was, at all relevant times, a director of Elanco, and signed or authorized the signing of the Merger Registration Statement filed with the SEC.  Anand served as a partner at KPMG LLP from 2011 to 2017, Partner in Charge—Public Policy Business Initiatives from 2009 to 2013, KMPG LLP Board Member from 2005 to 2010, Advisory Leader—Private Equity, Real Estate and Hospitality from 2002 to 2009 and Audit Partner—Real Estate and Hospitality from 1989 to 2002.

26.     Defendant John P. Bilbrey ("Bilbrey") was, at all relevant times, a director of Elanco, and signed or authorized the signing of the Merger Registration Statement filed with the SEC.  Bilbrey was Chief Executive Officer and President of The Hershey Company from 2011 until 2017 and as Chairman of the Board from 2015 until 2018.  Bilbrey served as Chief Operating Officer and EVP at The Hersey Company from 2010 to 2011 the President of North America from 2007 to 2010, the President of International Commercial group from 2005 to 2007.

27.     Defendant Art A. Garcia ("Garcia") was, at all relevant times, a director of Elanco, and signed or authorized the signing of the Merger Registration Statement filed with the SEC.  Garcia was Executive Vice President and Chief Financial Officer at Ryder Systems, Inc. from 2010 until 2019, Senior Vice President and Controller from 2005 to 2010 and Vice President and Controller from 2002 to 2005. Mr. Garcia is a certified public accountant.

28.     Defendant Michael J. Harrington ("Harrington") was, at all relevant times, a director of Elanco, and signed or authorized the signing of the Merger Registration Statement filed with the SEC.  Harrington served as Senior Vice President and General Counsel at Eli Lilly since 2013.  Harrington served as Vice President and Deputy General Counsel of Global Pharmaceutical Operations at Eli Lilly from 2010 to 2012 and Vice President and General Counsel, Corporate from 2004 to 2010.

29.     Defendant Deborah T. Kochevar ("Kochevar") was, at all relevant times, a director of Elanco, and signed or authorized the signing of the Merger Registration Statement filed with the SEC.  Kochevar has served as the Provost and Senior Vice President ad interim at

Tufts University since 2018.  Kochevar served as Dean of the Cummings School of Veterinary Medicine at Tufts University from 2006 to 2018.

30.     Defendant Lawrence E. Kurzius ("Kurzius") was, at all relevant times, a director of Elanco, and signed or authorized the signing of the Merger Registration Statement filed with the SEC.  Kurzius has served as a director since 2015, Chairman of the Board of Directors since 2017, Chief Executive Officer since 2016, and President since 2015 at McCormick & Company. Kurzius served as Chief Operating Officer at McCormick & Company from 2015 to 2016, Chief Administrative Officer from 2013 to 2015, President, International Businesses from 2008 to 2013, President, Europe, Middle East and Africa from 2007 to 2008 and President, U.S. Consumer Foods from 2005 to 2006.

31.     Defendant Kirk McDonald ("McDonald") was, at all relevant times, a director of Elanco, and signed or authorized the signing of the Merger Registration Statement filed with the SEC.  McDonald has served as the Chief Marketing Officer at Xandr since 2017 and President of PubMatic since 2011.  McDonald served as President of Digital at Time Inc. from 2009 to 2011.

32.     Defendant Denise Scots-Knight ("Scots-Knight") was, at all relevant times, a director of Elanco, and signed or authorized the signing of the Merger Registration Statement filed with the SEC.  Scots-Knight has served as Chief Executive Officer and member of the board of Mereo BioPharma Group plc since 2015.  Scots-Knight served as Managing Partner of Phase4 Partners Ltd. from 2010 to 2015 and Head of Nomura Phase4 Ventures from 2004 to 2010.

33.     Defendants Meer, Hoover, Anand, Bilbrey, Garcia, Harrington, Kochevar, Kurius, McDonald, and Scots-Knight, are herein referred to as the "Securities Act Defendants."

## IV.     CONFIDENTIAL WITNESS ("CW") FOUNDATION ALLEGATIONS

34.     CW1 was a Corporate Account Manager in Elanco's large animal division from January 2015 to January 2020.  CW1 was responsible for managing Elanco's relationship with four distributors—MWI Animal Health ("MWI"), an affiliate of AmerisourceBergen Corporation, Midwest Veterinary Supply ("Midwest"), K+K Vet Supply Inc. ("K+K"), and

Veterinary Service, Inc. ("VSI").   CW1 reported to Director of Food Animal Channel & Distribution, Courtney Shriver ("Shriver").   Shriver reported to Senior Director of Channel Strategy and Sales Force Excellence for North America, Julia Loew ("Loew"), who reported to Vice President, Companion Animal US, Shawn McKee ("McKee").   According to CW1, Shriver had a "direct conversation pipeline" to Simmons and that Shriver attended monthly senior management meetings with Simmons and Young at the Company's headquarters in Greenfield, Indiana.   CW1 attended at least two of these meetings, one in person during the first half of 2018 and one by video conference in 3Q 2019.   At these meetings, CW1 presented sales data for CW1's accounts and noted that the purpose of these meetings was to "go over strategy" for sales based on past performance, for example, by tracking "days on hand," *i.e.*, the amount of inventory held by distributors.   It was in the days following these senior management meetings that CW1 often would receive a phone call from Shriver directing CW1 to push distributors to purchase an additional amount of inventory beyond what they were demanding to meet the Company's revenue forecast.

35.    CW2 was a Corporate Account Manager in Elanco's Companion Animal division from March 2018 to January 2020.   CW2 was responsible for contract negotiations and overseeing the day-to-day management of one of Elanco's key accounts in Companion Animal products, distributor MWI, and during that time knew "pretty intimately what inventory levels looked like at MWI."   Prior to holding that position, CW2 was a National Account Manager for MWI from February 2015 to March 2018.   CW2 also reported to Shriver.   According to CW2, Simmons held monthly and quarterly meetings at Elanco's headquarters with other executive attendees including McKee and Loew.   Though CW2 did not attend these meetings, CW2's understanding of the purpose of those meetings was to discuss operations and future business plans, for example, how Elanco was "tracking things, updates, etc."

36.    CW3 was a National Accounts Manager in Elanco's Food Animal division from January 2015 to January 2020.   CW3 was responsible for contract negotiations and overseeing the day-to-day management of three key accounts—distributors MWI, Covetrus, Inc.

("Covetrus"), and Patterson Veterinary ("Patterson").  CW3 also reported to Shriver.  CW3 also recalled that Shriver and Simmons met frequently to discuss the status of Elanco's sales and Shriver told CW3 that Simmons would instruct them to "make the quarter no matter what."  CW3 also recalled Shriver routinely asking if CW3 could get certain distributors "to order an extra million" of inventory "to make the quarter look better."

37.     CW4 was a Vice President at Elanco from January 2020 to July 2020.  CW4 was responsible for driving revenue and improving Elanco's profitability of its Companion Animal and Food Animal business lines of vaccines and feed additives.  Prior to holding that position, CW4 was the Global Head of Animal Care Expansion, Business Development & Licensing and Alternate Innovation from September 2018 to January 2020.  CW4 had regular and frequent direct contact with Simmons and Young during CW4's tenure at Elanco.  According to CW4, at the end of every quarter, primarily Simmons and McKee negotiated with distributors either in-person or telephonically.  CW4 described McKee as "very involved" in negotiations with distributors and Simmons as "hands on" in managing distributor relationships over 2018 to 2020.

## V.     SUBSTANTIVE ALLEGATIONS

### A.     Background of Elanco's Business: Its Products, Distributors, and the Aratana Merger

38.     Elanco generates revenue primarily from product sales to customers, who generally are not end-users, but rather are third-party wholesale distributors of Elanco's products.[2]  From the beginning of Class Period until approximately 4Q 2019, Elanco's customers included the following major distributors: MWI, an affiliate of AmerisourceBergen Corporation ("ABC") that sources and distributes pharmaceuticals, healthcare products and supplies for companion animal and livestock markets; Covetrus, a global animal-health technology and services company supporting the companion, equine, and large-animal veterinary markets,

---

[2]  Elanco does sell some FA products "directly to a diverse set of food animal producers, including beef and dairy farmers as well as pork, poultry and aquaculture operations."  Merger Registration Statement, at 147.

including cattle, swine, and poultry; Patterson, a leading distributor of supplies, equipment, technology, vaccines and pharmaceuticals in the U.S. and the United Kingdom; Midwest, a provider of equipment, supplies, and vaccines to veterinary clinics; K+K, a family owned and operated animal health distribution company; Penn Veterinary Supply, Inc. ("Penn Vet"), a provider of veterinary supplies and veterinary equipment to veterinary clinics; Victor Medical Company ("Victor Medical"), the largest privately-owned veterinary distributor in California, Arizona, Nevada, and Pacific Northwest; VSI, a provider of products to customers in the beef, dairy, and poultry business, as well as feed supply and pet stores; and Nutra Blend LLC ("Nutra Blend"), a manufacturer and distributor of vitamins, trace minerals, and antibiotic premixes for the feed industry.

39.     MWI, which describes itself as the "cornerstone business" of ABC, was Elanco's largest customer during the relevant time period, representing approximately 12% and 13% of Elanco's revenue for 2018 and 2019, respectively.  Elanco's 2019 Form 10-K reported that "product sales resulted in accounts receivable with this customer of $90.5 million and $96.4 million as of Dec. 31, 2019 and 2018, respectively."

40.     According to animal health industry research conducted by BMO Capital Markets ("BMO"), Companion Animal products typically have higher gross margins relative to Food Animal products.  More specifically, vaccines have higher gross margins (high 60s to low 70s gross margins) compared to other animal health products.  In BMO's September 26, 2018 report, BMO estimated that vaccines contributed to less than 10% of Elanco's revenue.  Additionally, BMO's research suggested the medicated feed additives segment grows slower than the overall market and has low gross margins (in the 40s) as their manufacturing process is relatively complex.  In that same report, BMO estimated that approximately one-third of Elanco's revenue is from medicated feed additives for use in the Food Animal segment.  Examples of Elanco's medicated feed additive products include Rumensin, Hemicell, Imvixa (salmon), and productivity products such as Ractopamine.

41.     To expand its presence in the higher-margin Companion Animal sector, Elanco

licensed Galliprant, a nonsteriodal anti-inflammatory drug for canine osteoarthritis, from Aratana—a pet therapeutics company focused on developing and commercializing therapeutics for dogs and cats—in 2016, which contributed to Companion Animal sales growth for Elanco of 10% in 2017.  On or about April 26, 2019, Elanco announced its agreement to acquire Aratana. Elanco filed a Form S-4 registration statement with the SEC on May 30, 2019 (as amended on June 12, 2019), and its final Form 424(b)(3) prospectus, incorporated by reference into the registration statement, was dated June 17, 2019 (the "Merger Registration Statement").  The Aratana Merger was declared effective on July 18, 2019.   Upon the consummation of the Merger, Aratana shareholders received 0.1481 share of Elanco common stock and one contingent value right ("CVR") for each share of Aratana common stock held.  Including the CVR, the Aratana Merger was valued at approximately $245 million.  Pursuant to the Aratana Merger, Elanco issued approximately 7.2 million shares of stock with a value of $238 million to Aratana shareholders, based on the stock price of the last trading day before the Merger closed ($33.18 on July 17, 2019).

42.     Elanco's main competitor is industry behemoth Zoetis Inc. ("Zoetis"), which brought in $5.3 billion in revenues for 2017, compared to Elanco's approximate $2.89 billion in 2017.  Compared to Elanco, Zoetis was more heavily involved in the higher-margin Companion Animal sector.  In 2017, for example, Companion Animal vaccines accounted for approximately 26% of Zoetis's overall revenue compared to 8% at Elanco.  The Companion Animal sector as a whole accounted for 42% of Zoetis' 2017 revenue, compared to 32% at Elanco.

43.     For the year ending 2018, Companion Animal accounted for approximately 35% of Elanco's revenue, while Food Animal accounted for approximately 61%.  More specifically, the 2018 revenue generating categories were broken down as follows: CA Disease Prevention accounted for 26%, CA Therapeutics accounted for 9%, FA Future Protein & Health accounted for 23%, and FA Ruminants & Swine accounted for 38%.  Approximately 51% of Elanco's revenue was generated in North America with the next closest region, Europe, Middle East, and Africa ("EMEA") accounting for approximately 23%.

44.     For the year ending 2019, the Companion Animal division accounted for 37% of Elanco's revenue, while Food Animal accounted for 60%, broken down as follows: CA Disease Prevention 26%; CA Therapeutics 11%; FA Future Protein & Health 24%; and FA Ruminants & Swine 36%.  Approximately 52% of Elanco's revenue was generated in North America with the next closest region, EMEA, accounting for approximately 23%.

45.     Elanco's quarterly revenues reported during the Class Period are reflected (in millions of dollars) in the table below:

| Revenue ($M) | | | | | | |
|---|---|---|---|---|---|---|
| | CA Disease Prevention | CA Therapeutics | FA Future Protein & Health | FA Ruminants & Swine | Other (Strategic Exits) | Total Revenue |
| Q3 18 | $188.6 | $80.5 | $162.8 | $301.5 | $27.7 | $761.1 |
| Q4 18 | $200.7 | $72.0 | $209.1 | $292.9 | $24.6 | $799.3 |
| Q1 19 | $185.9 | $81.4 | $167.2 | $274.1 | $22.5 | $731.1 |
| Q2 19 | $223.4 | $83.4 | $175.8 | $271.5 | $27.5 | $781.6 |
| Q3 19 | $207.6 | $87.6 | $191.5 | $266.2 | $18.4 | $771.3 |
| Q4 19 | $171.0 | $95.6 | $210.6 | $298.5 | $11.3 | $787.0 |
| Q1 20 | $140.3 | $65.8 | $180.0 | $252.6 | $19.0 | $657.7 |
| Q2 20 | $176.3 | $78.0 | $157.9 | $158.2 | $15.9 | $586.3 |

46.     Defendants were particularly focused on showing growth during the Class Period, which Elanco accomplished through a combination of volume growth (*i.e.*, selling more product) and price increases, as well as margin improvement.  For example, in discussing the Company's strategy in the IPO Registration Statement, Elanco stated "[o]ur sales strategy is focused on achieving growth in our targeted product categories while increasing productivity within our sales force.  We plan to utilize both our sales force's strong customer relationships and our strategic distributor partnerships to efficiently grow demand for our products."  During the Company's 3Q 2018 earnings call on November 6, 2018, Simmons again emphasized Elanco's growth during its first quarter as a standalone company, "we returned to growth this year and are pleased to say we've accelerated that growth during Q3."

47.     Analysts covering Elanco were also focused on Elanco's ability to show growth. Cowen, in its report initiating coverage on October 15, 2018, noted Elanco's "focus on the faster

growth areas of companion animal preventive and therapeutic medicines, poultry and fish products (vaccines and parasiticides), and development efforts in nutritional and antibiotic alternatives, should support an estimated 2017-2024 revenue CAGR of 4%." Credit Suisse's October 15, 2018 report initiating coverage noted that Elanco "is committed to bolstering its Companion Animal portfolio (among other faster-growing segments)," which Credit Suisse expected to become "an increasingly greater component of [Elanco's] mix through 2023, contributing to more consistent topline growth, in line with the industry (+5%)."

### B.  Elanco's Shifting Strategies to First "Clean Up" Its Inventory Channels and then Boost the Appearance of Sales and Growth Prior to the IPO

48.     According to CW1, during 2017, Elanco employed a "move out" style business model, which focused on creating incentives and opportunities to increase sales by distributors to the ultimate end-users. A "move out" model focuses on and incentivizes sales to end users, and thus seeks to balance sales to distributors with actual end-user demand. CW1 explained that under this "move out" model, Elanco representatives, including CW1, focused on helping distributors identify consumer-buying trends and market opportunities. CW4 echoed that in 2017 under Eli Lilly, Elanco was focused on balancing channel inventory sale to end-user demand, specifically "clean[ing] it up" so that channel inventory would look good to investors as Elanco prepared for its IPO.

49.     Then, according to CW2, in or around 4Q 2017, in order to begin pushing more sales, Loew introduced a sliding scale of margins, adjusted quarterly, based on the amount of product distributors purchased. For example, "MWI was held to a certain amount of buy from us, and if they didn't make it, then their margin dropped." CW2 commented that "[n]obody does this. You should be able to give your client at least annually visibility" on their margins. When making a presentation on the sliding scale of margins at a conference in 2018 in Florida, CW2 recalled that MWI executives' "jaws dropped." This type of strategy is consistent with the transition to a "move in" sales model, which incentivizes distributors to purchase as much product as possible, rather than aiming to balance sales to true end-user demand.

50.     In the months leading up to Elanco's September 2018 IPO, CW2 recounted that Elanco's top management became so consumed with hitting sales numbers to meet market expectations that the pressure to "stuff the channel" ramped up.   "Pre-IPO [management] couldn't stress it enough," CW2 recalled, in reference to the need to increase sales to meet projections.  CW1 similarly recalled that amid the impending IPO, hitting sales numbers became critical.  Likewise, CW4 recalled that "[w]hen 'move out' started to come short of projections, that's when [Elanco] start [sic] to 'move in' more," referring to the months leading up to the September 2018 IPO.

51.     According to CW1, Shriver analyzed the sales forecasts for all Elanco products to identify monthly and quarterly sales shortfalls in non-FA business units, which then dictated the amount of excess inventory that Elanco needed to sell to distributors in a given month or quarter. To compensate for the effect of those shortfalls on Elanco's overall revenues, Shriver would ask CW1 to sell excess inventory to, for example, MWI, to make up for that gap.  For example, in February 2018, CW1 recalled being asked "to bring in a million here, an extra $2 million there, to close the gap on another business segment that wasn't doing well."

52.     Also during 1Q 2018, Shriver directed CW2 to work with MWI to "figure out which products [MWI could] take and stuff it in," and "it doesn't matter how you get it in." Ultimately, Shriver directed CW2 to stuff the MWI channel with an additional $3 million of Interceptor Plus and Trifexus, two popular Companion Animal medications used to treat worms and fleas, even though MWI was already holding 75-80 days of both products.  To accomplish this directive, CW2 recalls that Elanco increased MWI's margin on Trifexus from 18% to 20%.

53.     CW1 recalled that in or around 2Q 2018, Shriver and an IPO consultant specifically directed CW1 to switch to a "move in" model, whereby the focus shifted to selling as much of Elanco's products to distributors as possible, regardless of end-user demand.  Under the "move in" model, CW1 noted, "we were asking [distributors] to bring in inventory in excess of anything they could have moved [out]."  Similarly, CW4 recalled that "by mid-2018" the shift to selling as much of Elanco's products to distributors as possible, regardless of end-user

demand, had "started again."

C.    **Elanco Continued to Rely On Concealed Channel Stuffing to Show Growth During the Class Period, Obscuring the Risks Posed By Increasing Channel Inventory**

54.    As the Class Period progressed, Elanco relied even more heavily on increased rebates, discounts, and extended payment terms to boost sales and incentivize distributors to take on large amounts of excess inventory.  CW4 recalled that the "move in" model was in full force by late 2018, with Elanco offering discounts, additional rebates, and extended payment terms to induce distributors to purchase more and more inventory regardless of end-user demand.

55.    But these sales practices came with undisclosed risks.  As recounted by CW2, these types of practices cannibalized Elanco's ability to make future sales because "when you stuff the channel, the following quarter you're not gonna make it."  According to CW4, "[y]ou post a good quarter, some of which is pre-sale"—referring to pulling future sales into the current quarter—but eventually "your growth rate suffers."

56.    According to CW2, Elanco typically offered all its distributors of companion animal products discounts in the range of a 1% to 3% discount off Elanco's regular sales price.  CW2 also recalled that Elanco would offer a rebate of 2% to 4% of the net revenue, paid annually, from a distributor's companion animal product purchase.  According to CW2, Elanco would offer *additional* rebates as incentives on top of increased discounts in order to entice customers to purchase more product.  According to CW1, even if the distributors "didn't care to expend themselves" in a particular month—meaning, even if they did not need to purchase additional inventory in that month—they "didn't want to leave money on the table."

57.    According to CW3, Elanco would offer increased incentives to distributors in exchange for a purchase order that exceeded the distributors average monthly purchase.  For example, during a single quarter in 2019, Elanco sold $10 million of product to Animal Health International, a Patterson subsidiary, in exchange for a 5% rebate, while Nutra Blend received a 20% rebate to incentivize Nutra Blend to make a larger purchase in excess of its needed inventory.  Additionally, if a distributor made its purchases in the last week of a quarter, Elanco

would offer a 10% rebate.  Lastly, CW3 recalled that Elanco offered a 5% rebate if a distributor held inventory that went unsold for more than 90 days.  In other words, Elanco incentivized distributors to purchase in excess of 90 days inventory.

58.     According to CW1, CW2, and CW3, the industry standard practice for distributors of veterinary products, feed additives, and/or Food Animal vaccines is to hold between 45 and 60 days' worth of inventory.

59.     According to CW1, one of the special incentives offered to CW1's accounts was that if a distributor purchased excess inventory, Elanco would offer extended payment terms of 120 days—30 days more than the 90-day payment term typically offered.

60.     According to CW1, MWI would typically purchase approximately $12 million in feed additive on a monthly basis.  If needed, Shriver would then typically direct CW1 to push MWI to purchase approximately $2 million in additional cattle feed additives and vaccines on top of MWI's $12 million monthly purchase.  However, "[t]he biggest ask was in 4Q," when demands from Shriver for CW1 to push excess inventory grew to $10-12 million in *additional* inventory.  Specifically, CW1 recalled that by 4Q 2018, inventory levels of feed additives and cattle vaccines were at 120 days at Elanco's major distributors, double the industry standard.

61.     In 1Q and 2Q 2019, Shriver instructed CW3 to sell an additional $2 million and $5 million of large animal products to CW3's distributors, respectively.  At the end of 2Q 2019, when MWI was already holding more than 60 days of inventory for feed additives, Shriver directed CW1 to sell an additional $10 million that quarter on top of MWI's normally scheduled $9-$10 million purchase.  In order to convince MWI to make such a large additional purchase, CW1 offered an additional rebate of 3%, which grew to an additional 5% on top of the standard discount as the year progressed.

62.     CW1 also recalled that by around mid-2019, MWI had taken on so much extra inventory that MWI had to rent warehouse space and use tractor-trailers in Amarillo, Texas to store the surplus product MWI purchased from Elanco.

63.     In September 2019, CW3 recalled a telephone conversation with Shriver in which Shriver said that while meeting with Simmons at Elanco's headquarters, Simmons told him "to make the quarter, no matter what."  In or around that same time, CW3 also recalled Shriver telling CW3 that Simmons was particularly worried about a competitor's introduction of a generic form of Rumensin[3] and was thus eager to push out Elanco's Rumensin inventory. Ultimately, Shriver directed CW3 to sell an additional $5 million for that quarter amongst MWI, Covetrus, and Patterson even though each customer was already "bursting" with inventory.

64.     In September 2019, Shriver asked CW1 to push an extra $10 million in cattle feed additives (which includes Elanco's biggest revenue generator Rumensin) and Micatil, a cattle vaccine, on MWI, to meet Elanco's 3Q 2019 revenue forecast.

65.     In the last week of 3Q 2019, CW3 recalled that a fellow National Account Manager, using the 10% rebate incentive Elanco offered to distributors purchasing in the last week of a quarter, successfully sold an extra $20 million of inventory to distributor Nutra Blend.

66.     In September 2019, Zoetis announced its plans to launch Simparica Trio (a triple combination antiparasitic medication for dogs that prevents heartworm, fleas, and ticks in one pill) in early 2020.  Simparica Trio stood to threaten Elanco's sales of its products Trifexis (heartworm and fleas), Interceptor Plus (heartworm) and Credelio (fleas and ticks), among others.  According to research conducted by Umer Raffat ("Raffat") of Evercore ISI, an analyst who covered Elanco since around the time of its IPO and the specialty pharma industry for at least five years, in order to defend against Zoetis's anticipated release of Simparica Trio, Elanco created additional financial incentives for distributors to purchase 90+ days of inventory (up to 120+ days) so that distributors would be sitting on a lot of extra Elanco inventory when the Simparica Trio launch actually occurred.  The observation that Elanco would stuff the channel in anticipation of Zoetis's Simparica Trio launch was echoed by Zoetis itself.  On a February 13, 2020 conference call to discuss Zoetis's 4Q 2019 results, a Zoetis representative stated that they

---

[3] Monovet90, a generic form of Rumensin, was approved by the FDA on July 1, 2019.

expected competitors would "try to stuff the channels or sell-in and fill up the shelves as best they can."

67.     According to CW4, Elanco's employment of a technique called "pre-sale," whereby Elanco would pull sales from future quarters into the current quarter by selling extra inventory to distributors, become progressively worse in 2019, with Elanco hitting its peak in 4Q 2019.  According to CW2, by 4Q 2019, MWI had purchased so much excess Elanco inventory that it had approximately 100 to 120 days of inventory of Companion Animal products—*far* beyond the typical 45- to 60-day average.  Likewise, according to Raffat's channel research, if a distributor committed to carrying 90 days of inventory, Elanco offered a 0.75% rebate.  If the distributor committed to carrying an additional 30 days of inventory (equaling 120+ days), then Elanco offered a rebate of up to 1%.

68.     According to CW3, at least one distributor, Nutra Blend, pushed back in 1Q 2020, saying, "we're not doing this anymore."

69.     According to CW4, Young hosted monthly "financial meetings" during the Class Period, which CW4 attended.  In connection with these meetings, CW4 reviewed the relevant sales data, which was prepared by Young on a monthly basis, and "saw a consistent delta between dispensing numbers and selling numbers."  According to CW4, during these meetings in 2019, senior executives challenged Simmons on Elanco's apparent channel stuffing, which CW4 understood to be occurring "based on the numbers, consumption, … what the distributors [were] selling and what [we sold] them."

**D.     Further Undisclosed Distributor Changes and Channel Stuffing in 4Q 2019 Pose Additional Concealed Risks To Elanco's Operations and Results**

70.     In Q4 2019, Elanco drastically changed its distributor sales strategy, cutting the number of primary distributors from eight (8) to four (4).  At the time, this material change to Elanco's channel distribution strategy was not disclosed to investors.  MWI, Covetrus, Patterson, and Midwest were the four distributors that survived the cut.

71.     According to CW4, even prior to the decision to consolidate distributors from 8 to 4, distributor inventory had been going "up and up and up."

72.     According to CW4, during the period of November to December 2019, the decision to consolidate the distributors in the Companion Animal division from eight to four "was made by the US management team," including Simmons and Young.  Regarding the consolidation of distributors, senior management, including CW4 and McKee, as well as "people in charge of different distributors", attended "weekly meetings in US management" to "keep your finger on the pulse" and discuss "ongoing updates of what was happening, who was buying."  These weekly senior management meetings, which were held in person at Elanco headquarters in Greenfield, Indiana, or telephonically, were "coordinated by the CFO [Young]."

73.     In addition to decreasing the number of distributors from eight to four in 4Q 2019, Elanco again switched its sales model, from the "move in" model that was implemented before the IPO, back to a "move out" model.  Thus, from 4Q 2019 onward, distributor incentives were based on inventory they ultimately sold to the end-user, rather than inventory bought by the distributor.  However, according to Raffat's channel research, Elanco set "move out" targets that were unrealistic and not in sync with end-user demand.  Moreover, around the same time, Elanco lowered its base margins offered on products sold.  All of these changes had the effect of reducing the incentive for Elanco's remaining distributors to continue to over-purchase and carry excess inventory.

74.     As CW4 explained, "[t]he distributors that got eliminated first that had inventory kept selling until they ran out."  CW4 recalled that as a result of the eliminated distributors still offloading their excess supply, "[t]he pick up [by remaining distributors] was delayed.  So it creates an accumulation of inventory" which was "a compounding factor at the end of 4Q 2019." In other words, because both the departing distributors and the remaining distributors were so over-saturated with excess inventory by 4Q 2019 that they needed to sell down, the four remaining distributors did not immediately purchase the same levels of inventory that the departing distributors had been purchasing.

**E.** **Subtle Changes to Elanco's SEC Filings in 3Q 2019 Suggest that Defendants Understood—But Did Not Disclose to the Market—the Risks of Increasing Channel Inventory and Elanco's 4Q 2019 Distributor Changes**

75.     While CW1 recounted that offering extended payment terms of up to 120 days was among Elanco's incentives to entice distributors to purchase excess inventory, in Elanco's 2018 Form 10-K and all of Elanco's quarterly SEC filings from the beginning of the Class Period until 3Q 2019, the Company reported it sold its products on payment terms of 30 to 100 days:

> Payment terms differ by jurisdiction and customer, but payment terms in most of our major jurisdictions typically range from 30 to 100 days from date of shipment.[4]

76.     Then, starting in the Company's 3Q 2019 Form 10-Q, Defendants subtly changed Elanco's description of its payment terms, without explanation, as follows:

> Payment terms differ by jurisdiction and customer, but payment terms in most of our major jurisdictions typically range from 30 to *120 days* from date of shipment.  (emphasis added.)

77.     Young later admitted, during the 4Q 2019 earnings call held on February 19, 2020, that Defendants made a "decision[] to extend terms in Q3" but insisted "we did not extend any terms in Q4" 2019.  In Elanco's 2019 Form 10-K, the Company stated that "[w]e have extended our payment terms in the past in certain customer situations and may need to continue this practice going forward as a result of competitive pressures and the need for certain inventory levels at our channel distributors to avoid supply disruptions."  Defendants did not explain that Elanco offered extended payment terms in order to induce distributors to purchase inventory far in excess of demand.

78.     In addition, for the first time in 3Q 2019, Defendants slipped in the following misleading and incomplete risk disclosure near the end of Elanco's "Forward-looking statements" disclaimer in its November 6, 2019 Form 8-K and press release and its 3Q 2018

---

[4] Substantially the same language appears in each of the following Form 10-Qs: 3Q 2018; 1Q 2019; 2Q 2019.

Form 10-Q filed two days later, which language did not appear in the Company's previous SEC filings during the Class Period:

- the impact of increased or decreased sales to our channel distributors resulting in higher or lower inventory levels held by them in advance of or trailing actual customer demand, which could lead to variations in quarterly revenue results;

79.     Defendants similarly slipped the following language into the Management Discussion and Analysis ("MD&A") section of Elanco's 3Q 2019 Form 10-Q, immediately following the revenue and net income figures for the period ending September 30, 2019, which language did not appear in the Company's previous SEC filings during the Class Period:

> ***Increases or decreases in inventory levels at our channel distributors can positively or negatively impact our quarterly and annual revenue results, leading to variations in quarterly revenues.*** This can be a result of various factors, such as end customer demand, new customer contracts, heightened and generic competition, the need for certain inventory levels, our ability to renew distribution contracts with expected terms, our ability to implement commercial strategies, regulatory restrictions, unexpected customer behavior, payment terms we extend, which are subject to internal policies, and procedures and environmental factors beyond our control, including weather conditions.

80.     Defendants did not discuss these subtle changes in language regarding channel distributors during Elanco's earnings conference call held on November 6, 2019.  Indeed, rather than meaningful cautionary language disclosing to investors the material risks of *actual* growing distributor inventory levels due to Elanco's undisclosed channel stuffing and the material risks that the *actual* planned changes to Elanco's distributors posed to Elanco's financial condition and results of operations, the language appears to have been carefully crafted by Defendants as a misleading hypothetical rather than the known risk that it was.  Indeed, it suggests that Defendants were well aware of the material risks of Elanco's growing channel inventory, which risks would only be heightened by Elanco's planned distributor changes, but they knowingly or recklessly concealed that growing inventory, and the risks it posed, from the market.

**F.     The Undisclosed Risks Materialize With Disappointing First Quarter 2020 Results Announced on May 7, 2020**

81.     On May 7, 2020, Elanco announced that "[w]ith the liquidity and working capital pressure from COVID, distributors are managing their inventory more tightly. Consequently, in Q1, we reduced the amount of product in distributor inventory by approximately $60 million, mainly in the US companion animal space, and we expect to further reduce an additional $80 million to $100 million mainly in the second quarter[.]"

82.     Simmons explained during the earnings call held the same day that "[t]he COVID-19 pandemic has impacted Elanco in Q1, particularly the effect on our commercial distribution partners' liquidity and thus actions that the pandemic has prompted us to take in working with them … The decline in our Q1 revenue is a direct result of these discrete commercial actions."   Simmons went on to cite the COVID-19 pandemic for "creat[ing] significant working capital and liquidity pressures and uncertainty on near-term end customer demand for [Elanco's] distributors, prompting reductions in the amount of inventory they hold." Simmons emphasized that "[t]he reduction in channel inventory [was] a structural change with [Elanco's] distribution partners and was a move brought on by COVID-19 pandemic."

83.     When pressed by an analyst on the distributors' inventory levels leading into 1Q and whether they were at "unusually high levels heading into 1Q," Simmons misleadingly responded as follows:

> So, let me be clear that over time, over the 13 years since starting our companion animal business, we've been in this very similar buy-sell where we actually buy – the distributors buy the product and represent the product. And let me just really highlight, it's varied over time. We look at three things – or have looked at three things consistently every quarter with our distributors: 90-day trailing demand, so a very disciplined process; campaigns that are in place; and the upcoming season that's ahead. And that's been our criteria over the years….
>
> * * *
>
> Now, factors that I would say have changed over time is, one, our distribution network has become more concentrated. There's varying differences between them. So, we started to move towards tightening terms and tightening the number of distributors, and this was an evolution. And as we mentioned, this was not

something we expected to do in the beginning of the year, but COVID really drove this working capital and concern about vet clinic working capital and our distributors, so they were unable to continue to do this….

84.     But rather than the distributor liquidity crisis cited by Defendants, a review of the financials of the major distributors paints a different picture; in fact, each appears to have had a healthy cash balance during 4Q 2019 and 1Q 2020, which continued into 2Q 2020:

| Cash Balances (in millions) | | | | | | |
|---|---|---|---|---|---|---|
| Distributor | 1Q19 | 2Q19 | 3Q19 | 4Q19 | 1Q20 | 2Q20 |
| ABC (MWI)[5] | $2,876 | $3,000 | $3,374 | $3,233 | $3,692 | $3,420 |
| Covetrus[6] | $73 | $55 | $68 | $130 | $205 | $414 |
| Patterson[7] | $96 | $110 | $130 | $106 | $78 | $120 |

85.     Furthermore, ABC/MWI—which was *by far* Elanco's largest single distributor, representing approximately 13% of the Company' overall revenue in 2019—reported free cash flow in 1Q 2020 that was significantly *better* than it had reported for any quarter in 2019. Moreover, while Covetrus experienced a free cash flow dip in 1Q 2020 and Patterson experienced a dip in Q4 2019 and Q1 2020, as demonstrated in the chart below, both companies had experienced cash flow fluctuation at various quarters during 2019—and these two companies combined barely accounted for the same levels of Elanco's sales as its most important distributor, ABC/MWI.

| Free Cash Flow (in millions) | | | | | |
|---|---|---|---|---|---|
| Distributor | 1Q19 | 2Q19 | 3Q19 | 4Q19 | 1Q20 |
| ABC (MWI) | $542 | $499 | $593 | $76 | $776 |

---

[5] For 2019, ABC/MWI held approximately 35% of the overall animal health distributor market and represented approximately 13% of Elanco's revenue.

[6] For 2019, Covetrus held approximately 29% of the overall animal health distributor market and represented approximately 7% of Elanco's revenue.

[7] For 2019, Patterson held approximately 27% of the overall animal health distributor market in 2019 and represented approximately 6% of Elanco's revenue.

| Covetrus | ($41) | $18 | $21 | $61 | ($87) |
| Patterson | ($55) | ($54) | $17 | ($164) | ($84) |

### G. After the Class Period, Defendants' Concealed and Misleading Channel Stuffing Is Exposed and Defendants Announce Further "Channel Inventory Reduction" for 2Q 2020

86.     In a J.P. Morgan analyst report on May 7, 2020 following Defendants' surprise 1Q 2020 announcement, JP Morgan observed that the "**ELAN new distributor approach came as a surprise to the Street**.... Historically, distributors have helped to promote Elanco's products with the company paying commission on product sales and distributors holding larger volumes of inventory of Elanco product."

87.     Other reports noted the impact of the distributor change on the 1Q 2020 results. A May 6, 2020[8] JP Morgan report stated: "ELAN reported a messy 1Q with sales ($639mm, -$63mm vs JPMe) coming in below expectations. The primary source of the miss is a $60mm reduction in channel inventory (which the company is reporting is based on a mix of <u>reduced demand due to COVID-19 as well as a re-evaluation of its distributor relationships</u> to focus more on direct demand generation)."  (emphasis added.)

88.     On July 28, 2020, Evercore ISI analyst Umer Raffat, who covered the pharma and specialty pharma industry for at least five years and covered Elanco since its IPO, hosted an hour-long webinar on Elanco titled, "Digging into the channel inventory issues & implications."

89.     Among other things, Mr. Raffat, based on his experience covering the industry and Elanco, in particular, concluded that:

> I do think that ***Elanco worked their inventories up to more than what*** was ***appreciated by the street*** and that's what weighed in on their free cash flows, that theoretically weighed in on a bunch of different aspects of the company. Including what the underlying growth looks like, because ***the growth they've been reporting on volume does not mimic what the end user demand was***.

---

[8] Elanco's 1Q 2020 results were announced after the close of the market on May 6, 2020.9

90.     Mr. Raffat noted that supposed distributor liquidity problems caused by COVID-19 "was something that Elanco really flagged as a key reason why it all [meaning the 1Q 2020 inventory write-down and disappointing revenue] happened."   Mr. Raffat then examined Defendants' proffered explanation of Elanco's 1Q 2020 inventory write-down as being a "direct result" of COVID-19-caused liquidity problems at Elanco's distributors, in light of his analysis of the actual financial condition of Elanco's major distributors, in particular that "ABC is not having liquidity problems," and that "I don't know if I fully agree with [Elanco's COVID-related explanation] by the way and I'll explain why.  If COVID is a driver, it's not the biggest driver in my opinion."   Instead, Mr. Raffat observed that the sales drop in 1Q 2020 was more likely caused by Elanco's practice of selling inventory in excess of end-user demand (in other words, channel stuffing) and the changes in distributor sales strategy during 4Q 2019.

91.     In making these observations, Mr. Raffat also flagged the subtle change in Elanco's forward-looking statements risk disclosure, which cautioned for the first time in 3Q 2019 that "the impact of increased or decreased sales to our channel distributors resulting in higher or lower inventory levels held by them in advance of or trailing actual customer demand, which could lead to variations in quarterly revenue results."   Mr. Raffat noted that Elanco made this subtle disclosure change just prior to the time that it cut its distributors from eight to four, and noted that it was not disclosed at the time:

> Elanco said the decision to cut the number of distributors from 8 down to 4 was a very important change.  In my opinion, that was key, that was critical.  Now, before we proceed, an important question comes up.  When did Elanco cut the number of distributors from 8 down to 4?  Cause that's a very meaningful change, eliminating your regional distributors, that's a very big change in your commercial strategy.  Very material, in my opinion.  Turns out, this was done in December.  And my question is, hang on, when did you guys disclose this?

92.     The 4Q 2019 distributor changes and the material risks relating thereto were not discussed by Defendants in the Company's January 10, 2020 guidance call, the January 14, 2020 JP Morgan Healthcare Conference, nor in the 2019 Form 10-K.

93.   On July 30, 2020, Defendants admitted that Elanco had experienced a second consecutive negative quarter in a row, announcing disappointing 2Q 2020 results "driven by lower volume" in all four of Elanco's primary business segments.  Defendants explained in a Form 8-K and press release published that day, in relevant part, that:

> **Total Revenue for the second quarter was $586.3 million, a decrease of 25 percent. On a constant currency basis, Total Revenue declined 23 percent primarily due to a reduction in channel inventory and lower demand resulting from the COVID-19 pandemic.**

> * * *

> **In the second quarter, Elanco completed the previously communicated channel inventory reduction**, moving to inventory levels across the world and across species that represent the minimum necessary to allow our distributors to maintain strong service levels with their end customers. **This created an approximate $100 million revenue decrease in the period**, with approximately $45 million from U.S. Companion Animal, $45 million from U.S. Food Animal, and $10 million from our International business. We do not anticipate further reductions in overall channel inventory levels.

## VI.   DEFENDANTS' VIOLATIONS OF THE EXCHANGE ACT

### A.   Defendants' Materially False and Misleading Statements and Omissions In Violation of the Exchange Act

#### 1.   The IPO Registration Statement[9]

94.   The Class Period begins on September 20, 2018, when Elanco's securities began publicly trading pursuant to the IPO Registration Statement.  The IPO Registration included the following materially misleading statements regarding Elanco's financial performance for the six months ending on June 30, 2018:

> For the six months ended June 30, 2018 and 2017, our revenue was $1.5 billion and $1.4 billion, respectively, and for each of the years ended December 31, 2017, 2016 and 2015, our revenue was $2.9 billion. For the six months ended June 30, 2018 and 2017, our net income (loss) was $9.9 million and $(128.5) million, respectively, our adjusted EBITDA was $306.2 million and $278.4 million,

---

[9] Throughout this section, bold and/or italic emphasis is in original; underscore emphasis is added.

respectively, and our adjusted net income was $219.0 million and $156.4 million, respectively.

95.     The IPO Registration Statement included the following misleading statement regarding Elanco's growth strategies:

### Our Targeted Value-Generating Strategies

We intend to <u>continue to grow our business and create value for our shareholders through a targeted value-generating strategy with three key pillars</u>: a Portfolio Strategy for our marketed products, an Innovation Strategy for our R&D pipeline and a Productivity Strategy for our margin expansion initiatives.

* * *

### *Portfolio Strategy*

***Invest in categories with the greatest potential for growth.*** We are focusing the majority of our resources, including more than 75% of our R&D funding, on our three targeted growth categories: CA Disease Prevention, CA Therapeutics and FA Future Protein & Health, where we believe <u>we are well positioned to grow faster than the market</u>. These categories represented 54% of our revenue in 2017.

- CA Disease Prevention — Parasiticides and vaccines are fundamental to preventing disease in companion animals. We have a strong vaccines portfolio as well as products that protect pets from a broad spectrum of parasites, such as fleas, ticks, heartworms, roundworms, hookworms, whipworms and tapeworms. <u>We believe we are well positioned to drive additional growth through continued product innovation and sales channel expansion</u>.

- CA Therapeutics — Pets are living longer and owners increasingly seek treatments for chronic diseases in their pets. <u>To capitalize on these trends, we are focused on driving growth in our CA Therapeutics category by building on our broad base of pain and osteoarthritis products</u>.

- FA Future Protein & Health — <u>We expect to drive revenue growth through our poultry and aquaculture portfolios</u>. Poultry and aquaculture are expected to be among the fastest growing animal health protein sources over the next 10 years. We also are focused on nutritional health products and antibiotic stewardship that address market trends in this category.

***Reinforce our strong presence in our FA Ruminants & Swine category.*** We plan to continue fortifying our long-standing FA Ruminants & Swine category to <u>meet our customers' needs through targeted product investment and by continuing to strengthen our deep business-to-business relationships through sales force</u>

<u>excellence and leadership in industry coalitions</u>. We also plan to continue to utilize analytics, social media and other support to provide value to our customers beyond our products.

96.     The foregoing statements in ¶¶94-95 regarding Elanco's financial results and growth strategies are materially false or misleading because: (i) Defendants misrepresented and failed to disclose that during the six months ending June 30, 2018, Elanco had implemented systematic and undisclosed channel stuffing practices that misleadingly inflated the Company's revenue, net income, and appearance of year-over-year growth; and (ii) to meet its financial targets and market expectations for the IPO, Elanco was reliant upon undisclosed and risky channel stuffing practices, practices that Defendants knew or recklessly ignored had the effect of both artificially inflating the Company's immediate financial results and risking substantial negative impact on the Company's sales and growth going forward.

97.     The IPO Registration Statement also contained the following misleading and incomplete "risk factors" regarding Elanco's "distribution channels" and "inventory management":

> ***For our companion animal products, increased use of alternative distribution channels, or changes within existing distribution channels, could negatively impact our market share, margins and distribution of our products.***
>
> * * *
>
> In addition, if one or more of our companion animal distributors discontinues or modifies their relationship with us, our business, financial condition and results of operations may be materially adversely affected. For example, in 2017, a change in our U.S. inventory management practices resulted in a revenue lag as existing inventory was sold down, which management estimates decreased our revenue by approximately $35 million.

98.     The IPO Registration Statement also included the following misleading and incomplete "risk factors" regarding sales of its top products:

> ***Our results of operations are dependent upon the success of our top products.***
> If any of our top products experience issues, such as disruptive innovations or the introduction of more effective competitive products,  negative publicity, changes to veterinarian or customer preferences, loss of patent protection, material product liability litigation, new or unexpected side effects, manufacturing disruptions and/or regulatory proceedings, our revenue could be negatively impacted, perhaps

significantly. Our top five products, *Rumensin*, *Trifexis*, *Maxiban*, *Denagard* and *Tylan Premix*, contributed approximately 29% of our revenue in 2017. Any issues with these top products, particularly *Rumensin*, which contributed approximately 10% of our revenue in 2017, could have a material adverse effect on our business, financial condition and results of operations.

99.     The foregoing statements regarding Elanco's "risk factors" in ¶¶97-98 were materially false and/or misleading because: (i) Defendants misrepresented and failed to disclose that during the run-up to the IPO in 2018, Elanco had already materially changed its distribution sales strategy to a model that inflated sales far in excess of end-user demand, implementing practices that Defendants knew or recklessly ignored had the effect of both artificially inflating the Company's immediate financial results and risking substantial negative impact on the Company's sales and growth going forward; (ii) specifically, that beginning in early 2018 and continuing in the months running up to the IPO, Elanco materially changed its model from the 2017 "move out" model that sought to balance sales to end-user demand, to instead implement a "move in" model that incentivized sales to distributors far in excess of end-user demand with the effect of "over-stuffing" the sales channels; and, (iii) as a result of the foregoing, sales of its top products were at significant risk going forward.

100.     Defendants' MD&A section in the IPO Registration Statement also included the following misleading description of Elanco's "targeted value creation strategy":

> **Product Development and New Product Launches**
> <u>A key element of our targeted value creation strategy is to drive growth through portfolio development and product innovation</u>, primarily in our three targeted growth categories. Our nine product launches between 2015 and 2017 have had a significant positive impact on our revenue over those periods, and we expect new products and innovation will continue to have a positive impact on our revenue in the future. Revenue from these product launches contributed $143.8 million to revenue for the year ended December 31, 2017 and $136.6 million to revenue for the six months ended June 30, 2018. We continue to pursue the development of new chemical and biological molecules through our approach to innovation. <u>Our future growth and success depends on both our pipeline of new products, including new products that we may develop through joint ventures and products that we are able to obtain through license or acquisition, and the expansion of the use of our existing products</u>. We believe we are an industry leader in animal health R&D, with a track record of product innovation, business development and commercialization.

101.    The foregoing statements in ¶100 regarding Elanco's "value creation strategy" and growth drivers were materially false and/or misleading because: (i) Defendants failed to disclose that during the run-up to the IPO in 2018, Elanco had implemented systematic channel stuffing practices that misleadingly inflated the Company's appearance of growth; and (ii) Defendants knew or recklessly ignored that Elanco's undisclosed and risky channel stuffing practices had the effect of both artificially inflating the Company's immediate financial results and risking substantial negative impact on the Company's sales and growth going forward.

102.    The IPO Registration Statement also failed to provide material information required by Item 303 of SEC Regulation S-K ("Item 303"), 17 C.F.R. §229.303(a)(3)(ii), which mandates that securities issuers such as Elanco disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Similarly, the regulation requires that registration statements disclose events that the registrant knows would "cause a material change in the relationship between costs and revenues" and "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected." 17 C.F.R. §229.303(a)(3)(i), (ii).  Here, the IPO Registration Statement was materially false and misleading because it failed to disclose the following known adverse trends and/or uncertainties that Defendants were required to disclose under Item 303, including: (i) beginning in early 2018 and continuing in the months running up to the IPO, Elanco materially changed its distribution sales model from the 2017 "move out" model that sought to balance sales to end-user demand, to instead implement a "move in" model that incentivized sales to distributors far in excess of end-user demand with the effect of "over-stuffing" the sales channels; and (ii) Elanco's reliance on systemic and undisclosed channel stuffing practices, would, or was reasonably expected to, have a material negative impact on the Company's sales, revenues, and/or results of operations going forward.

### 2.    3Q 2018 Financial Results and Earnings Call

103.    On November 6, 2018, Elanco filed a Form 8-K and press release announcing its

3Q 2018 financial results, reporting, in relevant part:

- ***Third quarter revenue grew 9 percent to $761.1 million.***

- ***Revenue, excluding strategic exits, grew 13 percent to $733.4 million; removing the impact of foreign currency exchange rates, growth was 15 percent.***

- ***Reported net income grew $80.9 million in the third quarter to $60.2 million, which represents $0.16 per diluted share and $0.29 per diluted share on an adjusted basis.***

* * *

- ***2018 revenue is expected to be between $3.05 billion and $3.08 billion. Earnings per share (EPS) for 2018 are expected to be in the range of $0.31 to $0.33 on a reported basis and $1.14 to $1.16 on an adjusted basis.***

* * *

"We are pleased to have met our expectations in our first quarter as a publicly traded company. Our results reflect the broad-based momentum established as we have executed against our strategy," said Jeff Simmons, President and Chief Executive Officer of Elanco. "Looking back at the last nine months, Elanco has accelerated growth by delivering on our commitment to innovation and continuing progress on our aggressive margin expansion agenda to increase profitability and unlock value for shareholders."

* * *

**Companion Animal Disease Prevention** revenue increased 34 percent for the quarter, primarily driven by volume and increased price partially offset by an unfavorable impact from foreign exchange. Growth was primarily driven by higher realized price on Trifexis®, as well as a favorable comparison to prior year related to an anticipated stock-out in the third quarter of 2017, which shifted sales to the second quarter of 2017. Growth was also driven by the continued uptake of Interceptor ® Plus and Credelio, as well as increased sales of certain vaccines from new customer agreements.

**Companion Animal Therapeutics** revenue increased 27 percent for the quarter, driven both by volume and increased price, partially offset by an unfavorable impact from foreign exchange. Growth was primarily due to the re-introduction of

the 100mg dosage of Galliprant, continued uptake of the product and realized price increases across the category.

* * *

**Food Animal Ruminants & Swine** revenue increased 8 percent for the quarter, driven by volume, partially offset by an unfavorable impact from foreign exchange. Growth was driven mainly by U.S. and international purchasing patterns in both the current and prior year.

104.    During the November 6, 2018 earnings call to discuss 3Q 2018 results, Simmons made the following additional false or misleading statements:

First, as you know, we returned to growth this year and are pleased to say we have accelerated that growth during Q3.

We saw strong performance in our targeted growth categories, and we continue delivering on our commitments to achieve a sustainable flow of innovation with new product approvals, several new launches, and an R&D collaboration. Finally, our margin expansion efforts continue to progress. Ultimately, we met our expectations for delivery in our first quarter as a publicly traded company.

* * *

Our portfolio accounted for top-line revenue of $761.1 million, an increase of 9%, or 11% without the impact of foreign exchange. While most importantly, revenue, excluding strategic exits, what we call core revenue, grew 13% to $733.4 million, or 15% without the impact of foreign exchange. This performance is consistent with our expectations for the quarter.

As a group, our targeted growth categories -- Companion Animal Disease Prevention, Companion Animal Therapeutics, and Future Protein & Health -- grew 19% in constant currency.

* * *

Transitioning over to slide 6, this summarizes the constant currency growth of targeted categories for the quarter and year to date. You can see all categories contribute positively to our growth, offset by the impact of strategic exits.

While some of the growth rates in Q3 are quite large due to purchasing patterns, the year-to-date results are more in line with our goals and strategy. This demonstrates our strategy is performing as expected and we are tracking towards our goals.

105.    During the same November 6, 2018 third quarter earnings call, Elanco's then acting-CFO, Lucas Montarce ("Montarce"), made the following additional false or misleading

statements regarding revenue and growth during the third quarter:

> As Jeff mentioned earlier, core revenue increased 13%. Core revenue excluded strategic exits, which are businesses that we have exited or we have made a decision to exit.  Revenue growth this quarter was driven by the uptake of new products, performance of mature products, and the favorability of purchase pattern from last year.

* * *

> At the bottom, line net income increased 108% to $107.4 million. We achieved these significant earnings growth by delivering nearly double-digit revenue growth while improving our margins and reducing our operating expenses…

> Moving to slide 10, let's take a look at the effect of price, rate, and volume on revenue growth. This quarter, the effect of foreign exchange was a 2% headwind overall. Excluding this, our core revenue growth on a performance basis was 15%, volume growth was 11%, while price growth was 4%.

* * *

> Companion Animal Disease Prevention, which includes parasiticides and vaccines, grew 35% in the quarter: 22% from volume and 13% from price. These results were driven by growth in Trifexis from higher realized price as well as a favorable comparison to prior year, including an anticipated stock-out in Q3 in 2017, which shifted sales to the second quarter, the continued uptake of Interceptor Plus and Credelio, and an increased sales of certain vaccines from new customer agreements.

> Companion Animal Therapeutics grew 28% in the quarter: 21% from volume and 7% from price, driven by the reintroduction of Galliprant 100-milligram presentation for large dogs, continued overall growth of the product, and realized price increase.

> Future Protein & Health grew 2% in the quarter: 3% from price, offset by a 1% volume decline, driven by growth in aqua, vaccines, and nutritionals, partially offset by current-year international purchase pattern in poultry. Note that year-to-date growth in Future Protein & Health is 9%.

> Ruminants & Swine grew 9% in the quarter, all from volume. Growth was driven mainly by US and international purchase patterns in both the current and prior year and the performance of key mature brands and our cattle vaccine. Note that year-to-date growth in Ruminants & Swine is 2%, consistent with our expectations.

106.   The foregoing statements in ¶¶103-05 regarding Elanco's 3Q 2018 financial results and growth were materially false or misleading because: (i) Defendants misrepresented

and failed to disclose that Elanco was reliant upon systematic and undisclosed channel stuffing practices that misleadingly inflated the Company's revenue, net income, and appearance of growth; and (ii) Defendants knew or recklessly ignored that these systemic and undisclosed practices had the effect of both artificially inflating the Company's immediate financial results and risking substantial negative impact on the Company's sales and growth going forward. Moreover, Simmons' statement that "our strategy is performing as expected and we are tracking towards our goals" was materially misleading where Defendants misrepresented and failed to disclose that Elanco was meeting its targets through undisclosed channel stuffing and distributors were carrying unsustainable levels of inventory as a result.

107.     In response to direct analyst inquiry about Elanco's step-up in growth in the CA Therapeutics business, Montarce misleadingly responded as follows:

> So to your second question in terms of the Q3 growth in Companion Animal Therapeutics.  As you highlighted, it's 28%: 21% from volume and 7% from price.  The strong volume growth can be attributed to the introduction of the Galliprant 100 milligrams [sedative].

> Once you normalize by that, the overall growth factor is 18% for the quarter: 7% from price and 11% from product from volume. Just to compare versus last quarter, actually Q2 growth was 15%. So you see actually again mid-double-digit growth, again both quarters. That is basically the trend that we are seeing in Companion Animal Therapeutics.

108.     The same analyst attempted to drill down further to see if the step-up in growth was "just a one-time step-up" or "a sustainable level of sales," Elanco's Head of Investor Relations, James Greffet ("Greffet"), misleadingly responded as follows:

> Certainly, yes, because there wasn't much inventory in the system, I think there needs to be a replenishment of the pool, so to speak.  There continues to be good pull-through demand there, so there might be a little bit of a lump, but the underlying fundamentals of that product are still pretty strong on the flow-through as well.

109.     The foregoing statements in ¶¶107-08 regarding the volume growth step-up and demand in Elanco's Companion Animal business were materially false or misleading because: (i) Defendants misrepresented and failed to disclose that Elanco was reliant upon systematic and

undisclosed channel stuffing practices that misleadingly inflated the Company's appearance of growth; (ii) Defendants knew or recklessly ignored that these systemic and undisclosed practices had the effect of both artificially inflating the Company's immediate financial results and risking substantial negative impact on the Company's sales and growth going forward; and (iii) due to Elanco's changes in its distributor sales model from the 2017 "move out" model to the "move in" model implemented in 2018, Elanco's quarterly sales to distributors were substantially exceeding end user demand.

110.    On November 8, 2018, Defendants filed Elanco's Form 10-Q for the quarter ending September 30, 2018 (the "3Q 2018 Form 10-Q").    The 3Q 2018 Form 10-Q repeated the same misleading financial results announced in the 3Q 2018 Form 8-K and press release.  In addition, Defendants' MD&A in the 3Q 2018 Form 10-Q included the following misleading revenue and net income figures for the period ending September 30, 2018 as a year-over-year comparison:

> For the three months ended September 30, 2018 and 2017, our revenue was $761.1 million and $697.1 million, respectively.  For the three months ended September 30, 2018 and 2017, our net income (loss) was $60.2 million and $(20.7) million, respectively.

> For the nine months ended September 30, 2018 and 2017, our revenue was $2,267.5 million and $2,134.7 million, respectively.  For the nine months ended September 30, 2018 and 2017 our net income (loss) was $70.1 million and $(149.2) million, respectively.

111.    The foregoing statements in ¶110 regarding Elanco's 3Q 2018 financial results, particularly regarding its revenue and year-over-year growth, were materially false and misleading because: (i) Defendants misrepresented and failed to disclose that Elanco was reliant on systematic and undisclosed channel stuffing practices that misleadingly inflated the Company's revenue, net income, and appearance of year-over-year growth; and (ii) Defendants knew or recklessly ignored that Elanco' reliance upon undisclosed and risky channel stuffing practices had the effect of both artificially inflating the Company's immediate financial results and risking substantial negative impact on the Company's sales, revenues and/or growth going

forward.

112.    The 3Q 2018 Form 10-Q also was materially false and misleading because it failed to disclose the following known adverse trends and/or uncertainties that Defendants were required to disclose under Item 303, including: (i) beginning in early 2018 and continuing in the months running up to the IPO, Elanco materially changed its distribution sales model from the 2017 "move out" model that sought to balance sales to end-user demand, to instead implement a "move in" model that incentivized sales to distributors far in excess of end-user demand with the effect of "over-stuffing" the sales channels; and (ii) Elanco' reliance on systemic and undisclosed channel stuffing practices continuing through 3Q 2018, would, or was reasonably expected to, have a material negative impact on the Company's sales, revenues, and/or results of operations going forward.

### 3.    2019 Financial Guidance

113.    On December 18, 2018, Elanco filed a Form 8-K and press release announcing its 2019 Financial Guidance, reporting, in relevant part:

> GREENFIELD, IND. (December 18, 2018) — Elanco Animal Health Incorporated (NYSE: ELAN) today announced its updated 2018 and initial 2019 financial guidance, including 2019 revenue expectations in the range of $3.10 billion to $3.16 billion. Elanco expects earnings per share (EPS) in 2019 of $0.36 to $0.48 on a reported basis and $1.02 to $1.12 on an adjusted basis. Revenue in 2018 is still expected to be between $3.05 billion to $3.08 billion. EPS in 2018 are being adjusted to $0.15 to $0.17 (from $0.31 to $0.33) on a reported basis due to restructuring actions as part of the company's productivity agenda and a charge due to an increase in contingent consideration liability. Adjusted EPS are still expected to be in the range of $1.14 to $1.16.

114.    The 2019 Financial Guidance included the following misleading and incomplete "Cautionary Statement Regarding Forward-Looking Statements" stating, in relevant part:

> Forward-looking statements are based on our current expectations and assumptions regarding our business, the economy and other future conditions. Because forward-looking statements relate to the future, by their nature, they are subject to inherent uncertainties, risks and changes in circumstances that are difficult to predict. As a result, our actual results may differ materially from those contemplated by the forward-looking statements. Important factors that could cause actual results to differ materially from those in the forward-looking statements include regional, national, or global political, economic, business,

competitive, market, and regulatory conditions including, but not limited to the following:

- heightened competition, including from new innovation or generics;

- the impact of disruptive innovations and advances in veterinary medical practices, animal health technologies and alternatives to animal-derived protein;

- changes in regulatory restrictions on the use of antibiotics in food animals, as well as changing market demand regarding the use of antibiotics and productivity products;

- our ability to implement our business strategies or achieve targeted cost efficiencies and gross margin improvements;

- consolidation of our customers and distributors;

- the success of our R&D and licensing efforts;

- our ability to successfully acquire target companies and integrate them into our existing operations;

- unanticipated safety, quality or efficacy concerns associated with our products;

- the impact of weather conditions and the availability of natural resources;

- changes in U.S. foreign trade policy, imposition of tariffs or trade disputes;

- the impact of global macroeconomic conditions; and

- the effect of the transactions involving the separation of our business from that of Lilly and distribution of Lilly's interest in us to its shareholders, if consummated, on our business.

115.    During the December 18, 2018 call to discuss the 2019 Financial Guidance, Simmons made the additional following false or misleading statements:

Elanco is driving the growth of our marketed portfolio of products where we can lead and can grow. We are delivering a sustainable flow of innovation, launching multiple new innovations again in 2018. . .Our strategy is sound, we have the foundation we need and we are in execution mode to deliver.

\* \* \*

Overall, we're pleased with the progress we made in 2018. We are meeting our expectations, achieving sales growth, delivering innovation, executing our margin expansion priorities and carrying momentum into 2019.

\* \* \*

On a like-for-like comparison across years, <u>we expect to grow 2019 earnings at a double-digit pace.</u>

* * *

<u>The fundamentals of our industry are strong, and our strategy sets us up to grow revenue, expand margins and bring new innovation.</u> Our focus is on execution. <u>We have prioritized our resources to our growth opportunities, and we're building the capabilities we need as an independent company.</u>

116.    During the same December 18, 2018 guidance call, Young made the following additional false or misleading statements:

In the shaded box, you can see that <u>the underlying operational growth and the benefits of the restructuring actions provide an expected 15% increase in adjusted EPS for 2019, well above the expected constant currency core revenue growth rate of 4% to 6%.</u>

* * *

For 2019, we expect total revenue between $3.10 billion and $3.16 billion. Excluding strategic exits, we expect core revenue of $3.04 billion to $3.10 billion. As Jeff indicated, when holding foreign exchange rates constant, <u>this would represent core revenue growth of 4% to 6%.</u>

117.    In response to direct analyst inquiry about Elanco's projected 4% to 6% constant currency core revenue growth, Elanco's Greffet misleadingly responded as follows:

<u>I'd say, our view of our portfolio, our pipeline and how we're looking at the business overall, those growth rates still feel representative how our business is operating.</u> So, I think that's a macro way of thinking about our growth. Quarter-by-quarter, year-by-year, there will be some variability. But we're looking at this on a long-term time horizon. So, <u>we think that's a reasonable profile of the underlying performance.</u>

118.    The foregoing statements in ¶¶113-17 regarding Elanco's 2019 Financial Guidance, growth, and Forward-Looking Statements were materially false and misleading because: (i) Defendants misrepresented and failed to disclose that Elanco was then-reliant on systematic and undisclosed channel stuffing practices that misleadingly inflated the Company's revenue, net income, and appearance of year-over-year growth in order to attain the projected targets; (ii) the Company's ability to achieve the targeted revenue range and targeted core revenue growth of 4%-6% was reliant, at least in part, on undisclosed and risky channel stuffing

practices; (iii) Defendants knew but did not disclose that changes to Elanco's distribution sales strategy in 2018, including its growing reliance upon undisclosed and risky channel stuffing practices, had the effect of both artificially inflating the Company's immediate financial results and risking substantial negative impact on the Company's sales and growth going forward; and (iv) Elanco's stuffing practices created a material risk in that artificially inflated sales caused customer inventory levels for key products to pile up (thereby inherently decreasing future demand), rendering the Company's forecasts unreliable and highly vulnerable to competitive or economic pressure.

### 4.    4Q and Full Year 2018 Financial Results and Earnings Call

119.    On February 6, 2019, Elanco filed a Form 8-K and press release announcing its 4Q and Full Year 2018 financial results, reporting, in relevant part:

- *Fourth quarter and full year revenue both grew 6 percent to $799.3 million and $3.1 billion, respectively.*

- *Core Revenue, which excludes strategic exits, grew 6 percent to $774.7 million in Q4; or 9 percent without the impact of foreign currency exchange rates.*

- *Full year reported earnings per share (EPS) increased by $1.34 to $0.28 compared to a loss of $1.06 per share in 2017; Adjusted EPS increased 71 percent to $1.18.*

\* \* \*

The results reflect strong volume growth and the execution of the company's targeted, three-pillar strategy focused on Portfolio, Innovation and Productivity. The results also reflect strong full year performance in its three targeted growth categories: Companion Animal Disease Prevention, Companion Animal Therapeutics and Food Animal Future Protein & Health.

"Our solid results for the full year demonstrate that our strategy is on track, we're executing efficiently and making strong progress against our strategy to deliver the results we promised to our customers, investors and employees," said Jeff Simmons, president and chief executive officer of Elanco. "Overall, the animal health market continues to display strong fundamentals that will drive growth going forward. We are well positioned to capitalize on these industry growth drivers and are optimistic about our ability to continue to drive top and bottom line growth with the momentum we are carrying into 2019."

* * *

**Companion Animal Disease Prevention** <u>revenue increased 43 percent for the quarter, primarily driven by volume</u> and increased price partially offset by an unfavorable impact from foreign exchange. Revenue growth improved in comparison to prior year due to a reduction in channel inventory in the fourth quarter of 2017. Growth was also driven by continued uptake in demand for Interceptor Plus and Credelio, and increased sales of certain vaccines from new customer agreements. Parastar® contributed unique growth in the quarter as we entered into a one-time agreement to sell all remaining inventory.

**Companion Animal Therapeutics** revenue decreased 6 percent for the quarter, driven by decreased volume and an unfavorable impact from foreign exchange, partially offset by increased price. The revenue decrease was impacted by both timing and availability of Galliprant® shipments. A planned shipment in late 2018 was delayed until early 2019 to appropriately complete the quality release process. In addition, <u>market demand for Galliprant continues to grow, exceeding supply capacity and resulting in Galliprant backorders at the end of the year</u>. Elanco is working diligently to expand production and expects to clear remaining backorders by late first quarter or early second quarter 2019.

**Food Animal Future Protein & Health** <u>revenue increased 8 percent for the quarter, driven by both volume and increased price</u>, partially offset by an unfavorable impact from foreign exchange. Growth was driven by poultry animal-only antibiotics and vaccines, as well as aqua products.

* * *

"Moving into 2019, we have a compelling value proposition, supported by our financial expectations for the year. <u>The combination of our revenue growth, the positive impact of our ongoing productivity agenda and the consistent flow of innovation we've created will continue to result in our ability to deliver consistent value to shareholders</u>," said Simmons.

120.    During the February 6, 2019 earnings call to discuss 4Q and Full Year 2018 results, Simmons made the following additional false or misleading statements regarding revenue and growth during the fourth quarter:

First, we are delivering on our financial goals. In 2018, <u>our core revenue grew 8%</u> and our adjusted EBIT margin, earnings before interest and tax, was 18%. That's a 400-basis point improvement in one year.

* * *

Our second highlight is we continue to deliver new innovation using an approach that should deliver a sustainable flow over time. 2018 was the fourth year in a row with three product approvals: Prevacent, Correlink and Experior. Finally, our new products are launching well.  <u>Sales in 2018 from the group of products launched over the past three years nearly doubled compared to 2017.</u> This portfolio now represents 9% of total sales.  Remember, it typically takes five to seven years for a product in animal health to reach peak sales, so we're excited for the continued potential in this portfolio of products. <u>Of note, Interceptor Plus, our oral product for heartworm and other worms reached blockbuster status, achieving more than $100 million in sales in 2018.</u> It's fourth year in the market.

\* \* \*

Our targeted growth categories, which again are Companion Animal Disease Prevention, Companion Animal Therapeutics and Future Protein & Health, now represents 60% of sales and are leading our growth. As we move to the innovation side of our strategy, our portfolio of innovation launched since 2015 grew 74% over Q4 2017 to $69.8 million in revenue, continuing to track to our expectations.

\* \* \*

And as we discussed in the 2019 guidance call, we've increased our sales projections for Galliprant and are working diligently to expand production. We had backorders of Galliprant at the end of 2018. We expect to clear them by late Q1 or early Q2. These backorders impacted the growth of Companion Animal Therapeutics. And then thirdly in Ruminants & Swine, growth in our cattle feed additives was offset by a softness in swine antibiotics, particularly in Asia and a stock-outage of Micotil.  <u>Importantly – very importantly, the underlying trends in our categories are solid and we're on track for our projected 4% to 6% core revenue growth for 2019.</u> These results also highlight the benefit of our approach as a portfolio innovator.

\* \* \*

In summary, I'll close by saying there are a few key themes that I hope you see in our results. First, as we close our first year as a public company, <u>we're delivering the top line growth and margin expansion that we expect.</u> This is a long journey and <u>we're tracking where we want to be.</u> Our targeted value-generating strategy also is working. Our newly launched products continue to grow, new products are being approved and our pipeline is solid.

This quarter, you again see the dynamics in our business and the fluctuations that can occur over the near-term. We look at our business in a long-term view and we encourage you to do the same. <u>We'll be as transparent as possible so that you understand the drivers impacting our results each period.</u>

121.    During the same 4Q 2018 earnings call, Young made the following additional

false or misleading statements regarding revenue and growth during the fourth quarter:

> Looking at the adjustment measures on slide 9, you'll see total Elanco revenue grew 6% in the quarter or 8% at constant exchange rates. <u>As Jeff mentioned earlier, core revenue increased 9% at constant exchange rates.</u> Core revenue excludes Strategic Exits, which are businesses we have exited or have made the decision to exit. Our focus is core revenue. <u>Revenue growth this quarter was driven by favorable comparisons from prior-year channel inventory that Jeff mentioned, continued uptake of our new Companion Animal Disease Prevention products, as well as our Future Protein & Health portfolio</u> that more than offset the quarterly headwinds in the other two categories.

* * *

> At the bottom line, Q4 adjusted net income increased 148% to $105.4 million. <u>We achieved this significant earnings growth by delivering strong revenue growth while improving our margins and reducing our operating expenses</u>. . . Moving to slide 10, let's take a look at the effect of price, rate and volume on revenue growth. This quarter, the effect of foreign exchange on quarter revenue was a 3% headwind overall. <u>Excluding this, our revenue growth on a constant exchange rate basis was 9%. Volume growth was 8% and price growth was 1%.</u> On this slide, you can see the breakdown of revenue across our four categories. I will focus on the constant exchange rate growth column. <u>Companion Animal Disease Prevention, which includes parasiticides and vaccines grew 45% in the quarter – 39% from volume</u> and 6% from price.

122.    The foregoing statements in ¶¶119-21 regarding Elanco's 4Q and Full Year 2018 financial results and growth were materially false or misleading because: (i) Defendants misrepresented and failed to disclose that Elanco, in order to meet its 2018 guidance, was reliant upon systematic and undisclosed channel stuffing practices that misleadingly inflated the Company's revenue, net income, and appearance of growth; and (ii) Defendants knew or recklessly ignored that these systemic and undisclosed practices had the effect of both artificially inflating the Company's immediate financial results and risking substantial negative impact on the Company's sales and growth going forward.  Moreover, Simmons' statement that "we're tracking where we want to be" was materially misleading where Defendants misrepresented and failed to disclose that Elanco was meeting its targets through undisclosed channel stuffing and distributors were carrying unsustainable levels of inventory as a result.

123.    In response to analyst inquiry about key headwinds and tailwinds in Elanco's four

FIRST AMENDED CLASS ACTION COMPLAINT
45

main revenue categories, Simmons misleadingly responded, in relevant part, as follows:

> KATHY MINER (COWEN): . . . And second of all on just the outlook on 2019 on the 4 key – your 4 revenue categories, can you tell us what you view as the sort of the key headwinds and tailwinds that we should watch for in each of those?
>
> * * *
>
> JEFFREY N. SIMMONS: On the pushes-and-pulls, there's lots of them, and I would just emphasize the point we opened up in the call and that is continue to look at aggregate results, continue to look at year-to-date results, there will be some variation by quarter, we're dealing with lots of species of animals in animal health with lots of geographies and lots of moving parts. <u>We also have transitioned this business, moved it back to growth,</u> feel very good about our long-term plans, but I would ask for understanding to look at this thing over time. And any specifics, you can always ask Jim and Katy for. We want to be very transparent with all of you. I think we feel – if you look at just the livestock industry overall, so that gets two categories, we feel very good overall about the beef market and just continue to see the recent big National Cattle Association meeting last week in the U.S. Cowherd expansion cycle continues to grow. We added some 510,000 head in 2019. That expansion is supposed to go up about another 180,000 and then level off. So beef continues to be I think stable, strong. . . And then when you look at the trends behind it again, we see nothing that would materially change our trajectories. <u>Companion Animal, I would focus heavy on our innovation and our growth drivers that we've talked about.</u> Products like Interceptor Plus, Galliprant and Credelio are early in the lifecycle, reaching towards those peak sales so we've got a lot of runway of growth there. And then they all fit into portfolios. I feel very good about our portfolio of vaccines, parasiticides and therapeutic products, so the continuing move of that. And I think <u>we'll continue to watch the channel emerge but at this point in time, we see nothing there that would impact our plans.</u>

124.    The foregoing statements in ¶123 regarding Elanco's "growth drivers" and "headwinds and tailwind" were materially false and/or misleading because: (i) Defendants failed to disclose that during 2018, Elanco had implemented systematic and undisclosed channel stuffing practices that misleadingly inflated the Company's appearance of growth; and (ii) Defendants knew or recklessly ignored that Elanco's undisclosed and risky channel stuffing practices had the effect of both artificially inflating the Company's immediate financial results and risking substantial negative impact on the Company's sales and growth going forward.

125.    On February 20, 2019, Defendants filed Elanco's Form 10-K for the period ending December 31, 2018 (the "2018 Form 10-K"). The 2018 Form 10-K repeated the financial

results announced in the February 6, 2019 Form 8-K and press release, and included the following misleading and incomplete "risk factors" regarding Elanco' "distribution channel" and "inventory management":

> ***For our companion animal products, increased use of alternative distribution channels, or changes within existing distribution channels, could negatively impact our market share, margins and distribution of our products.***
>
> \* \* \*
>
> In addition, if one or more of our companion animal distributors discontinues or modifies their relationship with us, our business, financial condition and results of operations may be materially adversely affected. For example, in 2017, a change in our U.S. inventory management practices resulted in a revenue lag as existing inventory was sold down, which management estimates decreased our revenue by approximately $35 million.

126.    The 2018 Form 10-K included the following misleading and incomplete "risk factors" regarding sales of its top products:

> ***Our results of operations are dependent upon the success of our top products.***
> If any of our top products experience issues, such as disruptive innovations or the introduction of more effective competitive products, negative publicity, changes to veterinarian or customer preferences, loss of patent protection, material product liability litigation, new or unexpected side effects, manufacturing disruptions and/or regulatory proceedings, our revenue could be negatively impacted, perhaps significantly. Our top five products, *Rumensin*, *Trifexis*, *Maxiban*, *Denagard* and *Interceptor Plus*, contributed approximately 31% of our revenue in 2018. Any issues with these top products, particularly *Rumensin*, which contributed approximately 11% of our revenue in 2018, could have a material adverse effect on our business, financial condition and results of operations.

127.    The foregoing statements regarding Elanco's "risk factors" in ¶¶125-26 were materially false and/or misleading because: (i) Defendants misrepresented and failed to disclose that during 2018, Elanco had already materially changed its distribution sales strategy to a model that inflated sales far in excess of end-user demand, implementing practices that Defendants knew or recklessly ignored had the effect of both artificially inflating the Company's immediate financial results and risking substantial negative impact on the Company's sales and growth going forward; (ii) specifically, that beginning in early 2018 and continuing throughout 2018, Elanco materially changed its model from the 2017 "move out" model that sought to balance

sales to end-user demand, to instead implement a "move in" model that incentivized sales to distributors far in excess of end-user demand with the effect of "over-stuffing" the sales channels; and, (iii) as a result of the foregoing, sales of its top products were at significant risk going forward.

128.    Defendants' MD&A in the 2018 Form 10-K also included the following materially false or misleading statements:

> **_Product Development and New Product Launches_**
> A key element of our targeted value creation strategy is to drive growth through portfolio development and product innovation, primarily in our three targeted growth categories. Our eleven product launches between 2015 and December 31, 2018, have had a significant positive impact on our revenue over those periods, and we expect new products and innovation will continue to have a positive impact on revenue in the future. Revenue from these product launches contributed $274.2 million to revenue for the year ended December 31, 2018. We continue to pursue the development of new chemical and biological molecules through our approach to innovation. Our future growth and success depends on both our pipeline of new products, including new products that we may develop through joint ventures and products that we are able to obtain through license or acquisition, and the expansion of the use of our existing products. We believe we are an industry leader in animal health R&D with a track record of product innovation, business development and commercialization.

129.    The foregoing statements in ¶128 regarding Elanco's "value creation strategy" and growth driver were materially false and/or misleading because: (i) Defendants failed to disclose that during the run-up to the IPO in 2018 and continuing in the quarter thereafter, Elanco had implemented systematic and undisclosed channel stuffing practices that misleadingly inflated the Company's appearance of growth; and (ii) Defendants knew or recklessly ignored that Elanco's undisclosed and risky channel stuffing practices had the effect of both artificially inflating the Company's immediate financial results and risking substantial negative impact on the Company's sales and growth going forward.

130.    The 2018 Form 10-K also was materially false and misleading because it failed to disclose the following known adverse trends and/or uncertainties that Defendants were required to disclose under Item 303, including: (i) beginning in early 2018 and continuing in the months running up to the IPO, Elanco materially changed its distribution sales model from the 2017

"move out" model that sought to balance sales to end-user demand, to instead implement a "move in" model that incentivized sales to distributors far in excess of end-user demand with the effect of "over-stuffing" the sales channels; and (ii) Elanco' reliance on systemic and undisclosed channel stuffing practices continuing through year-end 2018 would, or was reasonably expected to, have material negative impact on the Company's sales, revenues, and/or results of operations going forward.

### 5.   1Q 2019 Financial Results and Earnings Call

131.   On May 9, 2019, Elanco filed a Form 8-K and press release announcing its 1Q 2019 financial results, reporting, in relevant part:

- ***Expected 2019 revenue updated to be between $3.08 billion and $3.14 billion due to changes in foreign exchange rate assumptions; constant currency growth at 4 to 6 percent remains unchanged***

* * *

Greenfield, IN, May 9, 2019 - Elanco Animal Health Incorporated (NYSE: ELAN), today reported its financial results for the first quarter of 2019. The results reflect underlying volume growth and execution of the company's targeted, three-pillar strategy focused on Innovation, Portfolio and Productivity.

* * *

**Companion Animal Disease Prevention** revenue decreased 8 percent for the quarter, primarily driven by lower volume and price, as well as unfavorable impact from foreign exchange rates. Declines in older generation parasitcide products and vaccines were partially offset by continued growth in Credelio, Interceptor Plus and certain over-the-counter products. Year on year comparisons are also impacted by purchasing patterns.

**Companion Animal Therapeutics** revenue increased 31 percent for the quarter, driven by increased volume and to a lesser extent price, partially offset by the impact of foreign exchange rates. The revenue increase was primarily driven by sales of Galliprant. In the quarter, backorders in the channel were resolved and the product was launched in several European markets.

**Food Animal Future Protein & Health** revenue was flat for the quarter, driven by both volume and increased price, fully offset by an unfavorable impact from foreign exchange rates. Without the impact of foreign exchange rates, the category grew 5 percent. Growth was driven by the aqua portfolio and poultry vaccines, offset by timing of international purchasing patterns for other poultry products.

132.    During the May 9, 2019 earnings call to discuss 1Q 2019 results, Simmons made the following additional false or misleading statements regarding revenue and growth during the first quarter:

> I think it's particularly important to put our sales results into context. My key message is that the fundamentals of our business are strong and we are tracking to our goals.
>
> * * *
>
> The leading indicators of demand at the vet clinic are consistent with this longer term sales trajectory.
>
> * * *
>
> Our targeted growth categories, Companion Animal Disease Prevention, Companion Animal Therapeutics and Future Protein & Health grew 4% in the quarter and represent nearly 60% of our sales.
>
> * * *
>
> We're pleased that our efforts so far over the past several years are now delivering growth and profitability and accelerated income.

133.    During the same May 9, 2019 first quarter earnings call, Young stated as follows:

> Looking at the adjusted measures on slide 8, you'll see total Elanco revenue declined 1% in the quarter. On a constant currency basis growth was 2%. As Jeff mentioned earlier, core revenue also increased 2% at constant exchange rates. Overall, revenue growth this quarter was driven by the continued uptake of our Companion Animal Therapeutics products, aqua, poultry vaccines and nutritional health products.

134.    The foregoing statements in ¶¶131-33 regarding Elanco's 1Q 2019 financial results and growth are materially false and misleading because: (i) Defendants misrepresented and failed to disclose that Elanco was reliant upon systematic and undisclosed channel stuffing practices that misleadingly inflated the Company's revenue, net income, and appearance of growth; (ii) Defendants knew or recklessly ignored that these systemic and undisclosed practices had the effect of both artificially inflating the Company's immediate financial results and risking substantial negative impact on the Company's sales and growth going forward; and (iii) the explanation of the Companion Animal Disease Prevention volume decrease was misleading

because Defendants misrepresented and failed to disclose that 1Q 2019 sales were negatively impacted by the Company's undisclosed channel stuffing in 4Q 2018.   Moreover, Simmons' statement that "the fundamentals of our business are strong and we are tracking to our goals" was materially misleading where Defendants misrepresented and failed to disclose that Elanco was meeting its targets through undisclosed channel stuffing and distributors were carrying unsustainable levels of inventory as a result.

135.    In response to direct analyst inquiry about "stocking dynamics" in CA Disease Prevention, Young misleadingly responded as follows:

> ERIN WILSON WRIGHT (CREDIT SUISSE): …And then on the Companion Animal Disease Prevention segment, you mentioned that stocking dynamics potentially hurts you in the quarter. I guess how much does it help you in the fourth quarter and how should we be thinking about the quarterly cadence there as well in terms of those distributor stocking dynamics?

> TODD S. YOUNG: Certainly. I'll focus on slide four, where we showed the 16% growth on a 6-month over 6-month basis. We've done this to demonstrate that there is a lot of variability, especially between the Companion Animal Therapeutics, Companion Animal Disease Prevention. As I look at it, one of the key items is with respect to our distributors. They have incentives that are tied to the entire companion animal products, not these two categories.

> And so with the stock out we had at the distributor level, not at the vet clinic level for Galliprant in Q4, there were some incentives for them to buy more vaccines and parasiticides to meet the tiering incentives in Q4. So they were pretty fully stocked on those versus in Q1 the incentive was to buy Galliprant given we resolved all the backorders and had lots of production on that side.

> In addition to that, there was a flush of inventory in Q4 of 2017, we've mentioned before, that was a build back then in Q1 of 2018 that made for a tough comparison. But finally, just want to emphasize we feel very good about the underlying demand at the vet channel and feel like while the 16% to 19% is certainly not what we project for the full year, we do feel very good about our position with our companion animal portfolio for the rest of 2019.

136.    Another analyst attempted to follow up and further drill down on the financial impact of the CA Disease Prevention stocking dynamics:

> MICHAEL RYSKIN (BofA): . . . I've got a couple of quick ones – hopefully quick ones. One is, I think you appreciate all the focus on the moving pieces between the quarters, particularly in Disease Prevention. And I appreciate the clarity you provided in the slides on the 6- months growth year-over-year. But

given that there were some weird inventory stocking going back to 3Q 2017, 4Q 2017 in Disease Prevention, I was hoping you could give us a little bit more of the normalized underlying growth rate here. Looking at – you did $186 million in the quarter.  Is something in the $195 million range more appropriate to account for that stocking?  And I'm just trying to parse apart some of the pull forward to 4Q that you mentioned versus any actual underlying slowdown in the older generation parasiticides that you called out?

* * *

JEFFREY N. SIMMONS: Yeah. I think just overall in this Companion Animal Prevention area, Michael, I think it's really important that, one, we look every day at that vet clinic demand.  We feel very good about that.  That's the lead indicator. And the second is our portfolio approach. Yes, there are some pushes and pulls. But as we've launched the company, we talk a lot about the next five years, how that portfolio will drive growth and the growth of the overall market.

Third thing is we're putting a lot of time on the channel and the channel to not only drive demand in multiple channels but also compliance. And as we talk, compliance is again one of the greatest areas of opportunity in this space. And I will say in this last quarter, we see that continued opportunity to execute there. And so, I think those are – and then lastly, as Jim mentioned, we're leaning in, we're investing, and we're taking from areas that are maybe less strategically critical, like these countries that we moved out of, 10 that we executed in international and rechanneling some of that investment and that investment will increase in Q2.

137.    The foregoing statements in ¶¶135-36 regarding CA Disease Prevention "stocking dynamics," "vet clinic demand," and "driv[ing] demand in multiple channels" in 1Q 2019 are materially false and misleading because: (i) Defendants misrepresented and failed to disclose that during 2018, Elanco had implemented systematic and undisclosed channel stuffing practices that misleadingly inflated the Company's appearance of growth, which practices only escalated in 2019; (ii) Defendants knew that during 2018 Elanco materially changed its distribution sales model from the 2017 "move out" model that sought to balance sales to end-user demand, to instead implement a "move in" model that incentivized sales to distributors far in excess of end-user demand with the effect of "over-stuffing" the sales channels; and (iii) Defendants knew or recklessly ignored that Elanco's undisclosed and risky channel stuffing practices had the effect of both artificially inflating the Company's immediate financial results and risking substantial negative impact on the Company's sales and growth going forward.

138.   In response to direct analyst inquiry about the development of a generic competitor to Elanco's key product, Rumensin, Simmons misleadingly responded as follows:

MICHAEL RYSKIN (BofA): . . . And then a follow-up question if I could. You also called out some positive Rumensin purchasing patterns in the U.S. I was wondering if you had an update on the potential for generic competition and just sort of generally an update on Rumensin?

\* \* \*

JEFFREY N. SIMMONS: As you look at generic Rumensin, good question. No change in our assumptions. We'll do that when we know information like you. I will emphasize again, we continue to innovate, we continue to grow this product, we continue to lean in and this continues to be a very important value contributor to our customers. So we're going to continue to represent and drive this product. We have competed, as you know Michael, against generic monensin in many markets. We're prepared, and actually doing increasing things as we go forward over our long range plans to continue to keep Rumensin as a very critical part of our cattle business globally.

139.   The foregoing statements in ¶138 about Rumensin sales and continued growth in the U.S. in 1Q 2019 were materially false and misleading because Defendants misrepresented and failed to disclose that Elanco was pushing sales of Rumensin far in excess of actual demand: According to CW1, by 4Q 2018, inventory levels of feed additives, the main product which was Rumensin, and cattle vaccines were at 120 days at Elanco's major distributors, double the industry standard.  CW3 similarly recalled being instructed by Elanco to push excess large animal feed additive inventory on CW3's customers in 1Q 2019.

140.   On May 14, 2020, Defendants filed Elanco's Form 10-Q for the quarter ending March 31, 2019 (the "1Q 2019 Form 10-Q").  The 1Q 2019 Form 10-Q repeated the same misleading financial results announced in the 1Q 2019 Form 8-K and press release, and included the following misleading year-over-year comparison:

For the three months ended March 31, 2019 and 2018, our revenue was $731.1 million and $736.2 million, respectively. For the three months ended March 31, 2019 and 2018, our net income was $31.5 million and $72.7 million, respectively.

141.   The foregoing statements in ¶140 regarding Elanco's 1Q 2019 financial results, particularly regarding its revenue and year-over-year growth, are materially false and misleading

because: (i) Defendants misrepresented and failed to disclose that Elanco was increasingly reliant on systematic and undisclosed channel stuffing practices that misleadingly inflated the Company's revenue, net income, and appearance of year-over-year growth; and (ii) Defendants knew or recklessly ignored that Elanco' reliance upon undisclosed and risky channel stuffing practices had the effect of both artificially inflating the Company's immediate financial results and risking substantial negative impact on Elanco's sales and growth going forward.

142.     Defendants' MD&A in the 1Q 2019 Form 10-Q also included the following materially false or misleading statements:

> ***Product Development and New Product Launches***
> A key element of our targeted value creation strategy is to drive growth through portfolio development and product innovation, primarily in our three targeted growth categories of CA Disease Prevention, CA Therapeutics and FA Future Protein & Health. Since 2015, we've launched 11 new products, five of which were launched in 2017 and 2018. Revenue from these product launches contributed $97.8 million to revenue for the three months ended March 31, 2019 . We continue to pursue the development of new chemical and biological molecules through our approach to innovation. Our future growth and success depends on both our pipeline of new products, including new products that we may develop through joint ventures and products that we are able to obtain through license or acquisition, and the expansion of the use of our existing products. We believe we are an industry leader in animal health research and development (R&D), with a track record of product innovation, business development and commercialization.

143.     The foregoing statements in ¶142 regarding Elanco's "value creation strategy" were materially false and/or misleading because: (i) Defendants failed to disclose that during 2018 and into 1Q 2019, Elanco had implemented and was increasingly reliant upon systematic and undisclosed channel stuffing practices that misleadingly inflated the Company's appearance of growth; and (ii) Defendants knew or recklessly ignored that Elanco's undisclosed, risky, and unsustainable channel stuffing practices had the effect of both artificially inflating the Company's immediate financial results and risking substantial negative impact on the Company's sales and growth going forward.

144.     The 1Q 2019 Form 10-Q also was materially false and misleading because it failed to disclose the following known adverse trends and/or uncertainties that Defendants were

required to disclose under Item 303, including: (i) during 2018, Elanco materially changed its distribution sales model from the 2017 "move out" model that sought to balance sales to end-user demand, to instead implement a "move in" model that incentivized sales to distributors far in excess of end-user demand with the effect of "over-stuffing" the sales channels; and (ii) Elanco' reliance on systemic, undisclosed, and unsustainable channel stuffing practices throughout 2018 and into 1Q 2019 would, or was reasonably expected to, have material negative impact on the Company's sales, revenues, and/or results of operations going forward.

### 6.    Aratana Merger Registration Statement

145.    On June 17, 2019, Elanco filed its final Merger Registration Statement, including the final Prospectus, for the Aratana Merger.  The Merger Registration Statement stated, in relevant part:

> ***A key element of Elanco's targeted value creation strategy is to drive growth through portfolio development and product innovation***, primarily in its three targeted growth categories: CA Disease Prevention, CA Therapeutics and FA Future Protein & Health. Elanco's eleven product launches between 2015 and December 31, 2018 have had a significant positive impact on its revenue over those periods, and Elanco expects new products and innovation will continue to have a positive impact on revenue in the future. Revenue from these product launches contributed $274.2 million to revenue for the year ended December 31, 2018 and $97.8 million to revenue for the three months ended March 31, 2019.

146.    The foregoing statements in ¶145 regarding Elanco's "value creation strategy," growth, and revenue were materially false and misleading because: (i) Defendants failed to disclose that during 2018 and into 2Q 2019, Elanco had implemented and was increasingly reliant upon systematic and undisclosed channel stuffing practices that misleadingly inflated the Company's appearance of growth; and (ii) Defendants knew or recklessly ignored that Elanco's undisclosed, risky, and unsustainable channel stuffing practices had the effect of both artificially inflating the Company's immediate financial results and risking substantial negative impact on the Company's sales and growth going forward.

147.    The Merger Registration Statement described Elanco's 1Q 2019 financial results, in relevant part, as follows:

CA Disease Prevention revenue decreased by $15.4 million or 8% [as compared to Q1 2018], primarily driven by lower volume and price, as well as unfavorable impact from foreign exchange rates. Declines in older generation parasiticide products and Companion Animal vaccines were partially offset by continued growth in Credelio, Interceptor Plus and certain over-the-counter parasiticide products.

148.   The foregoing explanation in ¶147 of the Companion Animal Disease Prevention volume decrease was misleading because Defendants misrepresented and failed to disclose that 1Q 2019 sales were negatively impacted by the Company's undisclosed channel stuffing in 4Q 2018, which cannibalized 1Q 2019 sales.

149.   The Merger Registration Statement further described Elanco's FY 2018 financial results, in relevant part, as follows:

2018 vs. 2017

Total revenue increased $177.8 million or 6% in 2018 as compared to 2017, reflecting a 3% increase due to higher realized prices and a 3% increase due to higher volumes.

In summary, the total revenue increase was due primarily to:

- an increase in revenue of $142.1 million or 22% from CA Disease Prevention products, excluding the impact of foreign exchange rates;

- an increase in revenue of $18.4 million or 7% from CA Therapeutics products, excluding the impact of foreign exchange rates;

- an increase in revenue of $63.8 million or 10% from FA Future Protein & Health products, excluding the impact of foreign exchange rates;

* * *

The detailed change in revenue by product category was as follows:

- CA Disease Prevention revenue increased by $144.4 million or 22% due primarily to a reduction in channel inventory in 2017 providing a favorable year-on-year comparison, continued uptake of Credelio and Interceptor Plus, as well as realized price increases primarily impacting Trifexis, Capstar (a flea treatment) and Comfortis, partially offset by volume declines in certain parasiticides, primarily Trifexis and Comfortis volumes.

- CA Therapeutics revenue increased by $22.3 million or 9% due primarily

to the continued uptake of *Galliprant* and *Osurnia*, as well as increased demand for *Onsior*, partially offset by a temporary supply shortage of *Percorten V* used for the treatment of canine Addison's Disease.

- FA Future Protein & Health revenue increased by $62.0 million or 10% due primarily to the launch of *Invixa* and the growth in poultry animal-only antibiotics and poultry vaccines.

- FA Ruminants & Swine revenue decreased by $1.0 million due primarily to competitive headwinds for ractopamine based products, offset by growth in animal-only antibiotics, primarily in cattle.

150.   The foregoing statements in ¶149 regarding Elanco's FY 2018 financial results and year-over-year growth, were materially false and misleading because: (i) Defendants misrepresented and failed to disclose that Elanco was increasingly reliant on systematic and undisclosed channel stuffing practices that misleadingly inflated the Company's revenue, net income, and appearance of year-over-year growth; and (ii) Defendants knew or recklessly ignored that Elanco' reliance upon undisclosed, risky, and unsustainable channel stuffing practices had the effect of both artificially inflating the Company's immediate financial results and risking substantial negative impact on the Company's sales and growth going forward.

151.   The Merger Registration Statement included the following misleading and incomplete "risk factors" regarding Elanco's "distribution channels" and "inventory management":

> ***For Elanco's companion animal products, increased use of alternative distribution channels, or changes within existing distribution channels, could negatively impact its market share, margins and distribution of its products.***
>
> * * *
>
> In addition, if one or more of Elanco's companion animal distributors discontinues or modifies their relationship with it, Elanco's business, financial condition and results of operations may be materially adversely affected. For example, in 2017, a change in Elanco's U.S. inventory management practices resulted in a revenue lag as existing inventory was sold down, which management estimates decreased its revenue by approximately $35 million.

152.   The Merger Registration Statement also included the following misleading and incomplete "risk factors" regarding sales of its top products:

***Our results of operations are dependent upon the success of our top products.***
If any of our top products experience issues, such as disruptive innovations or the introduction of more effective competitive products,  negative publicity, changes to veterinarian or customer preferences, loss of patent protection, material product liability litigation, new or unexpected side effects, manufacturing disruptions and/or regulatory proceedings, our revenue could be negatively impacted, perhaps significantly. Our top five products, *Rumensin*, *Trifexis*, *Maxiban*, *Denagard* and *Interceptor Plus*, contributed approximately 31% of our revenue in 2018. Any issues with these top products, particularly *Rumensin*, which contributed approximately 11% of our revenue in 2018, could have a material adverse effect on our business, financial condition and results of operations.

153.    The Merger Registration Statement also included the following misleading and incomplete "General risk factors":

- heightened competition, including from innovation or generics;

- the impact of disruptive innovations and advances in veterinary medical practices, animal health technologies and alternatives to animal-derived protein;

- changes in regulatory restrictions on the use of antibiotics in food animals;

- impact of generic products;

- Elanco's ability to implement its business strategies or achieve targeted cost efficiencies and gross margin improvements;

- consolidation of Elanco's customers and distributors;

- an outbreak of infectious disease carried by food animals;

- the success of Elanco's R&D and licensing efforts;

- Elanco's ability to complete acquisitions and successfully integrate the businesses they acquire;

- misuse or off-label use of Elanco products;

- unanticipated safety, quality or efficacy concerns associated with Elanco products;

- the impact of weather conditions and the availability of natural resources;

- risks related to Elanco's presence in emerging markets;

- changes in U.S. foreign trade policy, imposition of tariffs or trade

disputes;

- the impact of global macroeconomic conditions;

- the effect on Elanco's business of the transactions involving the separation and the distribution of Lilly's interest in Elanco to its shareholders through an exchange offer consummated on March 11, 2019;

- other factors that may affect future results of the combined company described in the section titled "Risk Factors" beginning on page 26 and in Elanco's and Aratana's respective filings with the SEC that are available on the SEC's web site located at www.sec.gov, including the sections entitled "Risk Factors" in Elanco's and Aratana's Annual Reports on Form 10-K for the fiscal year ended December 31, 2018 and subsequent Quarterly Reports on Form 10-Q and

- the risks set forth in or incorporated by reference into this proxy statement/prospectus, including the risks set forth in the section titled "Risk Factors" beginning on page 26.

154.    The foregoing statements regarding Elanco's "risk factors" in ¶¶152-53 were materially false and/or misleading because: (i) Defendants misrepresented and failed to disclose that during 2018 and continuing through 2019, Elanco had already materially changed its distribution sales strategy to a model that inflated sales far in excess of end-user demand, implementing practices that Defendants knew or recklessly ignored had the effect of both artificially inflating the Company's immediate financial results and risking substantial negative impact on the Company's sales and growth going forward; and (ii) as a result of the foregoing, sales of its top products were at significant risk going forward.

155.    The Merger Registration Statement also was materially false and misleading because it failed to disclose the following known adverse trends and/or uncertainties that Defendants were required to disclose under Item 303, including: (i) prior to the IPO, Elanco materially changed its distribution sales model from the 2017 "move out" model that sought to balance sales to end-user demand, to instead implement a "move in" model that incentivized sales to distributors far in excess of end-user demand with the effect of "over-stuffing" the sales channels; and (ii) Elanco's increasing reliance on systemic, undisclosed, and unsustainable channel stuffing practices throughout 2018 and into 2Q 2019 would, or was reasonably expected

to, have a material negative impact on Elanco's sales, revenues, and/or results of operations going forward.

### 7.    2Q 2019 Financial Results and Earnings Call

156.    On August 13, 2019, Elanco filed a Form 8-K and press release announcing its 2Q 2019 financial results, reporting, in relevant part:

- ***Total Revenue in the second quarter of 2019 increased 1 percent to $781.6 million; Total and Core Revenue grew 4 percent and 3 percent, respectively, at constant currency rates***

\* \* \*

"We continue to be pleased with the delivery of our productivity agenda driving the significant increase in adjusted gross margin as a percent of sales. We are encouraged by the 9 percent constant currency growth in our targeted growth categories and continue to make strategic investments that advance all three pillars of our strategy," said Jeff Simmons, president and chief executive officer at Elanco….

\* \* \*

**Companion Animal Disease Prevention** revenue increased 4 percent for the quarter, driven by both increased volume and price, partially offset by an unfavorable impact from foreign exchange rates.  Without the impact of foreign exchange rates, the category grew 6 percent. The revenue increase was driven by the continued uptake of Interceptor Plus and Credelio, partially offset by declines in certain older generation parasiticides.

**Companion Animal Therapeutics** revenue increased 22 percent for the quarter, driven by increased volume and to a lesser extent price, partially offset by an unfavorable impact from foreign exchange rates. Without the impact of foreign exchange rates, the category grew 26 percent. The revenue increase was driven by increased demand for products across the therapeutics portfolio, including the continued uptake of Galliprant®. In Europe, Galliprant®, experienced strong demand signals in its first full quarter on the market as the launch progressed to more clinics and more countries.

**Food Animal Future Protein & Health** revenue increased 2 percent for the quarter, driven by increased volume and price, offset by an unfavorable impact from foreign exchange rates. Without the impact of foreign exchange rates, the category grew 7 percent. Growth was driven by the aqua portfolio, as well as, the poultry portfolio and nutritional health products.

\* \* \*

"Elanco is delivering on our Innovation, Portfolio and Productivity strategy and the stand-up of the independent company is on track. We are narrowing our full year guidance to reflect discrete events in the external market, but are pleased with our margin expansion progress and <u>confident in the growth of our underlying business</u>," said Simmons.

157.    During the August 13, 2019 earnings call to discuss 2Q 2019 results, Simmons made the following additional false or misleading statements regarding revenue and growth during the second quarter:

<u>Our targeted growth categories are growing above the market on a constant currency basis.</u>  Fueled by new products and geographic expansion, our productivity agenda is delivering and driving improved profitability and we continue to demonstrate our position as a partner of choice with additional strategic relationship, all while building a fit-for-purpose independent company.

<u>Our top line results represents a solid underlying demand for our products and the strength of our fundamentals.</u>  The <u>9% growth of our targeted growth categories</u> is in line with our expectations.

* * *

<u>Our targeted growth categories delivered above-market growth of 9%</u> and now represent about 62% of our total sales…

158.    During the same August 13, 2019 second quarter 2018 earnings call, Young made the following additional false or misleading statements regarding revenue and growth during the second quarter:

Elanco delivered another strong quarter….On a constant currency basis, <u>growth was 4%.</u>

* * *

Starting with Companion Animal Disease Prevention, which includes parasiticides and vaccines, <u>revenue grew 6% in the quarter, 3% from volume</u> and 3% from price.  Growth is driven by the continued uptake of Interceptor Plus and Credelio…

Moving to Companion Animal Therapeutics, <u>revenue increased 26% in the quarter, 21% from volume</u> and 5% from price.  <u>The growth is driven by demand for products across the therapeutics portfolio</u>, primarily the continued uptake for Galliprant in the U.S. and now a strong launch in Europe as well.

Turning to Future Protein and Health in our Food Animal portfolio, <u>revenue grew 7% in the quarter, 4% from volume</u> and 3% from price.  Growth in this category is driven primarily by the continued uptake of our aqua portfolio as well as poultry and nutritional health products.

\* \* \*

we are updating full year guidance for revenue and EPS…We now project core revenue to be between $3 billion and $3.04 billion reflecting up to 4% core revenue growth…

We are pleased with the trajectory of our margin expansion goals and <u>confident in the underlying growth of our core business.</u>

159.    The foregoing statements in ¶¶156-58 regarding Elanco's 2Q 2019 financial results and growth were materially false and misleading because: (i) Defendants misrepresented and failed to disclose that Elanco was increasingly reliant on systematic and undisclosed channel stuffing practices that misleadingly inflated the Company's revenue, net income, and appearance of growth; and (ii) Defendants knew or recklessly ignored that Elanco' reliance upon undisclosed, risky, and unsustainable channel stuffing practices had the effect of both artificially inflating the Company's immediate financial results and risking substantial negative impact on the Company's sales and growth going forward.

160.    In response to direct analyst inquiry about the impact of the FDA's approval of a generic Rumensin in the quarter, Simmons misleadingly responded as follows:

MICHAEL RYSKIN (BofA): . . . One, there was a generic Rumensin approval in the U.S. in the quarter. Could you comment on how that reads in relative to your expectations?  And any update on timing on generic Rumensin competition in the U.S.?

JEFFREY N. SIMMONS: Yeah.  Thank you, Michael.  So on the generic monensin that is coming into the marketplace, just real quick, again I'll reiterate, <u>we are prepared.  It aligns with what our expectations were</u>.  They will continue to pursue combination clearances in beef and able to be in the dairy market. I want to emphasize that, again, this is a competitor that we know with Huvepharma. <u>Our full year guidance incorporates all of the known dynamics right now that are impacting us and the industry, including this.  So it aligns very much with our assumptions that we've had, both this year as well as next year</u>.

161.    The foregoing statements in ¶160 about Rumensin in 2Q 2019 were materially

false and misleading because Defendants misrepresented and failed to disclose that Elanco was pushing sales of Rumensin far in excess of actual demand: According to CW1, by 4Q 2018, inventory levels of feed additives, the main product which was Rumensin, and cattle vaccines were at 120 days at Elanco's major distributors, double the industry standard.  CW3 similarly recalled being instructed by Elanco to push excess large animal feed additive inventory on CW3's customers in both 1Q and 2Q 2019.  CW1 also recalled that by mid-2019, *i.e.*, prior to the announcement of 2Q 2019 results, MWI had taken on so much extra inventory that MWI had to rent warehouse space and use tractor-trailers in Amarillo, Texas to store the surplus product MWI purchased from Elanco.

162.    In response to direct analyst inquiry about Zoetis' pending launch of Simparica Trio, Simmons misleadingly responded as follows:

> CHRISTOPHER SCHOTT (JP MORGAN): . . . the first one here, I'd <u>just be interested in your views on the parasiticides market in light of the pending Simparica Trio launch. I think there's been quite a bit of debate of what that means for your Flea and Tick business. So just be interested in any comments you might have about how you see the market evolving and how Elanco kind of plays in that evolution.</u>
>
> * * *
>
> JEFFREY N. SIMMONS: Thanks, Chris. We feel and very clearly nothing new since with the news on additional innovation coming in.  As we've shared very openly in the IPO this was expected. We've shared that we would likely not be first-in-class. We're working on elements of best-in-class in our pipeline.  Don't talk as openly about this given that our pipelines are not quite as transparent as the pharmaceutical industry. <u>But I'll emphasize, we're tracking very nicely internally on our prospects in this area. We most importantly and as you saw with the new products, Chris, we're tracking very, very well relative to our portfolio of parasiticide products that we're offering to the market today.</u>
>
> We offer the broadest solution to the seven main parasites today between the two products of Credelio and Interceptor Plus. We also have different niches and segments both in the vet market as well as the retail market that we offer. So, we like our current portfolio. Assumptions are not new and our pipeline is progressing. So, we overall feel very good about it.

163.    The foregoing statements in ¶162 about the impact of the impending launch of Simparica Trio were materially false and misleading because Defendants misrepresented and

failed to disclose that Elanco was pushing sales of its competitor products far in excess of actual demand in anticipation of the Simparica launch.  According to research conducted by Mr. Raffat, as reported after the end of the Class Period, in order to defend against Zoetis's anticipated release of Simparica Trio, Elanco created additional financial incentives for distributors to purchase 90+ days of inventory (up to 120+ days) so that distributors would be sitting on a lot of extra inventory when the Simparica Trio launch actually occurred.

164.    In response to direct analyst inquiry about Elanco's "true underlying organic growth," Simmons misleadingly responded as follows:

> KEVIN ELLICH (CRAIG-HALLUM): . . . I guess <u>wanted to start off with the underlying organic growth for the business</u>. You have a lot of moving pieces with the Aratana acquisition, Prevtec, generic monensin coming into play here. <u>Could you walk us through kind of where the true underlying organic growth for the business is</u>?
>
> * * *
>
> JEFFREY N. SIMMONS: Yeah. I just think the underlying growth, I want to really emphasize <u>one key number that's important is when you take out the events which is African swine fever and the contract manufacturing impact in the Ruminants & Swine segment, we're growing the underlying demand for core revenue on constant currency is at 5%</u>. I think the other point that was stated by Todd is seven of the eight categories, when you look at our four market categories and U.S. and international, seven of the eight are growing. . . So when I look at this and <u>we look at things such as the placements and the demand pull through in vet clinics, when we look at market share in these key segments, we feel very good about the fundamentals</u>. And again, you understand – we talked about the fundamentals of Animal Health continue and I think the diversity of our industry and the global aspects of it and many therapeutic classes this year is an example, that diversity creates sustainability of growth, so that's important.

165.    The foregoing statements in ¶164 regarding Elanco's "growth" were materially false and/or misleading because: (i) Defendants failed to disclose that during 2018 and throughout 2019, Elanco had implemented systematic and undisclosed channel stuffing practices that misleadingly inflated the Company's appearance of growth; and (ii) Defendants knew or recklessly ignored that Elanco's undisclosed, risky, and unsustainable channel stuffing practices had the effect of both artificially inflating the Company's immediate financial results and risking substantial negative impact on the Company's sales and growth going forward.

166.     On August 13, 2019, Defendants filed Elanco's Form 10-Q for the quarter ending June 30, 2019 (the "2Q 2019 Form 10-Q").   The 2Q 2019 Form 10-Q repeated the same misleading financial results announced in the 2Q 2019 Form 8-K and press release, and included the following misleading and incomplete "Forward-Looking Statements":

> Forward-looking statements are based on our current expectations and assumptions regarding our business, the economy and other future conditions. Because forward-looking statements relate to the future, by their nature, they are subject to inherent uncertainties, risks and changes in circumstances that are difficult to predict. As a result, our actual results may differ materially from those contemplated by the forward-looking statements. Important factors that could cause actual results to differ materially from those in the forward-looking statements include regional, national, or global political, economic, business, competitive, market, and regulatory conditions, including but not limited to the following:
>
> - heightened competition, including from innovation or generics;
> - the impact of disruptive innovations and advances in veterinary medical practices, animal health technologies and alternatives to animal-derived protein;
> - changes in regulatory restrictions on the use of antibiotics in food animals;
> - our ability to implement our business strategies or achieve targeted cost efficiencies and gross margin improvements;
> - consolidation of our customers and distributors;
> - an outbreak of infectious disease carried by food animals;
> - the success of our R&D and licensing efforts;
> - our ability to complete acquisitions and successfully integrate the businesses we acquire;
> - misuse, off-label or counterfeiting use of our products;
> - unanticipated safety, quality or efficacy concerns associated with our products;
> - the impact of weather conditions and the availability of natural resources;
> - risks related to our presence in emerging markets;
> - changes in U.S. foreign trade policy, imposition of tariffs or trade disputes;
> - the impact of global macroeconomic conditions; and
> - the effect on our business resulting from our separation from Eli Lilly & Co. (Lilly), including the various costs associated with transition to a stand

alone entity.

167.    The foregoing statement in ¶166 regarding Elanco's risks are materially false and misleading because: Defendants failed to disclose that during 2018 and throughout 2019, Elanco had implemented systematic and undisclosed channel stuffing practices that misleadingly inflated the Company's appearance of growth; and (ii) Defendants knew or recklessly ignored that Elanco's increasing reliance on undisclosed, risky, and unsustainable channel stuffing practices had the effect of both artificially inflating the Company's immediate financial results and risking substantial negative impact on the Company's sales and growth going forward.

168.    Defendants' MD&A in the 2Q 2019 Form 10-Q also included the following materially false or misleading statements:

> **_Product Development and New Product Launches_**
> A key element of our targeted value creation strategy is to drive growth through portfolio development and product innovation, primarily in our three targeted growth categories of CA Disease Prevention, CA Therapeutics and FA Future Protein & Health. Since 2015, we've launched 11 new products, five of which were launched in 2017 and 2018. Revenue from these product launches contributed $206.3 million to revenue for the six months ended June 30, 2019. We continue to pursue the development of new chemical and biological molecules through our approach to innovation. Our future growth and success depends on both our pipeline of new products, including new products that we may develop through joint ventures and products that we are able to obtain through license or acquisition, and the expansion of the use of our existing products. We believe we are an industry leader in animal health research and development (R&D), with a track record of product innovation, business development and commercialization.

169.    The foregoing statements in ¶168 regarding Elanco's "value creation strategy" were materially false and/or misleading because: (i) Defendants failed to disclose that during 2018 and continuing throughout 2Q 2019, Elanco had implemented and was increasingly reliant upon systematic and undisclosed channel stuffing practices that misleadingly inflated the Company's appearance of growth; and (ii) Defendants knew or recklessly ignored that Elanco's undisclosed, risky, and unsustainable channel stuffing practices had the effect of both artificially inflating the Company's immediate financial results and risking substantial negative impact on the Company's sales and growth going forward.

170.    The 2Q 2019 Form 10-Q also was materially false and misleading because it failed to disclose the following known adverse trends and/or uncertainties that Defendants were required to disclose under Item 303, including: (i) prior to the IPO, Elanco materially changed its distribution sales model from the 2017 "move out" model that sought to balance sales to end-user demand, to instead implement a "move in" model that incentivized sales to distributors far in excess of end-user demand with the effect of "over-stuffing" the sales channels; and (ii) Elanco' increasing reliance on systemic, undisclosed, and unsustainable channel stuffing practices in 2018 and throughout 2Q 2019 would, or was reasonably expected to, have a material negative impact on the Company's sales, revenues, and/or results of operations going forward.

### 8.    September 11, 2019 Morgan Stanley Global Healthcare Conference

171.    At the Morgan Stanley Global Healthcare Conference held on September 11, 2019, Simmons made the following materially false or misleading statements:

> We launched the IPO on three growth categories that we look at where we have products, fundamentals in the market and expertise. There are two in Companion Animal. Companion Animal parasiticides and prevention; we call it prevention vaccines and parasiticides. Companion Animal therapy, so that's the Therapeutic side. And then Future Protein & Health, so the future of proteins of poultry, aqua, for us that's salmon and antibiotic replacements. Those three categories have been our growth drivers. We've got a lot of new products. The fundamentals of those markets are growing at or above industry growth rates, represents a little over 60% of our business. So that's become our growth platform.

172.    The foregoing statements are materially false and misleading because Defendants misrepresented and failed to disclose the extent to which Elanco was relying upon on systemic, undisclosed, and unsustainable channel stuffing practices far in excess of actual demand to attain its financial results in 2019.

### 9.    3Q 2019 Financial Results and Earnings Call

173.    On November 6, 2019, Elanco filed a Form 8-K and press release announcing its 3Q 2019 financial results reporting, in relevant part:

- ***Total Revenue in the third quarter of 2019 increased 1 percent to $771.3 million; Total and Core Revenue grew 2 percent and 4 percent, respectively, at constant currency rates***

\* \* \*

"Elanco's portfolio approach continues to deliver <u>strong results, with double digit growth in our targeted growth categories and 75 percent growth from our portfolio of innovation launched since 2015, highlighting the strong underlying fundamentals of the base business</u>. These balanced the external factors facing our company and industry," said Jeff Simmons, president and chief executive officer at Elanco….

\* \* \*

**Companion Animal Disease Prevention** <u>revenue increased 10 percent for the quarter, driven by both increased volume and price,</u> partially offset by an unfavorable impact from foreign exchange rates. Without the impact of foreign exchange rates, the category grew 11 percent. The revenue increase was driven by continued uptake of Credelio and Interceptor Plus, vaccines, and initial stocking for a new customer agreement.

**Companion Animal Therapeutics** <u>revenue increased 9 percent for the quarter, driven by increased volume and to a lesser extent price,</u> partially offset by an unfavorable impact from foreign exchange rates. Without the impact of foreign exchange rates, the category grew 10 percent. The revenue increase was driven by continued uptake of Galliprant®, initial stocking for a new customer agreement, and sales for Entyce® and Nocita®, as a result of the acquisition of Aratana Therapeutics, Inc. (Aratana).

**Food Animal Future Protein & Health** <u>revenue increased 18 percent for the quarter, driven by increased volume and price,</u> partially offset by an unfavorable impact from foreign exchange rates. Without the impact of foreign exchange rates, the category grew 20 percent. Growth was driven by the continued uptake of our Aqua portfolio, as well as poultry products. The quarter benefited from discrete items including the sale of the remaining inventory of a product that will be phased out in China and purchasing patterns in the prior year that created a favorable comparison for poultry products.

174.    During the November 6, 2019 earnings call to discuss 3Q 2019 results, Simmons made the additional following false or misleading statements regarding revenue and growth during the third quarter:

our top line results showed a <u>solid underlying demand for our products</u> and the strength of our fundamentals highlighted by the <u>double-digit growth in our 3 targeted categories</u>. Our portfolio approach enabled us to deliver 4% core revenue growth at constant currency.

\* \* \*

<u>Our targeted growth categories delivered double-digit growth</u> and now represent about 63% of our total sales.

175.    During the same November 6, 2019 third quarter earnings call, Young stated as follows:

On a constant currency basis, <u>growth was 2%</u>.

\* \* \*

Starting with Companion Animal Disease Prevention, which includes parasiticides and vaccines. <u>Revenue grew 11% in the quarter, 4% from volume</u> and 7% from price. Growth is driven by the continued uptake of Interceptor Plus and Credelio as well as vaccines….

Moving to Companion Animal Therapeutics. <u>Revenue increased 10% in the third quarter, 9% from volume</u> and 1% from price. The growth is driven primarily by the continued uptake for Galliprant as well as the inclusion of Entyce and Nocita from Aratana, which provided about 5 percentage points of growth in the quarter in this category. Both Companion Animal categories also benefited from initial stocking for a new customer agreement that we had expected in Q4, but that our team successfully delivered in Q3. Without this impact, in addition of Aratana, total Companion Animal sales grew 3%.

Turning to our Food Animal portfolio and Future Protein & Health, <u>revenue grew 20% in the quarter, 16% from volume</u> and 4% from price. Growth in this category is driven primarily by the continued uptake of our aqua portfolio as well as poultry products.

\* \* \*

We are updating our full year guidance for revenue and EPS. For total revenue, we now expect a range of $3.07 billion to $3.085 billion, a narrowing of the range, and a $10 million reduction in the low end of the range.

\* \* \*

In summary, we are pleased with the progress of our margin expansion goals and <u>confident in the underlying growth of our core business</u>.

176.    In response to direct analyst inquiry about Elanco's "earnings progression" heading into 4Q 2019, Young misleadingly responded as follows:

CHRISTOPHER SCHOTT (JP MORGAN): … My second question was just on the earnings progression this year. <u>I think that the 4Q earnings imply a step down from what we've been seeing in the last few quarters</u>. I think it's $0.23 at the midpoint versus $0.30 this quarter. <u>Can you just help me understand a little bit of</u>

the dynamics that are impacting that progression of earnings that we're seeing?

* * *

TODD S. YOUNG: Sure. Chris, on the EPS chain, obviously, one part is the tax rate. We do expect the tax rate to be back in the low 20s in Q4, generally where we were tracking in the year before getting this benefit from the Brazilian tax audit settlement. And then the other one would be on the gross margin side. As I mentioned in the prepared remarks, we do have a different mix in Q4, you would have seen that in last year's Q4 margin. We still expect the productivity initiatives to provide margin growth year-over-year, but just a lot of international poultry, which is a lower margin product for us in Q4. The other item is utilization of our plants. We have planned shutdowns at the end of the year, and thus, we don't have as much positive variations that we've had this year. So that's the main drivers of the progression given we still expect to have a high revenue point for the full year here in Q4.

177.   Another analyst attempted to follow up and further drill down on the Company's

sales in 3Q and heading into 4Q 2019:

KATHLEEN MINER (COWEN): … just to go back to the fourth quarter EPS and sort of the – the $0.02 that you took off the guidance for the full year. What were the specific things that really changed? Because my understanding is that Rumensin was on track. The sterile injectables hasn't changed, swine fever hasn't changed. What were the particular items that caused you to lower the top end of the range?

* * *

JEFFREY N. SIMMONS: . . . Kathy, I would just emphasize, I mean, we put our focus heavy on underlying demand for product. The value of our business and to our customers, and we feel very good about market shares, underlying fundamentals of the market and growth. These are environmental factors. And again, as we see them lessening or actually being out of the picture as we go into 2020.

178.   In response to further direct analyst inquiry trying to drill down on actual

Companion Animal growth during the quarter, Simmons misleadingly responded as follows:

MICHAEL RYSKIN (BofA): … If you exclude that stocking order that you called out for the Companion Animal business that was expected in 4Q and some of the M&A contribution from Aratana, I think you mentioned that Companion Animal business was only 3%, up 3% on a constant currency basis. And it's -- that's a little bit below our expectations. I mean, you highlighted the continued strength in Galliprant and Credelio and Interceptor. So is it true that if you look through the rest of the Companion Animal portfolio, some of the older products,

are you seeing any incremental weakness there? Did something new happen where -- tied to timing or was there maybe just some distraction with the sales force, given a lot of the turnover? Could you just talk about sort of the rest of that business, excluding the seasonality?

JEFFREY N. SIMMONS: Yes, Michael, there is some seasonality effects, as Todd just mentioned, Q3 is a little bit of a different dynamic. The channel is a little dynamic. What I would say is, we feel very good about our year-to-date. We feel good about the quarter overall. Yes, there's some pushes and pulls in there, but it is tracking very much to where we see the overall category.

\* \* \*

JEFFREY N. SIMMONS: But again, I would say, everything is in that category. And all 3 of our growth categories is tracking to our expectations. Underlying demand coming out of the clinics, and the fundamentals in the market, it's tracking to our expectations.

179.    The foregoing statements in ¶¶173-178 regarding Elanco's 3Q 2019 financial results, growth, market fundamentals, and demand were materially false or misleading because: (i) Defendants misrepresented and failed to disclose that Elanco was increasingly reliant on systematic and undisclosed channel stuffing practices that misleadingly inflated the Company's revenue, net income, and appearance of growth; and (ii) Defendants knew or recklessly ignored that Elanco' reliance upon undisclosed, risky, and unsustainable channel stuffing practices had the effect of both artificially inflating the Company's immediate financial results and risking substantial negative impact on the Company's sales and growth going forward.  Defendants' explanations for the earnings progression of Q3 heading into Q4 was misleading, where Defendants knew that 4Q 2019 would be down and full year guidance needed to be "narrowed" due to the fact that distributors were already over-loaded with inventory by the end of 3Q 2019, and also due to planned yet undisclosed changes in distributor strategy, including (a) cutting distributors from 8 to 4, (b) switching back to a "move out" distributor model, and (c) the reduction in distributor incentives, all of which risked resulting in the need to work-down inventory and/or associated decreased sales.  Moreover, Simmons' statement that "all 3 of our growth categories is tracking to our expectations. Underlying demand coming out of the clinics, and the fundamentals in the market, it's tracking to our expectations" was materially misleading

where Defendants misrepresented and failed to disclose that Elanco was meeting its targets through undisclosed channel stuffing and distributors were carrying unsustainable levels of inventory as a result.

180.    Finally, Defendants misrepresented Elanco's risks and responses to the development of a generic competitor to Elanco's key product, Rumensin, with Simmons stating, in relevant part, as follows:

> [A] generic version of Rumensin was approved in Q3. Importantly, we see a strong brand loyalty among our customers for Rumensin, and we are very pleased with the durability and end-user demand. As we expected, in the distribution channel, we've seen some changes in purchasing as they assess the environment. Important to note, we remain very confident in the value of Rumensin, the portfolio we offer our cattle customers and the value beyond product that differentiates Elanco from other players, particularly generics. In summary, things are <u>tracking to our expectations</u> with Rumensin.
>
> * * *
>
> CHRISTOPHER SCHOTT (JP MORGAN): First one was just on Rumensin. Can you just remind us or just walk through some of the assumptions that you have going forward, as we think about the impact from generic competition in terms of both the magnitude of impact and how quickly you expect that erosion to occur, just so that everyone's on the same page of how you're thinking about that?
>
> * * *
>
> JEFFREY N. SIMMONS: Yes, Chris. First of all, just again, strategy is working very well. I want to emphasize it's <u>tracking to our expectations</u>. And as we've said, we've modeled that there's an erosion in the first couple of years, a mix between price and volume. We've talked some about in the neighborhood of 30% over that first couple of years. What I really want to emphasize, though, is when we look at durability of the brand, durability of the total portfolio offer to cattle producers, the value beyond product as well as other means and measures competitively, what I would say is <u>we're tracking at those expectations or even better and feeling very good about it</u>. The alteration that we've mentioned is really just a supply chain assessment that typically happens when you bring a generic to the market where people's levels of inventories may change a little bit as they are assessing the marketplace.
>
> But again, I want to emphasize <u>we are feeling very good relative to Rumensin and tracking to our expectations</u>.

181.    The foregoing statements in ¶180 about Rumensin in 3Q 2019 were materially

false and misleading because Defendants misrepresented and failed to disclose that Elanco was pushing sales of Rumensin far in excess of actual demand (*i.e.*, channel stuffing Rumensin) in order to shore up against the generic threat.

182.    The November 6, 2019 Form 8-K included, for the first time, the following misleading and incomplete risk disclosure in its "Forward Looking Statements" section:

- the impact of increased or decreased sales to our channel distributors resulting in higher or lower inventory levels held by them in advance of or trailing actual customer demand, which could lead to variations in quarterly revenue results;

183.    The foregoing statements in ¶182 regarding Elanco's risk factors are materially false and misleading because: (i) Defendants failed to disclose that during 2018 and throughout 2019, Elanco had implemented systematic and undisclosed channel stuffing practices that misleadingly inflated the Company's appearance of growth; (ii) Defendants knew or recklessly ignored that Elanco's increasing reliance on undisclosed, risky, and unsustainable channel stuffing practices throughout 2019 had the effect of both artificially inflating the Company's immediate financial results and risking substantial negative impact on the Company's sales and growth going forward; (iii) Defendants concealed and failed to disclose the material risks of *actual* growing distributor inventory levels due to Elanco's undisclosed channel stuffing; and (iv) Defendants concealed and failed to disclose the material risks that the actual significant planned changes to Elanco's distributor strategy, which according to CW4 Defendants were analyzing and preparing to implement during November 2019 (when the 3Q 2019 Form 10-K was filed), including (a) cutting distributors from 8 to 4, (b) switching back to a "move out" distributor model, and (c) the reduction in distributor incentives, all changes which risked resulting in the need to work-down inventory and/or associated decreased sales.

184.    On November 8, 2019, Defendants filed Elanco's Form 10-Q for the quarter ending September 30, 2019 (the "3Q 2019 Form 10-Q").  The 3Q 2019 Form 10-Q repeated the misleading financial results announced in the 3Q 2019 Form 8-K and press release, and included the following misleading and incomplete "Forward-Looking Statements" disclaimer:

Important factors that could cause actual results to differ materially from those in the forward-looking statements include regional, national, or global political, economic, business, competitive, market, and regulatory conditions, including but not limited to the following:

\* \* \*

- consolidation of our customers and distributors;

\* \* \*

- the impact of increased or decreased sales to our channel distributors resulting in higher or lower inventory levels held by them in advance of or trailing actual customer demand, which could lead to variations in quarterly revenue results;

185.   The foregoing "risk factors" are materially false and misleading for the same reasons as set forth in ¶183, *supra*.

186.   Defendants' MD&A in the 3Q 2019 Form 10-Q included the following materially false or misleading statement in the "Overview" of Elanco's business, following the misleading revenue and net income figures for the period ending September 30, 2019:

For the three months ended September 30, 2019 and 2018, our revenue was $771.3 million and $761.1 million, respectively. For the three months ended September 30, 2019 and 2018, our net income was $10.0 million and $60.2 million, respectively.

For the nine months ended September 30, 2019 and 2018, our revenue was $2,284.0 million and $2,267.5 million, respectively. For the nine months ended September 30, 2019 and 2018, our net income was $77.4 million and $70.1 million, respectively.

Increases or decreases in inventory levels at our channel distributors can positively or negatively impact our quarterly and annual revenue results, leading to variations in quarterly revenues. This can be a result of various factors, such as end customer demand, new customer contracts, heightened and generic competition, the need for certain inventory levels, our ability to renew distribution contracts with expected terms, our ability to implement commercial strategies, regulatory restrictions, unexpected customer behavior, payment terms we extend, which are subject to internal policies, and procedures and environmental factors beyond our control, including weather conditions.

187.   The foregoing statements in ¶186 regarding Elanco's 3Q 2019 financial results, growth, and the note about "inventory levels at our channel distributors" were materially false or

misleading for the same reasons as set forth in ¶183, *supra*, and because: (i) Defendants misrepresented and failed to disclose that Elanco was increasingly reliant on systematic and undisclosed channel stuffing practices that misleadingly inflated the Company's revenue, net income, and appearance of growth; (ii) Defendants knew that Elanco's channel distributors already were over-loaded with inventory at the time of this disclosure on November 6, 2018; and (iii) Defendants knew or recklessly ignored that Elanco's reliance upon undisclosed, risky, and unsustainable channel stuffing practices had the effect of both artificially inflating the Company's immediate financial results and risking substantial negative impact on the Company's sales and growth going forward.

188.    Defendants' MD&A in the 3Q 2019 Form 10-Q included the following materially false or misleading statement:

> ***Product Development and New Product Launches***
> <u>A key element of our targeted value creation strategy is to drive growth through portfolio development and product innovation</u>, primarily in our three targeted growth categories of CA Disease Prevention, CA Therapeutics and FA Future Protein & Health. Since 2015, we've launched or acquired 14 new products, five of which were launched in 2017 and 2018. Revenue from these products contributed $325.0 million to revenue for the nine months ended September 30, 2019. We continue to pursue the development of new chemical and biological molecules through our approach to innovation. Our future growth and success depends on both our pipeline of new products, including new products that we may develop through joint ventures and products that we are able to obtain through license or acquisition, and the expansion of the use of our existing products. We believe we are an industry leader in animal health R&D, with a track record of product innovation, business development and commercialization.

189.    The foregoing statements in ¶188 regarding Elanco's "value creation strategy" and growth drivers were materially false and/or misleading because: (i) Defendants failed to disclose that during 2018 and continuing throughout 3Q 2019, Elanco had implemented and was increasingly reliant upon systematic and undisclosed channel stuffing practices that misleadingly inflated the Company's appearance of growth; and (ii) Defendants knew or recklessly ignored that Elanco's undisclosed, risky, and unsustainable channel stuffing practices had the effect of both artificially inflating the Company's immediate financial results and risking substantial

negative impact on the Company's sales and growth going forward.

190.    The 3Q 2019 Form 10-Q also was materially false and misleading because it failed to disclose the following known adverse trends and/or uncertainties that Defendants were required to disclose under Item 303, including: (i) Elanco' reliance on systemic, undisclosed, and unsustainable channel stuffing practices in 2018 and throughout 3Q 2019 would, or was reasonably expected to, have a material negative impact on the Company's sales, revenues, and/or results of operations; and (ii) in or around November 2019, Defendants made the decision to (a) decrease the number of primary distributors from 8 to 4, (b) to change the Company's distribution sales strategy from "move in," which incentivizes excess purchases by distributors in excess of demand, to "move out," which seeks to balance sales to end-user demand, and (c) to reduce distributor incentives, all changes which risked resulting in the need to work-down inventory and/or associated decreased sales.

### 10.    2020 Financial Guidance

191.    On January 10, 2020, Elanco announced its 2020 financial guidance in a press release that stated, in relevant part:

- ***2020 revenue is expected to be between $3.05 billion and $3.11 billion.***

- ***Earnings per share (EPS) for 2020 are expected to be in the range of $0.04 to $0.16 on a reported basis and $1.09 to $1.16 on an adjusted basis.***

- ***China regulatory clearance received for acquisition of Bayer AG's animal health business. Additional antitrust discussions progressing as expected.***

GREENFIELD, Ind.--(BUSINESS WIRE)-- Elanco Animal Health Incorporated (NYSE: ELAN) today announced its initial financial guidance for 2020, including total revenue expectations in the range of $3.05 billion to $3.11 billion, and Core Revenue, which excludes strategic exits, in the range of $3.00 billion to $3.06 billion. Elanco also expects earnings per share (EPS) for 2020 to be in the range of $0.04 to $0.16 on a reported basis and $1.09 to $1.16 on an adjusted basis.

* * *

While our audit for FY2019 is not yet complete, the anticipated results are consistent with the November guidance, trending toward the low end of

previously issued Revenue and EPS Guidance ranges.  In our anticipated FY2019 results, Elanco continued to grow revenue and expand margins, largely driven by the strength of Elanco's targeted growth categories, the portfolio of newly launched products, strategic business development and a sharp focus on execution. This performance was offset by nearly $100 million of revenue headwinds from environmental issues that arose during the year, including African Swine Fever, the Australian drought and others.

* * *

"In the past year, Elanco has become a stronger, faster and more fit-for-purpose organization, leveraging the advantage of a singular focus on animal health and a portfolio approach to drive growth," said Jeff Simmons, president and CEO of Elanco. "This is a resilient, diverse and durable business that grew in 2019 despite significant environmental pressures, including one of the most significant animal disease epidemics in decades. As we move into 2020 our focus continues to be on execution, balanced progress and building Elanco from strength to leadership."

192.    During the January 10, 2020 call to discuss Elanco's 2020 Financial Guidance, Simmons made the following false or misleading statements:

Our growth is durable and resilient, driven by our new products that offer solutions to key health challenges and target growth categories. This is an attractive industry as we know with positive fundamentals and we have a portfolio of pipeline and now an expanding suite of capabilities to capitalize on them. Our core sales at constant exchange grew 8% in 2018. Our unaudited estimate of core growth in 2019 is 3% despite the environmental headwinds and we are guiding to 1% to 3% core growth for 2020 at constant exchange rates even with the known challenges. Most importantly, we're well-positioned to sustain and build on this 2020 growth over the long term.

In summary on growth, there are two key messages I want you to hear. First, the drive for continued growth is at the forefront of everything we do and how I lead. Second, we are confident in our growth because of the fundamentals driving this growth. We operate, as you know, in segments that are attractive where our products address important needs and we have winning portfolios, as well as we have a flow of launching products and a pipeline that is and will deliver a constant flow of innovation. And we continue to expand our reach deeper in our core geographies and expanded channels.

* * *

Elanco is delivering a sustainable flow of innovation that is addressing important unmet needs. We are driving the growth of our marketed portfolio of products in an attractive areas where we can lead and we're executing on our productivity agenda to drive significant margin expansion and unlock value.

* * *

For the portfolio, our targeted growth categories are now more than 60% of our sales and all of the productivity initiatives are now in flight to deliver cost benefit through 2020. These are activities that drive our significant margin expansion agenda. We're very pleased with the progress. We have the right foundation and we are in execution mode to deliver.

* * *

With the information we have at this point, our initial results are within our previously issued revenue and EPS guidance ranges yet trending toward the low end of the ranges. We'll provide Q4 and full-year 2019 results on February 19.

2019 was a challenging year primarily with uncontrollable environmental forces. We faced over $100 million of revenue headwinds that arose in the course of the year. But despite these headwinds, we estimate core revenue growth of 3% at constant currency.

* * *

Specifically for generic Rumensin, we're pleased with Rumensin's performance in the initial months since a generic has been available in the US. The strength of our cattle portfolio, customer relationships, and value beyond product offerings are supporting Rumensin's sales at a higher level than our original erosion assumptions. Consequently, we've assumed a lesser decline in 2020 than we've previously estimated. Collectively, these competitive events represent approximately $60 million to $90 million of revenue headwind, or 2% to 3% of growth.

193.    In response to direct analyst inquiry about the impact of parasiticide competition,

Simmons misleadingly responded as follows:

UMER RAFFAT (EVERCORE): . . . I think when you say $60 million to $90 million growth headwind, my sense is, given from the prior commentary on Rumensin erosion, I think there's about a $20 million or so worth of impact baked in for – from parasiticide. And my question really is how should we think about that? How was – how did you guys think about that sort of sub-10% impact on the broader parasiticide franchise? What are the pushes and pulls that go into thinking about that just so we understand as well?

* * *

JEFFREY N. SIMMONS: . . . First, I would say that the year has started, the market has started, preparation for spring has started. We have the momentum coming out of 2019 with a winning portfolio. We've continued to strengthen our approach to the channel with the current Elanco portfolio that we have. So, when

we look at our targeted around segments, promotions, distribution, I start with our starting assumption just like we did with generic Rumensin is grow the demand to the highest peak. We're doing the same with parasiticides.

194.     In response to direct analyst inquiry about Elanco's revenue and EPS hitting the lower end of the 2019 guidance, Simmons misleadingly responded as follows:

NATHAN RICH (GOLDMAN SACHS): . . . Could you just maybe talk a little bit more about what changed in 4Q that led you to kind of point to revenue and EPS at the lower end of the range?

* * *

JEFFREY N. SIMMONS: . . . Q4, all I would say here, Nathan, is really clear is nothing new. Why are we having this call now? We believe transparency, openness, clarity is key, especially in a year like 2020. So, that's why we're doing this or we don't have audited books at this point in 2019 and a new stand-up company can have lots of moving parts and Todd can emphasize that.

But what we do see is some of the same things we talked about relative to those environmental forces, whether it's African Swine Fever, the contract manufacturer, the things that I listed throughout the year. It's a prevalence of them continuing through the end of the year, nothing new. You can be assured there's nothing new. And now, we've given you the color of what we think the pushes and pulls are of 2020, so the clarity should be pretty key. Things change as they did in 2020. We'll let you know when they can. But at this point in time, I feel real good about the headwinds and opportunities highlighted on slide 7.

195.     The foregoing statements in ¶¶191-94 regarding Elanco's 2020 financial guidance and 2019 financial results were materially false and misleading because: (i) Defendants misrepresented and failed to disclose that Elanco was then-reliant on systematic and undisclosed channel stuffing practices that misleadingly inflated the Company's revenue, net income, and appearance of growth; (ii) the Company's ability to achieve its 2020 guidance was reliant, at least in part, on undisclosed and risky channel stuffing practices; (iii) Defendants knew but did not disclose that Elanco's distribution channels were already stuffed with excess inventory going into 2020; and (iv) Elanco's stuffing practices created a material risk in that artificially inflated sales caused customer inventory levels for key products to pile up (thereby inherently decreasing future demand), rendering the Company's forecasts unreliable and highly vulnerable to competitive or economic pressure.   In addition, Defendants knew but did not disclose that

changes in Elanco's distributor strategy implemented in 4Q 2019, including (a) cutting distributors from 8 to 4, (b) switching back to a "move out" distributor model, and (c) the reduction in distributor incentives, risked resulting in the need to work-down inventory and/or would associated decreased sales going forward.

### 11.   January 14, 2020 JP Morgan Healthcare Conference

196.   At the JP Morgan Healthcare Conference held on January 14, 2020, Simmons explained Elanco's growth as follows, in relevant part:

> We'll talk about it here in a minute; 50 development projects in late-stage development, but more importantly, over a dozen products that are in launch mode, <u>driving the majority of our growth</u>. We're an execution story.
>
> * * *
>
> We have a company that <u>the state of growth continues</u>.  And as we look at kind of to the right side of this slide, <u>what's going to drive our guidance is, one, revenue growth</u>.
>
> * * *
>
> I think the state of Elanco is strong, and we're moving with Bayer to a position of further leadership. . . . The state of growth is important, top line growth, the durability, the resilience of growth, where the growth is coming from, primarily new products in key growth categories, we feel very good about the quality of the growth.

197.   In Elanco's presentation accompanying Simmons' comments during the January 14, 2020 JP Morgan Healthcare Conference, the Company stated, in relevant part, that "Targeted Growth Categories growing double digits; now >60% of total revenue" was "Driving Portfolio Growth" for the Company.  The presentation further stated that the Company's 2020 Guidance (announced on January 10, 2020) reflects "Revenue growth of 1% to 3% for Core Elanco, despite anticipated competitive and external events," and claimed to have achieved "Positive Revenue growth every quarter since [the] IPO" that was purportedly "Driven by new products, attractive segments and positive industry fundamentals."

198.   The foregoing statements regarding Elanco's "growth drivers" in ¶¶196-97  were materially false and/or misleading because: (i) Defendants failed to disclose that throughout

2019, Elanco increasingly relied on systematic and undisclosed channel stuffing practices that misleadingly inflated the Company's appearance of growth; and (ii) Defendants knew or recklessly ignored that Elanco's undisclosed, risky, and undisclosed channel stuffing practices had the effect of both artificially inflating the Company's immediate financial results and risking substantial negative impact on the Company's sales and growth going forward. In addition, Defendants knew but did not disclose that changes in Elanco's distributor strategy implemented in Q4 2019, including (a) the risks of cutting distributors from 8 to 4, (b) switching back to a "move out" distributor model, and (c) the reduction in distributor incentives, risked resulting in the need to work-down inventory and/or associated decreased sales going forward.

### 12.   4Q and Full Year 2019 Financial Results and Earnings Call

199.   On February 19, 2020, Elanco filed a Form 8-K announcing its fourth quarter and full year 2019 financial results in a press release that stated, in relevant part:

- *Fourth quarter 2019 earnings per share (EPS) was $(0.03) (reported), or $0.23 (adjusted). Full year 2019 EPS was $0.18 (reported), or $1.06 (adjusted).*

- *Fourth quarter 2019 gross margin was 47.9 percent of revenue (reported and adjusted). Full year 2019 gross margin was 52.1 percent of revenue (reported and adjusted), an improvement of 340 basis points on a reported basis and 220 basis points on an adjusted basis.*

- *Fourth quarter 2019 Total Revenue was $787.0 million, a decline of 2 percent, while Core Revenue was flat; on a constant currency basis, Total Revenue declined 1 percent and Core Revenue grew 1 percent. <u>Full year 2019 Total Revenue was $3.1 billion, flat compared to 2018, while Core Revenue grew 1 percent; on a constant currency basis, Total Revenue grew 2 percent and Core Revenue 3 percent.</u>*

\* \* \*

- *Confirmed financial guidance for the full year 2020, with total revenue in the range of $3.05 billion - $3.11 billion, Core Revenue in the range of $3.00 billion - $3.06 billion, and EPS in the range of $0.04 - $0.16 (reported), or $1.09 to $1.16 (adjusted). Guidance does not contemplate contributions from Bayer animal health or additional financing elements.*

200.   During the February 19, 2020 earnings call to discuss fourth quarter and full year 2019 results, Simmons made the following additional false and misleading statements:

Our <u>financial results for the year are in line with our previously issued guidance</u>. Full year sales of $3.071 billion is at the low-end of the sales guidance range, while adjusted diluted earnings per share of $1.06 is at the midpoint of EPS guidance range. For the full year, <u>Elanco core revenue grew 3%</u> at constant currency and <u>our targeted growth categories grew 7%</u>.

\* \* \*

To summarize, 2019 was a challenging year with a number of external events that emerged throughout the year including African Swine Fever, supply challenges, drought, changing producer use of certain products from policy and trade, and the entrant of a new generic competitor. <u>Despite these challenges, we grew core sales</u>. We increase margins and continue to build the foundation for long-term value creation. 2019 illustrates the importance of having a portfolio diversifying across species and geographies and having a sole focus on animal health. <u>Elanco is well positioned on all fronts</u>, and we believe we'll be even stronger with the addition of Bayer Animal Health.

\* \* \*

<u>Our growth is durable and resilient</u>.

201.    During the same February 19, 2020 earnings call, Young reiterated that Interceptor Plus and Credelio "continue to perform well with <u>strong underlying demand at the clinic level</u>."

202.    Regarding the distribution channel for Companion Animal products, Simmons misleadingly stated:

> . . . I cannot emphasize enough that we feel very good about our premium position today with the portfolio we have. I always start with Credelio and Interceptor Plus but when you look at what we have across our portfolio even products like Trifexis and what that does with people that are worried about fleas and the different segments and <u>what we're doing with the channel, we believe our position has never been stronger holistically when you compare ourselves to our position in 2018 or 2017</u>.

203.    The foregoing statements in ¶¶199-202 regarding Elanco's 4Q and Full Year 2019 financial results, growth, demand, and channel position were materially false or misleading because: (i) Defendants misrepresented and failed to disclose that Elanco was increasingly reliant on systematic and undisclosed channel stuffing practices that misleadingly inflated the Company's revenue, net income, and appearance of growth; (ii) that Elanco's distributors were

unsustainably overstocked with inventory in excess of end users' demand as of year-end 2019; and (iii) Defendants knew or recklessly ignored that Elanco' reliance upon undisclosed, risky, and unsustainable channel stuffing practices had the effect of both artificially inflating the Company's immediate financial results and risking substantial negative impact on the Company's sales and growth going forward.

204.    In response to analyst inquiry regarding distributor relationships, Simmons misleadingly stated as follows:

> DAVID WESTENBERG (GUGGENHEIM): . . . So, I noticed there were some changes in your distribution strategy with small distributors. Is there any contemplation of maybe disruption of distributors in the guidance? And is this kind of a signal of maybe future strategy around distribution?
>
> * * *
>
> JEFFREY N. SIMMONS: Yes. So from a distribution standpoint, yes, we have and we've been public about this, that we have prioritized and cut distribution down to 4 major distributors, and I'm talking primarily the pet market in the U.S. Our intention here is to be very focused on value and of course, you get great logistics and service but also value on areas where we want representation, where we want more value added around certain brands. So we have a very targeted approach that we have set up for this year with these key distributors.
>
> What I would say is we'll continue to monitor month to month as we go through the quarter. But a lot of analysis was done in putting this strategy together and we do not see disruption in the year, still yet to be seen as disruption in the quarter. We'll be monitoring this month to month as we look at it. But we feel very good about our distribution strategy. Distributors are key. And again, a very value-based approach as we move forward.

205.    The foregoing statements in ¶204 about distributor relationship changes was materially false or misleading because Defendants (i) knew but did not disclose the significant risks associated with cutting distributors from 8 to 4, including the need for a significant inventory work-down by eliminated distributors that risked material negative impact on Elanco's sales; and (ii) concealed and failed to disclose Elanco's decision to switch back to a "move out" distributor model and a reduction in distributor incentives, which risked resulting in the further need to work-down inventory by remaining distributors and/or associated decreased sales going forward.

206.    On February 28, 2020, Defendants filed Elanco's Form 10-K for the period ended December 31, 2019 (the "2019 Form 10-K").  The 2019 Form 10-K repeated the financial results announced in the February 19, 2020 Form 8-K and press release and included the following misleading and incomplete "Forward-Looking Statements":

> Forward-looking statements are based on our current expectations and assumptions regarding our business, the economy and other future conditions. Because forward-looking statements relate to the future, by their nature, they are subject to inherent uncertainties, risks and changes in circumstances that are difficult to predict. As a result, our actual results may differ materially from those contemplated by the forward-looking statements. Important factors that could cause actual results to differ materially from those in the forward-looking statements include regional, national, or global political, economic, business, competitive, market, and regulatory conditions, including but not limited to the following:
>
> * * *
>
> - consolidation of our customers and distributors;
>
> * * *
>
> - the impact of increased or decreased sales to our channel distributors resulting in higher or lower inventory levels held by them in advance of or trailing actual customer demand, which could lead to variations in quarterly revenue results;

207.    The 2019 Form 10-K included the following misleading and incomplete "risk factors" regarding sales of its top products:

> ***Our results of operations are dependent upon the success of our top products.***
> If any of our top products experience issues, such as disruptive innovations or the introduction of more effective competitive products, negative publicity, changes to veterinarian or customer preferences, loss of patent protection, material product liability litigation, new or unexpected side effects, manufacturing disruptions and/or regulatory proceedings, our revenue could be negatively impacted, perhaps significantly. Our top five products, *Rumensin*, *Trifexis*, *Maxiban*, *Denagard* and *Interceptor Plus*, contributed approximately 31% of our revenue in 2019. Any issues with these top products, particularly Rumensin, which contributed approximately 10% of our revenue in 2019 and is now subject to generic competition in the U.S., could have a material adverse effect on our business, financial condition and results of operations.

208.    The 2019 Form 10-K included the following misleading and incomplete "risk factors" regarding Elanco's "distribution channels" and "inventory management":

*For our companion animal products, increased use of alternative distribution channels, or changes within existing distribution channels, could negatively impact our market share, margins and distribution of our products.*

\* \* \*

In addition, <u>if one or more of our companion animal distributors discontinues or modifies their relationship with us, our business, financial condition and results of operations may be materially adversely affected</u>. For example, in 2017, a change in our U.S. inventory management practices resulted in a revenue lag as existing inventory was sold down, which management estimates decreased our revenue by approximately $35 million.

209.   The 2019 Form 10-K also included the following misleading and incomplete "risk factors" regarding "inventory levels at our channel distributors":

*Increased or decreased inventory levels at our channel distributors can lead to fluctuations in our revenues and variations in payment terms extended to our distributors can impact our cash flows.*

In addition to selling our products directly to veterinarians, we sell to distributors who, in turn, sell our products to third parties. Inventory levels at our distributors may increase or decrease as a result of various factors, including end customer demand, new customer contracts, heightened and generic competition, required minimum inventory levels, our ability to renew distribution contracts with expected terms, our ability to implement commercial strategies, regulatory restrictions, unexpected customer behavior, and procedures and environmental factors beyond our control, including weather conditions or an outbreak of infectious disease carried by food animals such as African Swine Fever. These increases and decreases can lead to variations in our quarterly and annual revenues. In addition, like all companies that manufacture and sell products, we have policies that govern the payment terms that we extend to our customers. Due to consolidation amongst our distributors, as well as changes in the buying habits of end customers or the need for certain inventory levels at our distributors to avoid supply disruptions, from time to time, our distributors have requested exceptions to the payment term policies that we extend to them. Extensions of customer payment terms can impact our cash flows, liquidity and results of operations.

210.   The foregoing statements in ¶¶206-09 regarding Elanco's risk factors were materially false and/or misleading because: (i) Defendants failed to disclose that during 2018 and throughout 2019, Elanco had implemented systematic and undisclosed channel stuffing practices that misleadingly inflated the Company's appearance of growth; (ii) Defendants knew or recklessly ignored that Elanco's increasing reliance on undisclosed, risky, and unsustainable

channel stuffing practices throughout 2019 had the effect of both artificially inflating the Company's immediate financial results and risking substantial negative impact on the Company's sales and growth going forward; (iii) Defendants concealed and failed to disclose the material risks of *actual* growing distributor inventory levels due to Elanco's undisclosed channel stuffing; (iv) Defendants failed to disclose risks relating to the reduction in primary distributors from 8 to 4; and (v) Defendants concealed other changes to Elanco's distributors implemented in 4Q 2019, including the switch back to a "move out" distribution model, and reduction in distributor incentives, as well as omitted the material risks these additional changes posed to Elanco's financial condition and results of operations.

211.    Defendants' MD&A in the 2019 Form 10-K included the following materially false or misleading statements:

> ### *Product Development and New Product Launches*
> A key element of our targeted value creation strategy is to drive growth through portfolio development and product innovation, primarily in our three targeted growth categories of CA Disease Prevention, CA Therapeutics and FA Future Protein & Health. Since 2015, we have launched or acquired 14 new products, including the additions of Entyce, Nocita and Tanovea in 2019. Revenue from these products contributed $439.2 million to revenue for the year ended December 31, 2019. We continue to pursue the development of new chemical and biological molecules through our approach to innovation. Our future growth and success depends on both our pipeline of new products, including new products that we may develop through joint ventures and products that we are able to obtain through license or acquisition, and the expansion of the use of our existing products. We believe we are an industry leader in animal health R&D, with a track record of product innovation, business development and commercialization.

212.    The foregoing statements in ¶211 regarding Elanco's "value creation strategy" were materially false and/or misleading because: (i) Defendants failed to disclose that during 2018 and continuing throughout 2019, Elanco had implemented and was increasingly reliant upon systematic and undisclosed channel stuffing practices that misleadingly inflated the Company's appearance of growth; and (ii) Defendants knew or recklessly ignored that Elanco's undisclosed, risky, and unsustainable channel stuffing practices had the effect of both artificially inflating the Company's immediate financial results and risking substantial negative impact on

the Company's sales and growth going forward.

213.    The 2019 Form 10-K also was materially false and misleading because it failed to disclose the following known adverse trends and/or uncertainties that Defendants were required to disclose under Item 303, including: (i) Elanco' reliance on systemic, undisclosed, and unsustainable channel stuffing practices in 2018 and throughout 2019 would, or was reasonably expected to, have a material negative impact on the Company's sales, revenues, and/or results of operations; (ii) the risks relating to the decision in 4Q 2019 to decrease the number of primary distributors from 8 to 4, which risked material negative impact on sales to remaining distributors due to released distributors working down excess inventory; (iii) the risks relating to the decision in 4Q 2019 to change the Company's distribution sales strategy from "move in," which incentivizes excess purchases by distributors in excess of demand, to "move out," which seeks to balance sales to end-user demand, and (iv) the risks relating to the decision in 4Q 2019 to reduce distributor incentives, all changes which risked resulting in the need to work-down inventory and/or result in associated decreased sales by remaining distributors.

## 13.    Defendants' Statement on COVID-19

214.    On March 24, 2020, Defendants issued a Form 8-K and press release titled "Elanco Provides Business Update Related to COVID-19." It stated, in relevant part:

> GREENFIELD, Ind. (March 24, 2020) As Elanco Animal Health Incorporated (NYSE: ELAN) evaluates the potential impact of the COVID-19 pandemic, it is providing an update on its business and financial position, as well as the actions it is taking to support employees, customers and public health.
>
> "In this time of uncertainty, the health and well-being of our employees, customers, animals and the communities where we operate are our top priority," said Jeff Simmons, Elanco president and CEO. "Our team is actively undertaking precautionary measures to keep our employees safe, while continuing to provide our customers with the products they need. Such an unprecedented time underscores the critical importance of a safe, affordable food supply, particularly meat, milk and eggs, and the role of healthy pets, bringing much needed companionship to families everywhere."
>
> Simmons continued, "I remain confident in Elanco's long-term strategy and our ability to deliver on the commitments to our stakeholders. The underlying industry fundamentals remain strong and the diversity of the global Elanco

business across livestock and pets provides durability and balance. We are resolute in our acquisition of Bayer AG's animal health business as it adds to our leadership position in animal health for the long-term."

As the situation around the COVID-19 pandemic is rapidly evolving, Elanco is withdrawing its previously announced 2020 revenue and earnings per share guidance. Elanco is monitoring several global dynamics, from changing foreign currency rates and a dynamic animal protein market to declining veterinary clinic visits, the growing use of direct-to-consumer shipping, and sales through ecommerce and other alternative channels. The company is confident in its working capital and liquidity levels, while continuing to actively monitor the changing environment across the world. Elanco will provide an update on its Q1 earnings call in early May, based on information available at that time.

The Elanco team remains focused and in execution mode, even as much of the employee base moves to remote working. The manufacturing plants and R&D labs are operational, and the company is closely monitoring distribution logistics. At this time, Elanco has not experienced any supply disruption and critical projects in the pipeline continue to advance. The U.S. Department of Homeland Security and most other countries globally have deemed manufacturing and distribution of animal medicines as essential critical infrastructure and workforce. However, in an effort to support public health and slow the spread of the disease, Elanco has moved its non-business critical work force to remote working globally, with the exception of China, which has begun to return to work. Elanco has also removed sales representatives from the field in many countries, including the U.S. along with its companion animal distribution partners. However, the Elanco team continues to collaborate with customers via webinars, teleconference and video conferences and other remote options.

Much like the human health system, the American Veterinary Medical Association, along with industry organizations across Europe and other countries, has recommended limiting patient care to acutely ill animals and emergencies, rescheduling annual exams and elective procedures. This guidance increases the importance of telemedicine, direct shipment and alternative channels, while underscoring the significance and value of Elanco's pending acquisition of Bayer AG's animal health business.

Elanco is executing its omnichannel approach with respect to companion animal health and determining the best methods for reaching pet owners and veterinarians. The company continues to assess the best strategy to strengthen its long-term competitive commercial position and go-to-market mix, with the goal of reaching pet owners where they wish to shop and enhancing our partnership with veterinarians to provide the best care for pets.

215.    The foregoing statements in ¶214 were materially false or misleading because

Defendants omitted and failed to disclose: (i) due to that Elanco' reliance on systemic,

undisclosed, and unsustainable channel stuffing practices throughout 2019, Elanco's distributors were already "over-stuffed" with inventory during 1Q 2020; (ii) the foregoing channel stuffing risked a material negative impact on the Company's sales, revenues, and/or results of operations and made the Company more vulnerable to competitive and economic pressures; (iii) the risks relating to the decision in 4Q 2019 to decrease the number of primary distributors from 8 to 4, which posed a material negative impact on sales to remaining distributors as released distributors worked down excess inventory; (iv) the risks relating to the decision in 4Q 2019 to change the Company's distribution sales strategy from "move in," which incentivizes excess purchases by distributors in excess of demand, to "move out," which seeks to balance sales to end-user demand, (v) the risks relating to the decision in 4Q 2019 to reduce distributor incentives, all changes which risked resulting in the need to work-down inventory and/or result in associated decreased sales by remaining distributors; and (vi) that any risks of disruption posed by COVID-19 were likely to exacerbate the foregoing undisclosed risks relating to oversaturated channel inventory and distributor changes.

216.    Following this announcement, Credit Suisse noted in a March 25, 2020 analyst report that Elanco reported that it was "comfortable with its inventory levels" and that "ELAN also noted its rationalized distributor relationships provide it greater clarity into purchasing patterns, offering it agility in its COVID-19 response."  Meanwhile, J.P. Morgan noted "[o]n the company's sensitivity to broader COVID-19 implications" that Elanco management "highlighted strong fundamentals (protein demand, etc.) for the industry, which Elanco sees as supportive of a resilient outlook in the medium-to-long term."

## B.    Additional Allegations Regarding Defendants' Scienter

### 1.    Individual Defendants' Knowledge of and Access to Information

217.    As alleged herein, Defendants acted with scienter because Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced

in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Elanco, their control over, and/or receipt and/or modification of Elanco's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Elanco, participated in the fraudulent scheme alleged herein.

218.    The Individual Defendants knew or recklessly disregarded the false and misleading nature of the information that they caused to be disseminated to the investing public. The ongoing fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

219.    For example, Defendants were keenly aware of—but did not disclose—significant risks posed to sales and revenue arising from the decision to switch Elanco's inventory/distributor management back to a "move-out" model during 4Q 2019, at the same time Elanco was cutting its number of primary distributors by half.  Indeed, the Company had very recently experienced just such a revenue hit flowing from the implementation of a "move out" model in 2017, and Defendant were thus keenly aware of the associated risks.  As explained in Elanco's IPO Registration Statement and 2018 Form 10-K, "in 2017, a change in our U.S. inventory management practices resulted in a revenue lag as existing inventory was sold down, which management estimates decreased our revenue by approximately $35 million."  According to CW1, Thus, given Defendants' experience with the implementation of a "move out" model in 2017, as described by CW1 and CW4, and the impact it had on sales due to the need of distributors to sell down inventory, they were aware of, yet recklessly disregarded, the same risk in at least Q4 2019.

220.    Defendants likewise appreciated the risk that a consolidation of distributors posed to Elanco's sales and pricing, as explained in the Company's IPO Registration Statement and its 2018 Form 10-K.

IPO Registration Statement:

"Consolidation of our customers and distributors could negatively affect the pricing of our products. In recent years, there has been a trend towards the concentration of veterinarians in large clinics and hospitals. In addition, food animal producers, particularly swine and poultry producers, and our distributors have seen recent consolidation in their industries. Furthermore, we have seen the expansion of larger cross border corporate customers and an increase in the consolidation of buying groups (cooperatives of veterinary practices that leverage volume to pursue discounts from manufacturers). If these trends towards consolidation continue, our customers could attempt to improve their profitability by leveraging their buying power to obtain favorable pricing."

2018 Form 10-K:

"**Consolidation of our customers and distributors could negatively affect the pricing of our products**. Third☐party distributors, veterinarians and food animal producers are our primary customers. In recent years, there has been a trend towards the concentration of veterinarians in large clinics and hospitals. In addition, food animal producers, particularly swine and poultry producers, and our distributors have seen recent consolidation in their industries. Furthermore, we have seen the expansion of larger cross☐border corporate customers and an increase in the consolidation of buying groups (cooperatives of veterinary practices that leverage volume to pursue discounts from manufacturers). The pace of consolidation and structure of markets varies greatly across geographies. If these trends towards consolidation continue, our customers could attempt to improve their profitability by leveraging their buying power to obtain favorable pricing. The resulting decrease in our prices could have a material adverse effect on our business, financial condition and results of operations."

Thus, Defendants were aware of significant risks to Elanco's business, financial condition, and operations posed by their decision to cut its number of primary distributors by half in 4Q 2019—but they knowingly or recklessly failed to disclose this information to investors.

221.    In Elanco's 3Q 2019 Form 10-Q, Defendants acknowledged that "Increases or decreases in inventory levels at our channel distributors can positively or negatively impact our quarterly and annual revenue results, leading to variations in quarterly revenues."   Thus, Defendants were keenly aware that the inventory build during 2018 and the first three quarters of 2019, as detailed herein above—which was known to Defendants but concealed from the market—posed a material undisclosed risk to Elanco's business, financial condition, and operations.

FIRST AMENDED CLASS ACTION COMPLAINT

222.    In addition, the Individual Defendants were aware of and/or directed the highly unusual and risky sales practices alleged herein that resulted in the inflated sales and revenue figures reported during the Class Period.  For example, according to CW1, Simmons received weekly and monthly reports, called "roll ups" from Elanco's sales force, which detailed sales to distributors.  CW1 noted that "Simmons knows the companion animal side very well, but he knows the large animal side even better.  Having massive jumps in buy-ins from [Elanco's] distributors, [Simmons] would have noticed."  CW4 similarly recalled that Simmons and Young participated in monthly "financial meetings" during which sales data, prepared by Young, was discussed.  CW4 further recalled that Simmons was challenged on Elanco's apparently channel stuffing practices by other executives during such meetings in 2019.

223.    Moreover, during the Class Period, Defendants emphasized to the market how critically important Elanco's partnerships with its product distributors were to the Company's growth strategy.  For example, during the November 6, 2018 earnings call to discuss 3Q 2018 financial results, Simmons responded to an analyst's inquiry about Elanco's "go-to-market" strategy, in relevant part:

> …what we are doing is designing our sales force to target the highest-value, most critical customers. But let me be clear: <u>distribution has played and will play a key role as we go forward</u>.

> A few areas that we use distribution the most for: number one is to share a voice to launch products. They are able to increase our share of voice, increase our call frequency when we are launching products, especially sales that maybe are a little bit more complex, like we see in Companion Animal therapy.

> Secondly is we see them helping us with smaller markets, markets that we are not concentrated on. And lastly is even smaller kind of SKUs that are a little bit less strategic. And we continue to see distribution playing a role there.  We are constantly evaluating the value and the value that they are adding and a cost that they add to us.  And I think that dialogue is very productive and is probably as lively as it has been.

224.    In addition, during the February 6, 2019 earnings call for 4Q and Full Year 2018, when an analyst asked about using distributors to reach end-users, Simmons responded, in relevant part, "…we're constantly monitoring and sitting down with our partners like distributors

to be challenging them with us to add more value."  Thus, Defendants were keenly aware of the significant risks to Elanco's business, financial condition, and operations posed by their decision to cut its number of primary distributors by half in 4Q 2019—but they knowingly or recklessly failed to disclose this information to investors.

### 2.    Corporate Scienter and *Respondeat Superior*

225.    Each of the Individual Defendants, Lucas Montarce, and James Greffet was a high-ranking management-level employee that either (i) made the false or misleading statements alleged herein; (ii) approved the false or misleading statements alleged herein; or (iii) approved the making or issuance of the false or misleading statements alleged herein.  In so doing, each was acting in his role as an executive employee and representative of Elanco.  The scienter of each of these individuals is therefore imputed to Defendant Elanco.

226.    In addition, the knowledge and conduct of high ranking sales executives (including McKee, Loew, and Shriver) acting in their capacity as Elanco employees, and under the oversight and direction of the Individual Defendants, is imputable to Elanco under the doctrine of *respondeat superior*.

### 3.    Executive Bonus Payments Based on Inflated Performance

227.    On April 3, 2019, Elanco announced the results of its 2018 annual cash bonus program which it administered for the period of September 24, 2018 (completion of the IPO) through December 31, 2018 ("2018 Cash Bonus Plan") was "designed to reward the achievement of Elanco's financial goals and innovation objectives…"  Under the 2018 Cash Bonus Plan, bonuses for certain named executive officers were calculated based on Elanco's performance as compared to Elanco's internal targets for the following objectives: revenue, operating margin, innovation, and Eli Lilly's corporate objectives measured under a separate bonus plan administered by Eli Lilly ("Eli Lilly Bonus Multiple").[10]

---

[10] Eli Lilly Bonus Multiple is calculated based on Eli Lilly's performance compared to weighted objectives including revenue (25%), EPS (50%), and innovation (25%).

228.    The amount of each named executive officer's potential incentive payment under the 2018 Cash Bonus Plan is based on the following formula:

**Bonus Multiple * Individual Bonus Target * Base Salary = Cash Bonus**

229.    For the 2018 Cash Bonus Plan, the following are the selected "individual bonus targets":

| Name | Pre-IPO Bonus Target | Post-IPO Bonus Target | Weighted Bonus Target[11] |
|---|---|---|---|
| Jeffrey N. Simmons | 80% | 120% | 91% |
| Todd S. Young | N/A | 70% | 70% |
| Sarena S. Lin | 55% | 60% | 56% |
| David A. Urbanek | 45% | 60% | 49% |
| David S. Kinard | 45% | 60% | 49% |
| Christopher W. Jensen | 70% | 70% | 70% |
| Lucas E. Montarce | 40% | 40% | 40% |

230.    In order to calculate the "bonus multiple" used to ultimately calculate each named executive officer's cash incentive payment under the 2018 Cash Bonus Plan, Elanco's 2018 performance was compared to the established targets for revenue, operating margin, innovation, and Eli Lilly Bonus Multiple.  The resulting multiples were then weighted according to the relative weighting for each objective.  The bonus multiple calculation is outline in the following table:

| | Objective Weighting | 2018 Elanco Target | 2018 Elanco Results | 2018 Bonus Multiple |
|---|---|---|---|---|
| Revenue | 25% | $3.171B | $3.143B | 0.85 |
| Operating Margin | 25% | 20.0% | 20.2% | 1.10 |
| Innovation | 25% | 3.00 | 3.60 | 1.30 |
| Eli Lilly Bonus Multiple | 25% | | | 1.73 |

---

[11] Individual bonus targets are a percentage of the named executive officer's actual base salary earnings.

| Bonus Multiple | | | | 1.24[12] |
|---|---|---|---|---|

231.    The following table outlines the cash incentive payments paid to each of the named executive officers under the 2018 Cash Bonus Plan:

| Name | 2018 Cash Bonus Payment |
|---|---|
| Jeffrey N. Simmons | $907,450 |
| Todd S. Young | $79,567 |
| Sarena S. Lin | $350,552 |
| David A. Urbanek | $233,083 |
| David S. Kinard | $180,180 |
| Christopher Jensen | $222,439 |
| Lucas E. Montarce | $138,404 |

232.    On April 8, 2020, Elanco announced the results of its 2019 annual cash bonus program that "support[s] the business strategy of innovation and profitable growth" ("2019 Cash Bonus Plan").  Under the 2019 Cash Bonus Plan, bonuses for certain named executive officers were calculated based on Elanco's performance as compared to Elanco's internal targets for the following objectives: revenue, earnings before interest and taxes ("EDIT"), and innovation progress.

233.    The amount of each named executive officer's potential incentive payment under the 2019 Cash Bonus Plan is based on the following formula:

**Bonus Multiple * Individual Bonus Target * Base Salary = Cash Bonus**

234.    For the 2019 Cash Bonus Plan, the following are the selected "individual bonus targets":

| Name | Individual Bonus Target[13] |
|---|---|

---

[12] Based on Elanco's objective weighting, the bonus multiple was calculated as follows:

(0.25 * 0.85) + (0.25 * 1.10) + (0.25 * 1.30) + (0.25 * 1.73) = 1.24

[13] Individual bonus targets are a percentage of the named executive officer's actual base salary earnings.

| Jeffrey N. Simmons | 120% |
|---|---|
| Todd S. Young | 70% |
| David S. Kinard | 60% |
| David A. Urbanek | 60% |
| Aaron L. Schacht | 60% |

235.    In order to calculate the "bonus multiple" used to ultimately calculate each named executive officer's cash incentive payment under the 2019 Cash Bonus Plan, Elanco's 2019 performance was compared to the established targets for revenue, EBIT, and innovation progress.[14]  The resulting multiples were then weighted according to the relative weighting for each objective.  The bonus multiple calculation is outline in the following table:

| | Objective Weighting | 2019 Elanco Target | 2019 Elanco Results | 2019 Bonus Multiple |
|---|---|---|---|---|
| Revenue | 30% | $3.128B | $3.100B | 0.8497 |
| EBIT | 40% | $590.2M | $589.5M | 0.9937 |
| Innovation | 30% | 100% | 130% | 1.3000 |
| **Bonus Multiple** | | | | **1.04**[15] |

236.    The following table outlines the cash incentive payments paid to each of the named executive officers under the 2019 Cash Bonus Plan:

| Name | 2019 Cash Bonus Payment |
|---|---|
| Jeffrey N. Simmons | $1,248,000 |
| Todd S. Young | $400,400 |
| David S. Kinard | $268,320 |
| David A. Urbanek | $240,240 |
| Aaron L. Schacht | $270,920 |

---

[14] Performance targets were based on Elanco's 2019 operating plan.

[15] Based on Elanco's objective weighting, the bonus multiple was calculated as follows:

(0.30 * 0.8497) + (0.40 * 0.9937) + (0.30 * 1.30) = 1.04

C.    **Loss Causation**

237.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

238.    During the Class Period, Plaintiffs and the Class purchased Elanco's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

239.    On May 7, 2020, Elanco announced its first quarter 2020 financial results in a press release, reporting revenue of $657.7 million and earnings per share of -$0.12. According to the Company, revenue declined "9 percent due to a reduction of approximately $60 million in channel inventory driven by factors resulting from the COVID-19 pandemic." Simmons attributed the disappointing results to "distributor performance," among other things, and stated that Elanco planned "to tighten [its] approach across many facets of [its] distributor relationships." Specifically, the press release stated, in relevant part:

- Total Revenue was $657.7 million, a decrease of 10 percent. On a constant currency basis, Total Revenue declined 9 percent due to a reduction of approximately $60 million in channel inventory driven by factors resulting from the COVID-19 pandemic.
- Gross margin was 49.4 percent of revenue (reported), or 50.1 percent of revenue (adjusted).
- Earnings per share (EPS) was $(0.12) (reported), or $0.13 (adjusted).
- Bayer Animal Health acquisition remains on track for mid-year close; Antitrust approval process progressing; new members of expanded executive leadership team announced.
- Long-term industry fundamentals remain intact; 2020 guidance withdrawn due to uncertainty of the duration and magnitude of impacts from the COVID-19 pandemic.

* * *

"In the first quarter, the COVID-19 pandemic created working capital pressures across our commercial value chain and dampened assumptions about near-term demand from end users of our products. ***These factors coupled with our recent***

> *evaluation of distributor performance has prompted us to tighten our approach across many facets of our distributor relationships*. Our relationship with our commercial partners has evolved significantly over the last 13 years and while distribution will continue to play a role in the future, our analysis shows our internal demand generation efforts are superior to distributors and higher inventory levels are not driving demand as it had in the past," said Jeff Simmons, president and chief executive officer at Elanco. "*In the first quarter, we made initial progress to meaningfully reduce channel inventory, primarily in our U.S. companion animal business, and we expect to further tighten channel inventory across all business areas, primarily in the second quarter. The decrease in channel inventory is a structural change that will improve our working capital and maximize our operational flexibility in the current environment and beyond.* While the actions we are taking with our commercial partners negatively impact our reported sales performance in the near term, these changes will strengthen our position, optimize our promotional approach and enable us to direct investment to the internal commercial activities that drive demand for our products over the long term."

240.   The same day, the Company held a conference call to discuss the financial results with analysts and investors. During the call, Simmons noted that the Company expected additional inventory reductions and explained:

> Recall at the start of 2020, we consolidated our U.S. Companion Animal distributors from eight to 4, and we instituted specific targets for them to generate end-customer demand. I also personally established a monthly review meeting with each of them. . . . As the Elanco demand creation was increasing, we were seeing less impact directly by distributors in today's environment. Furthermore, the volume of product being held by distributors was not impacting their ability to create demand. This is an insight and a change from our historical experience. *The COVID pandemic also impacted the inventory shift from our distributor consolidation. We expected the four remaining distributors would need to increase their inventory levels to handle the larger volume going through their operations, offsetting the inventory drawdown in the eliminated distributors.* With the liquidity and working capital pressure from COVID, the distributors are managing their inventory more tightly. Consequently, in Q1, we reduced the amount of product and distributor inventory by approximately $60 million, mainly in the U.S. companion animal space. And we expect to further reduce an additional $80 million to $100 million, mainly in the second quarter, as we apply these new tactics across our business and geographies.

241.   On this news, the Company's share price fell $3.05, or over 13%, to close at $19.88 per share on May 7, 2020, on unusually heavy trading volume.

**D.      Applicability of the Presumption of Reliance (Fraud-on-the-Market Doctrine)**

242.     The market for Elanco's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Elanco's securities traded at artificially inflated prices during the Class Period.  On January 23, 2020, the Company's share price closed at a Class Period high of $32.25 per share. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Elanco's securities and market information relating to Elanco, and have been damaged thereby.

243.     During the Class Period, the artificial inflation of Elanco's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Elanco's business, prospects, and operations.   These material misstatements and/or omissions created an unrealistically positive assessment of Elanco and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

244.     At all relevant times, the market for Elanco's securities was an efficient market for the following reasons, among others:

(a)      Elanco shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)      As a regulated issuer, Elanco filed periodic public reports with the SEC and/or the NYSE;

(c)     Elanco regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Elanco was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.   Each of these reports was publicly available and entered the public marketplace.

245.   As a result of the foregoing, the market for Elanco's securities promptly digested current information regarding Elanco from all publicly available sources and reflected such information in Elanco's share price. Under these circumstances, all purchasers of Elanco's securities during the Class Period suffered similar injury through their purchase of Elanco's securities at artificially inflated prices and a presumption of reliance applies.

246.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## VII.   VIOLATIONS OF THE SECURITIES ACT

247.   Plaintiffs' claims under the Securities Act do not sound in fraud and Plaintiffs expressly disavow and disclaim any allegations of fraud, scheme or intentional conduct as part of its claims under the Securities Act.  Any allegations of fraud, fraudulent conduct, or motive are specifically disclaimed from the following allegations for the purposes of Plaintiffs' claims under the Securities Act, which do not have scienter, fraudulent intent or motive as required elements. To the extent that these allegations incorporate factual allegations elsewhere in this Complaint, those allegations are incorporated only to the extent that such allegations do not allege fraud, scienter, or intent of the Defendants to defraud Plaintiffs or members of the Class.

248.   As alleged below, Elanco and other Defendants made a series of materially untrue statements or omissions of material facts in the offering materials filed in connection with the Aratana Merger.

249.   The Aratana Merger was made pursuant to the Merger Registration Statement, including the final Prospectus, filed with the SEC on June 17, 2019.  The Merger Registration Statement was signed by Simmons, Young, James M. Meer, R. David Hoover, Kapila K. Anand, John P. Bilbrey, Art A. Garcia, Michael J. Harrington, Deborah T. Kochevar, Lawrence E. Kurzius, Kirk McDonald, and Denise Scots-Knight.

250.   The Merger Registration Statement incorporated by reference, among other documents: (i) Elanco's 2018 Form 10-K; and (ii) Elanco's 1Q 2019 Form 10-Q.

251.   The Merger Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts and/or omitted to state facts necessary to make the statements made therein not misleading.  The Merger Registration Statement was not prepared in accordance with the rules and regulations governing their preparation.

252.   The Merger Registration Statement stated the following:

A key element of Elanco's targeted value creation strategy is to drive growth through portfolio development and product innovation, primarily in its three targeted growth categories: CA Disease Prevention, CA Therapeutics and FA Future Protein & Health. Elanco's eleven product launches between 2015 and

December 31, 2018 have had a significant positive impact on its revenue over those periods, and Elanco expects new products and innovation will continue to have a positive impact on revenue in the future. Revenue from these product launches contributed $274.2 million to revenue for the year ended December 31, 2018 and $97.8 million to revenue for the three months ended March 31, 2019.

253.    The Merger Registration Statement further described Elanco's FY 2018 financial results, in relevant part, as follows:

2018 vs. 2017

Total revenue increased $177.8 million or 6% in 2018 as compared to 2017, reflecting a 3% increase due to higher realized prices and a 3% increase due to higher volumes.

In summary, the total revenue increase was due primarily to:

- an increase in revenue of $142.1 million or 22% from CA Disease Prevention products, excluding the impact of foreign exchange rates;

- an increase in revenue of $18.4 million or 7% from CA Therapeutics products, excluding the impact of foreign exchange rates;

- an increase in revenue of $63.8 million or 10% from FA Future Protein & Health products, excluding the impact of foreign exchange rates;

* * *

The detailed change in revenue by product category was as follows:

- CA Disease Prevention revenue increased by $144.4 million or 22% due primarily to a reduction in channel inventory in 2017 providing a favorable year-on-year comparison, continued uptake of *Credelio* and *Interceptor Plus*, as well as realized price increases primarily impacting *Trifexis*, *Capstar* (a flea treatment) and *Comfortis*, partially offset by volume declines in certain parasiticides, primarily *Trifexis* and *Comfortis* volumes.

- CA Therapeutics revenue increased by $22.3 million or 9% due primarily to the continued uptake of *Galliprant* and *Osurnia*, as well as increased demand for *Onsior*, partially offset by a temporary supply shortage of *Percorten V* used for the treatment of canine Addison's Disease.

- FA Future Protein & Health revenue increased by $62.0 million or 10% due primarily to the launch of *Invixa* and the growth in poultry animal-only antibiotics and poultry vaccines.

- FA Ruminants & Swine revenue decreased by $1.0 million due primarily to competitive headwinds for ractopamine based products, offset by growth in animal-only antibiotics, primarily in cattle.

254.    The foregoing statements in ¶¶252-253 regarding Elanco's "value creation strategy," growth, and revenue were materially untrue or omitted to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading because: (i) Defendants failed to disclose that during 2018 and into 2Q 2019, Elanco had implemented and was increasingly reliant upon systematic and undisclosed channel stuffing practices that inflated Elanco's appearance of growth; and (ii) Elanco's undisclosed, risky, and unsustainable channel stuffing practices both artificially inflated the Company's financial results and risked substantial negative impact on Elanco's sales and growth going forward.

255.    The statements in, and incorporated into, the Merger Registration Statement, including but not limited to purported risk factors stating "*For Elanco's companion animal products, increased use of alternative distribution channels, or changes within existing distribution channels, could negatively impact its market share, margins and distribution of its products*" and "*Our results of operations are dependent upon the success of our top products*" were materially untrue or omitted to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading because: (i) Defendants misrepresented and failed to disclose that during 2018 and continuing through 2019, Elanco had already materially changed its distribution sales strategy to a model that inflated sales far in excess of end-user demand; (ii) as a result of the foregoing, Elanco's sales channels were already over-stuffed by the time of the Aratana Merger; and (iii) as a result, sales of its top products were at significant risk going forward.

256.    The failure to disclose the facts in ¶¶252-255, *supra*, also rendered the Merger Registration Statement materially misleading because those facts, as known adverse trends and/or uncertainties, were required to be stated therein pursuant to Item 303.

## VIII.   CLASS ACTION ALLEGATIONS

257.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Elanco securities between September 20, 2018 and May 6, 2020, inclusive, including a subclass of persons or entities that acquired Elanco common stock pursuant to the Aratana Merger Registration Statement, and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

258.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Elanco's common shares actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class.  Millions of Elanco common stock were traded publicly during the Class Period on the NYSE.  Record owners and other members of the Class may be identified from records maintained by Elanco or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

259.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

260.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

261.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Elanco; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

262.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## IX.    NO SAFE HARBOR

263.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Elanco who knew that the statement was false when made.

## X.      CLAIMS FOR RELIEF

### FIRST CLAIM
**Violation of Section 11 of the Securities Act
Against Elanco, Individual Defendants,
and Securities Act Defendants
(Relating to the Aratana Merger)**

264.    Plaintiffs repeat and re-allege the allegations contained in ¶¶13-33, 38-74, 247-263, above as if fully set forth herein.

265.    This Claim is brought by Plaintiffs pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all members of the Class who purchased or otherwise acquired Elanco common stock pursuant or traceable to the Aratana Merger, and were damaged thereby.

266.    This Count expressly excludes and disclaims any allegation of fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act.  For purposes of asserting this Count, Plaintiffs do not allege that Elanco, Individual Defendants or Securities Act Defendants acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

267.    Liability under this Claim is predicated on Elanco's filing the Merger Registration Statement, the Individual Defendants' and Securities Act Defendants' signing of the Merger Registration Statement, and Elanco's, Individual Defendants', and Securities Act Defendants' respective participation in the Aratana Merger, which was conducted pursuant to the Merger Registration Statement.  The Merger Registration Statement was false and misleading, contained untrue statements of material facts, omitted to state facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

268.    Less than one year elapsed between the time that Plaintiffs discovered, or could reasonably have discovered, the facts upon which this Complaint is based and the initial complaint in this action.  Less than three years has elapsed since the time that the securities at issue in this Complaint were bona fide offered to the public.

269.    By reason of the foregoing, the defendants named in this Claim are each jointly

and severally liable for violations of Section 11 of the Securities Act to Plaintiffs and the other members of the Class pursuant to Section 11(e).

**SECOND CLAIM**
**Violation of Section 12(a)(2) of the Securities Act**
**Against Elanco**
**(Relating to the Aratana Merger)**

270.     Plaintiffs repeat and re-allege the allegations contained in ¶¶13-33, 38-74, 247-263, 264-269, above as if fully set forth herein.

271.     This Claim is brought by Plaintiffs pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l, on behalf of all members of the Class who purchased or otherwise acquired Elanco securities in the Aratana Merger and who were damaged thereby.

272.     This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act.  For purposes of asserting this Count, Plaintiffs do not allege that Defendant Elanco acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.

273.     Elanco was a statutory seller of Elanco securities that were registered in the Aratana Merger pursuant to the Merger Registration Statement.  Pursuant to the Merger Registration Statement, Elanco issued approximately 7.2 million shares of stock in the Aratana Merger to members of the Class.  Defendant Elanco, at all relevant times, was motivated by its own financial interest.  In sum, Defendant Elanco was a seller, offeror, and/or solicitor of sales of the securities that were issued in the Aratana Merger by means of the materially false or misleading Merger Registration Statement.

274.     Plaintiff Strappe acquired Elanco securities pursuant to the Merger Registration Statement and was damaged by the materially false or misleading statements or omissions contained in Merger Registration Statement.

275.     The Merger Registration Statement contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose

material facts, as set forth herein.

276.    Less than one year elapsed between the time that Plaintiffs discovered, or could reasonably have discovered, the facts upon which this Complaint is based and the initial complaint in this action.  Less than three years has elapsed since the time that the securities at issue in this Complaint were bona fide offered to the public.

277.    By reason of the foregoing, Defendant Elanco is liable for violations of Section 12(a)(2) of the Securities Act to Plaintiffs and the other members of the Class who purchased or acquired securities in or traceable to the Aratana Merger, and who were damaged thereby.

### THIRD CLAIM
**Violation of Section 15 of the Securities Act**
**Against Individual Defendants and Securities Act Defendants**
**(Relating to the Aratana Merger)**

278.    Plaintiffs repeat and re-allege the allegations contained in ¶¶13-33, 38-74, 247-263, 264-277, above as if fully set forth herein.

279.    This Claim is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, against the Individual Defendants and the Securities Act Defendants.

280.    At all relevant times, the Individual Defendants and Securities Act Defendants were controlling persons of Elanco within the meaning of Section 15 of the Securities Act.  As set forth herein, because of their positions at Elanco and/or because of their positions on Elanco Board, the Individual Defendants and Securities Act Defendants had the requisite power to directly or indirectly control or influence the decision-making of the Company and the conduct of Elanco's business, including the wrongful conduct complained of herein.

281.    In their capacities as senior corporate officers of the Company, and as more fully-described above, Defendants Simmons and Young had direct involvement in the day-to-day operations of the Company, and therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities law violations as alleged herein. They were also directly involved in providing false information and certifying and/or approving the false and/or misleading statements disseminated by Elanco during the Class Period.  As a

result of the foregoing, Defendants Simmons and Young, as a group and individually, were controlling persons of Elanco within the meaning of Section 15 of the Exchange Act.

282.    Defendants Simmons and Young also each signed the Merger Registration Statement in connection with the Aratana Merger.  The Merger Registration Statement was disseminated to the investing public and became effective.  Thus, these defendants controlled the contents and dissemination of the Merger Registration Statement.

283.    Similarly, the Securities Act Defendants and Defendant Simmons served as Directors on Elanco's board of directors and Defendant Meer served as Chief Accounting Officer, at the time the Aratana Merger was conducted and at the time that the Merger Registration Statement was signed.  As directors and senior corporate officer of a publicly owned company, these defendants had a duty to disseminate accurate and truthful information with respect to Elanco's financial condition and results of operations.   These Securities Act Defendants and Defendant Simmons each signed the Merger Registration Statement in connection with the Aratana Merger.   Thus, these defendants controlled the contents and dissemination of the Merger Registration Statement.

284.    This Claim does not sound in fraud.  For purposes of asserting this Claim under the Securities Act, Plaintiffs do not allege that any defendant acted with scienter or fraudulent intent, which are not elements of a Section 15 claim.

285.    By reason of the aforementioned conduct, each of the defendants named in this Claim is liable under Section 15 of the Securities Act to Plaintiffs and other members of the Class with claims pursuant to Section 11 of the Securities Act, as set forth above.  As a direct and proximate result of the conduct of these Defendants, Plaintiffs and members of the Class suffered damages in connection with their purchase or acquisition of securities pursuant and/or traceable to the Aratana Merger.

**FOURTH CLAIM**
**Violation of Section 10(b) of The Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**Against Elanco and Individual Defendants**

286.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

287.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Elanco's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

288.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Elanco's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

289.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Elanco's financial well-being and prospects, as specified herein.

290.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Elanco's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state

material facts necessary in order to make the statements made about Elanco and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

291.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

292.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Elanco's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover

whether those statements were false or misleading.

293.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Elanco's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Elanco's securities during the Class Period at artificially high prices and were damaged thereby.

294.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Elanco was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Elanco securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

295.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

296.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**FIFTH CLAIM**
**Violation of Section 20(a) of The Exchange Act**
**Against the Individual Defendants**

297.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

298.     Individual Defendants acted as controlling persons of Elanco within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

299.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

300.     As set forth above, Elanco and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiffs and the other Class

members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(d)      As to the claims set forth under the Securities Act, awarding rescission or a recessionary measure of damages; and

(e)      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: November 9, 2020                  **GLANCY PRONGAY & MURRAY LLP**

By:  *s/ Kara M. Wolke*
Robert V. Prongay
Kara M. Wolke
Melissa C. Wright
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

**KATZ KORIN CUNNINGHAM**
Offer Korin
The Emelie Building
334 North Senate Avenue
Indianapolis, IN 46204
Telephone: (317) 464-1100
Facsimile: (317) 464-1111
okorin@kkclegal.com

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007

*Attorneys for Plaintiffs*

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On November 9, 2020, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of Indiana, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on November 9, 2020.

_s/ Kara M. Wolke_____
Kara M. Wolke