UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| SANDRA HUNTER Individually and on behalf of all others similarly situated, MARLA STRAPPE, Plaintiffs, v. ELANCO ANIMAL HEALTH INCORPORATED, JEFFREY N. SIMMONS, TODD S. YOUNG, JAMES M. MEER, R. DAVID HOOVER, KAPILA K. ANAND, JOHN P. BILBREY, ART A. GARCIA, MICHAEL J. HARRINGTON, DEBORAH T. KOCHEVAR, LAWRENCE E. KURZIUS, KIRK MCDONALD, DENISE SCOTS-KNIGHT, Defendants. | No. 1:20-cv-01460-SEB-MG |

**ORDER GRANTNG DEFENDANTS' MOTION TO DISMISS**

Investors in Elanco Animal Health, Inc.—a publicly traded company based in Greenfield, Indiana—have filed this purported class action for federal securities violations on behalf of all persons who purchased or otherwise acquired Elanco stock between September 20, 2018, and May 6, 2020. Plaintiffs allege that Elanco and its officers engaged in a scheme to deceive and defraud investors of the true value of Elanco's common stock in violation of federal securities law. Specifically, Plaintiffs

allege that Defendants artificially boosted Elanco's earnings and growth by "stuffing" product distribution channels "far in excess of end-user demand." This, Plaintiffs argue, combined with Defendants' false and misleading representations about Elanco's growth and financial situation, led to the artificial inflation of Elanco's stock prices during the class period. Due to Defendants' allegedly unlawful actions, Plaintiffs claim that they were injured by purchasing or acquiring Elanco stock during the class period. We consider here Defendants' Motion to Dismiss this cause of action for failure to state a claim, and failure to meet the heightened pleading standards required by these specific securities violations.

## I.   ALLEGATIONS OF FACT

Faced with a Rule 12(b)(6) motion to dismiss a federal securities action, "courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007) ("*Tellabs II*"), and draw all inferences in Plaintiffs' favor, *Bielanski v. County of Kane*, 550 F.3d 632, 633 (7th Cir. 2008). However, "we are not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). We are also not required to "cast a blind eye to 'facts alleged in the complaint that undermine the plaintiff's claim.'" *Gaines v. Guidant Corp.*, 2004 WL 2538374 (S.D. Ind. 2004) (Barker, J.) (quoting *Arazie v. Mullane,* 2 F.3d 1456, 1465 (7th Cir. 1993)). Except where explicitly noted, the facts described herein are those alleged by Plaintiffs in their First Amended Complaint.

## A.  BACKGROUND AND PARTIES

Plaintiffs include both those persons and entities who purchased Elanco securities between September 20, 2018, and May 6, 2020, as well as those who acquired Elanco common stock pursuant to Elanco's merger with Aratana Therapeutics on July 18, 2019. Lead Plaintiff, Sandra Hunter, filed this class action complaint alleging that Elanco, its Chief Executive Officer Jeffery N. Simmons, and its Chief Financial Officer Todd S. Young, made fraudulent misrepresentations by omitting material information relating to "systemic and undisclosed channel stuffing practices" that caused distributors to purchase inventory "far in excess of demand" from dozens of public statements.[1] Compl. ¶¶ 77, 94-96, 100-01, 103-11, 113-24, 128-29, 131-43, 145-54, 156-69, 171-81, 184-89, 191-203, 206-13. Plaintiffs argue the omission of this information made Elanco's growth and revenue figures throughout the class period materially misleading. Plaintiffs also allege that Elanco's Chief Account Officer James M. Meer and the nine members of Elanco's Board of Directors, by omitting this information regarding channel stuffing from the offering materials for Elanco's merger with Arantana Therapeutics, rendered the growth and revenue calculations within these documents materially misleading as well.[2]

---

[1] Because we decline to reproduce here the twenty-seven challenged statements in their entirety—which span sixty pages and consist of single-spaced, block quotations with large swathes of unchallenged portions of text—we have summarized and extracted relevant portions of the facts section of the briefs. We will address the challenged statements more thoroughly in the analysis section.

[2] The individual Defendants from the Elanco's Board of Directors are the Chairman R. David Hoover, Kapila K. Anand, John P. Bilbrey, Art A. Garcia, Michael J. Harrington, Deborah T. Kochevar, Lawrence E. Kurzius, Kirk McDonald, and Denise Scots-Knight. Compl. ¶¶ 23–33.

Formerly a business unit of Eli Lilly and Company, Elanco was spun-off into a standalone, public company after its initial public offering on September 20, 2018. Elanco develops, manufactures, and markets animal health products for both companion animals, such as dogs and cats, and food animals, i.e., cattle and poultry. Prior to its initial public offering, Elanco was the fourth largest animal health company in the world, with $2.9 billion in revenue in 2017. Docket. No. 38-1, at 7.[3] Elanco had reported net income losses for the three years preceding its initial public offering, with $310.7 million, $47.9 million, and $210.8 million net income loss in 2017, 2016, and 2015, respectively. Elanco expected to "continue to incur substantial expenditures to develop, manufacture, and market our products and implement [their] business strategies." *Id.* at 12.

Elanco generates revenue primarily through product sales to customers, who are generally not end-users, but rather third-party wholesale distributors of Elanco's products. These distributors, in turn, sell to customers like veterinary clinics for companion animal products, or cattle and dairy farms for food animal products. Consistent with generally accepted accounting principles (GAAP), Elanco generally recognizes revenue at the time the product is shipped their customers. *Id.* at 46. Payment terms "differ by jurisdiction and customer, but payment terms in most of [Elanco's] major jurisdictions typically range from 30 to 100 days from date of shipment." *Id.* at 47. Going into the IPO, Elanco had

---

[3] Docket No. 38-1 references Elanco's Form S-1 Registration Statement attached to the Declaration of Stacy Nettleton in support of Defendants' Motion to Dismiss. In ruling on a motion to dismiss, courts may consider judicially noticed documents, including publicly filed SEC filings, without converting the motion to dismiss into a motion for summary judgment. *See In re Guidant Corp. Sec. Litig.*, 536 F. Supp. 2d 913, 921 (S.D. Ind. 2008) (Barker, J.), *aff'd sub nom. Fannon v. Guidant Corp.*, 583 F.3d 995 (7th Cir. 2009).

eight primary customers: MWI Animal Health, Covetrus, Inc., Patterson Veterinary, Midwest Veterinary Supply, K+K Vet Supply Inc., Penn Veterinary Supply, Inc., Victor Medical Company, Veterinary Service, Inc., and Nutra Blend LLC.

Elanco's contracts with "direct and indirect customers may provide for various rebates and discounts that may differ in each contract." *Id.* To determine the appropriate transaction price for Elanco's product sales at the time it recognizes a sale to a direct customer, Elanco "must estimate any rebates or discounts that ultimately will be due to the direct customer and other customers in the distribution chain under the terms of [their] contracts." *Id.* "The rebate and discount amounts are recorded as a deduction to arrive at [their] net product sales." Elanco estimates these accruals using an expected value approach. Actual product returns were less than two percent of Elanco's net revenue between January 1, 2017, and June 30, 2018. *Id.* at 48. During the first six months of 2018, Elanco's sales rebates and discounts liability in the United States reached $88.6 million, compared to $108.2 million in liability for the first six months of the prior year, 2017. *Id.*

In the animal health sector, companion animal products generally have higher gross margins relative to food animal products. Elanco began as a food animal-focused company, but in the ten years preceding its initial public offering, it had "intentionally transformed" into a diversified global company. *Id.* at 7. In addition to Elanco's established position in Food Animal Ruminants & Swine, the company had sought to increase its profitability and grow its revenue by establishing positions in three "targeted growth categories": Companion Animal Disease Prevention, Companion Animal

Therapeutics, and Food Animal Future Protein and Health. *Id.* To establish market positions in these higher margin categories, Elanco had made "strategic acquisitions" to expand its product portfolio, increase its sales presence, and obtain Research & Development and manufacturing capabilities. *Id.* For example, Elanco licensed Galliprant—a canine osteoarthritis drug from Aratana Therapeutics in 2016—which generated ten percent sales growth in their Companion Animal sector in 2017. "As a result of these acquisitions as well as organic growth," Elanco grew their Companion Animal categories "from a minimal presence in 2007 to more than $900 million in revenue in 2017." *Id.* However, an estimated one-third of Elanco's revenue still came from its medicated feed additives within its Food Animal Ruminants & Swine category. Moreover, Elanco's top product, Rumensin, a feed additive for cattle, generated approximately ten percent of Elanco's total revenue that year. *Id.*

### B.  LEAD UP TO ELANCO'S INITIAL PUBLIC OFFERING

During 2017, according to Confidential Witness 1, Elanco employed a "move out" style business model which focuses on "creating incentives and opportunities to increase sales by distributors to the ultimate end-users." Compl. ¶ 48. Confidential Witness 1 was described as a Corporate Account Manager in Elanco's Large Animal division and was responsible for managing Elanco's relationship with four distributors—MWI, Midwest, K+K, and Veterinary Service, Inc. Confidential Witness 1 reported to Director of Food Animal Channel & Distribution, Courtney Shriver, who reported to Senior Director of

Channel Strategy and Sales Force Excellence for North America, Julia Loew, who reported to Vice President, Companion Animal US, Shawn McKee.

Towards the end of 2017, according to Confidential Witness 2, Elanco introduced a "sliding scale of margins, adjusted quarterly, based on the amount of product distributors purchased." *Id*. ¶ 49. Confidential Witness 2 was a Corporate Account Manager in Elanco's Companion Animal division and was responsible for contract negotiations and overseeing the day-to-day management of Elanco's relationship with MWI. Confidential Witness 2 also reported to Shriver, the Director of Food Animal Channel & Distribution. Confidential Witness 2 stated, "MWI was held to a certain amount of buy from us, and if they didn't make it, then their margin dropped." *Id.* According to Confidential Witness 2, "[n]obody does this," instead "[y]ou should be able to give your client at least annually [sic] visibility" on their margins. *Id.* When making a presentation on the sliding scale of margins at a conference in 2018, Confidential Witness 2 recalled that MWI executives' "jaws dropped." *Id.* This was a transition to a "move in" sales model, which incentivizes sales to Elanco's direct customers—the distributors.[4]

In the months leading up to Elanco's initial public offering in September of 2018, Confidential Witness 2 recounted that Elanco's top management became so consumed with hitting sales numbers to meet market expectations that the pressure to "stuff the channel" correspondingly ramped up. *Id*. ¶ 50. In February of 2018, Confidential Witness 1, recalled being asked by Shriver "to bring in a million here, an extra $2 million there, to

---

[4] While we accept as true Plaintiffs' factual allegation that Elanco switched sales models, we have sidestepped Plaintiffs' editorialized description of the "move in" sales model.

close the gap on another business segment that wasn't doing well." *Id*. ¶ 51. Confidential Witness 2 was directed by Shriver to "figure out which products [MWI could] take and stuff it in," and "it doesn't matter how you get it in." *Id*. ¶ 52. Ultimately, Shriver directed Confidential Witness 2 to "stuff the MWI channel with an additional $3 million of Interceptor Plus and Trifexus, two popular Companion Animal medications . . . even though MWI was already holding 75-80 days of both products." *Id*. The industry standard practice, we were told, is to hold between 45 and 60 days' worth of inventory. Confidential Witness 2 increased MWI's margin on Trifexus from eighteen to twenty percent.

Regarding these months leading up to the September initial public offering, Confidential Witness 4 recalled that "[w]hen 'move out' started to come short of projections, that's when [Elanco] start [sic] to 'move in' more." *Id*. ¶ 50. Specifically, Confidential Witness 4 recalled that "by mid-2018" the shift to selling as much of Elanco's products to distributors as possible, regardless of end-user demand, had "started again." *Id*. ¶ 53. Confidential Witness 4 was identified as the Global Head of Animal Care Expansion, Business Development & Licensing and Alternate Innovation from September of 2018 to January of 2020, and then a Vice President from January of 2020 until July of 2020. It is thus unclear how Confidential Witness 4 came to possess this information reflecting business activity occurring months before his or her being employed at Elanco.

## C. ELANCO'S INITIAL PUBLIC OFFERING

In Elanco's registration statement for its initial public offering, Elanco stated its intention to "continue to grow our business and create value for our shareholders through a targeted value-generating strategy with three key pillars: a Portfolio Strategy for our marketed products, an Innovation Strategy for our R&D pipeline and a Productivity Strategy for our margin expansion initiatives." *Id*. ¶ 95. Elanco's Portfolio Strategy promised to focus "the majority of our resources, including more than 75% of our R&D funding, on our three targeted growth categories": Companion Animal Disease Prevention, Companion Animal Therapeutics and Food Animal Future Protein & Health, "where we believe we are well positioned to grow faster than the market." *Id.* For its Companion Animal Disease Prevention category, Elanco believed it was well positioned to drive additional growth through "continued product innovation and sales channel expansion." *Id*. For its well-established Food Animal Ruminants & Swine category, Elanco expected to "continue to be a leader," believing it had "created long-standing customer relationships [that] provide[s] an important revenue source for our business and for investment capital to support future growth." Docket No. 38-1, at 7.

Elanco's Innovation strategy included "strong" in-house Research & Development capabilities in addition to acquiring products through acquisitions or venture capital investment. *Id.* at 8. "This inclusive approach to innovation allows us to identify, attract, fund, and develop new ideas in a manner that enhances our pipeline while, we believe, reducing the risk associated with an in-house only innovation model." *Id.* Pursuant to this strategy, Elanco had launched nine products from 2015 to 2017 that delivered revenue of $24.7 million in 2015, $97.9 million in 2016, and $143.8 million in 2017, and $136.6

million during the first half of 2018. Elanco believed its new products would continue to be an "important source of revenue." *Id.* However, Elanco cautioned that generic competitors were "becoming more aggressive in terms of lauching products before patent rights expire, and, because of attractive pricing, sales of generic products are an increasing percentage of overall animal health sales in certain regions." *Id.* at 12. Elanco also disclosed that approximately seventy-five percent of its revenue in 2017 came from products that did not have patent protection, including revenue from some of its top products like Rumensin. *Id.* at 16. As a result, Elanco already had faced competition from lower-priced generics or other alternatives to some of its products and warned that it could continue to face such competition for more of its products.

Elanco's Productivity Strategy focused, in part, on sales growth, which entailed plans by Elanco to significantly increase its operating margins by increasing productivity within its sales force. To accomplish this level of growth, Elanco would rely on both its "sales force's strong customer relationships" and Elanco's "strategic distributor partnerships to efficiently grow demand for [its] products." Compl. ¶ 46. Elanco's registration statement identified "increased use of alternative distribution channels," "changes within existing distribution channels," and changes within its existing distributor relationships as risk factors for its Companion Animal products. *Id*. ¶ 97. Elanco's registration statement included the disclosure that in 2017, a change in their "inventory management practices resulted in a revenue lag as existing inventory was sold down, which management estimates decreased our revenue by approximately $35 million." *Id.*

### D.  ELANCO'S 2018 FINANCIAL PERFORMANCE

#### i.  THIRD QUARTER PERFORMANCE

Confidential Witness 4 recalled that the "move in" model was in full force by late 2018, with Elanco offering discounts, additional rebates, and extended payment terms to induce distributors to purchase more inventory. *Id.* ¶ 54. On November 6, 2018, Elanco announced its third quarter 2018 financial results and reported that revenue had grown nine percent—as compared to the third quarter of 2017—to $761.1 million. Revenue from the Companion Animal Disease Prevention and Therapeutics categories grew thirty-four and twenty-seven percent, respectively, growth that was driven by increased volume and price.  Food Animal Ruminants & Swine increased eight percent for the quarter, while Food Animal Future Protein & Health grew two percent for the quarter.

On an earnings call conducted that same day, Elanco's President and Chief Executive Officer Jeffery Simmons explained that Elanco "saw strong performance in our targeted growth categories, and we continue delivering on our commitments to achieve a sustainable flow of innovation with new product approvals, several new launches, and an R&D collaboration." *Id.*  ¶ 104. He further explained that Elanco's "margin expansion efforts continue to progress," and ultimately, "we met our expectations for delivery in our first quarter as a publicly traded company." *Id.* Simmons commented that while some of the growth rates in this quarter were "quite large due to purchasing patterns, the year-to-date results are more in line with our goals and strategy." *Id.* For example, Elanco's then-Chief Financial Officer explained that part of the Companion Animal Disease Prevention's high growth rate was due to "a favorable comparison to the prior year,

including an anticipated stock out in [quarter three] in 2017, which shifted sales to the second quarter." *Id.* ¶ 105. Simmons concluded that these results demonstrated that "our strategy is performing as expected and we are tracking towards our goals." *Id.* ¶ 104.

### i. FOURTH QUARTER AND YEAR END PERFORMANCE

During the fourth quarter of 2018, Shriver directed Confidential Witness 1 to push $10 to $12 million worth of excess feed additive and vaccine inventory onto MWI, over and above MWI's typical monthly purchase of $12 million in feed additive. *Id.* ¶ 60. Confidential Witness 1 recalled that by the fourth quarter of 2018, inventory levels of feed additives and cattle vaccines were at 120 days at Elanco's major distributors, double the industry standard. On February 6, 2019, Elanco announced its financial results for both the fourth quarter and the full year of 2018, reporting revenue growth of six percent, to $799.3 million and $3.1 billion, respectively. Net income and earnings per share (EPS) had reached $86.5 million and $0.28, respectively. Docket No. 38-3, at 9. For the year, the deduction for estimated rebates and discounts totaled $221 million. Docket No. 38-11, at 6. These results, according to Elanco, reflected "strong volume growth and the execution of the company's targeted, three-pillar strategy focused on Portfolio, Innovation and Productivity" as well as a "strong full year performance in its three targeted growth categories." Compl. ¶ 119. Food Animal Ruminants & Swine still accounted for thirty-eight percent of Elanco's revenue for the year, with Food Animal Future Protein & Health accounting for twenty-three percent, Companion Animal

Disease Prevention accounting for twenty-six percent, and Companion Animal Therapeutics accounting for just nine percent. *Id.* ¶ 43.

For the fourth quarter of 2018, the constant currency core revenue growth rate reached six percent. Companion Animal Disease Prevention revenue was up forty-three percent for the quarter, which "improved in comparison to [the] prior year due to a reduction in channel inventory in the fourth quarter of 2017." *Id.* ¶ 119. However, Elanco reported that revenue for Companion Animal Therapeutics had decreased by six percent due to the timing and availability of Galliprant shipments. Elanco attributed this decrease to "a planned shipment in late 2018 [which] was delayed until early 2019 to appropriately complete the quality release process," and demand for Galliprant has exceeded supply capacity "resulting in Galliprant backorders at the end of the year." *Id.* Elanco was "working diligently to expand production and expects to clear remaining backorders by late first quarter or early second quarter 2019." *Id.* Food Animal Future Protein & Health revenue had increased eight percent, driven by volume and increased price. Revenue for Food Animal Ruminants & Swine, Elanco's largest revenue category, had decreased by eight percent, driven by "softness in swine antibiotics, particularly in Asia, and a stock-outage of Micotil, an injective treatment for Bovine Respiratory Disease, now resolved." Docket No. 38-3, at 8.

### E.  ELANCO'S 2019 FINANCIAL PERFORMANCE

On December 18, 2018, Elanco announced its financial guidance for 2019, with included stated expectations of annual revenue of between $3.10 and $3.16 billion and

earnings per share of between $0.36 to $0.48 on a reported basis and $1.02 to $1.12 on an adjusted basis. During a call with investors held that day, Simmons said the company was pleased with the progress made in 2018, and was "meeting our expectations, achieving sales growth, delivering innovation, executing our margin expansion priorities and carrying momentum into 2019." Compl. ¶ 115. "On a like-for-like comparison across years," Simmons stated that the company expected to "grow 2019 earnings at a double-digit pace." *Id.* He further explained that "the fundamentals of our industry are strong, and our strategy sets us up to grow revenue, expand margins and bring new innovation." *Id.* Elanco's Chief Financial Officer Todd Young explained on that call that "underlying operational growth and the benefits of the restructuring actions provide an expected 15% increase in adjusted EPS for 2019, well above the expected constant currency core revenue growth rate of 4% to 6%." *Id.* ¶ 116.

During an unspecified quarter in 2019, Confidential Witness 3 reportedly "sold $10 million of product to Animal Health International, a Patterson subsidiary, in exchange for a 5% rebate, while Nutra Blend received a 20% rebate to incentivize Nutra Blend to make a larger purchase in excess of its needed inventory." *Id.* ¶ 57. However, Confidential Witness 3 was a National Accounts Manager in Elanco's Food Animal Division and was responsible for Elanco's relationships with MWI, Covetrus, and Patterson. There is no mention of Confidential Witness 3 working with Nutra Blend, so it is unclear whether this information provided here by him or her was first-or second-hand. Confidential Witness 3 reported to Shriver.

### i.  FIRST QUARTER PERFORMANCE

On April 26, 2019, Elanco announced its agreement to acquire Aratana, the pet therapeutics company from whom Elanco had previously licensed Galliprant. On May 9, 2019, Elanco announced its first quarter financial results, reporting that revenue declined one percent to $731.1 million. Elanco reduced its revenue expectations for the year to a range of $3.08 and $3.14 billion. Companion Animal Disease Prevention revenue was down eight percent for the quarter, while Companion Animal Therapeutics revenue was up thirty-one percent, "primarily driven by sales of Galliprant" as "backorders in the channel were resolved and the product was launched in several European markets." *Id.* ¶ 116. Food Animal Future Protein & Health revenue was flat for the quarter, while Food Animal Ruminants & Swine decreased three percent as growth from the resolution of certain backorders and favorable purchasing patterns in cattle products was offset by other external factors such as the African Swine Fever.

On an earnings call conducted that day, CFO Todd Young explained that there is a lot of variability in the stocking dynamics of distributors, especially between the Companion Animal Therapeutics and Companion Animal Disease Prevention categories. Young further explained that there were incentives for distributors to buy more vaccines and parasiticides to meet the tiering incentives in the fourth quarter of 2018, so "they were pretty fully stocked on those" versus in the first quarter of 2019, when "the incentive was to buy Galliprant given [Elanco had] resolved all the backorders and had lots of production on that side." *Id.* ¶ 135. Young emphasized that he felt "very good about the underlying demand at the vet channel," and, while the sixteen percent six-month growth

rate was "certainly not what we project for the full year, we do feel very good about our position with our companion animal portfolio for the rest of 2019." *Id.*

### ii. SECOND QUARTER PERFORMANCE

During the second quarter of 2019, Shriver instructed Confidential Witness 3 to sell an additional $5 million of products to Confidential Witness 3's distributors. After filing the necessary merger registration documents with the SEC, Elanco's merger with Aratana was declared effective on June 17, 2019. At the end of the second quarter, when MWI was already holding more than 60 days of inventory for feed additives, Shriver directed Confidential Witness 1 to sell an "additional $10 million that quarter on top of MWI's normally scheduled $9-$10 million purchase." *Id.* ¶ 61. "In order to convince MWI to make such a large additional purchase," Confidential Witness 1 "offered an additional rebate of 3%, which grew to an additional 5% on top of the standard discount as the year progressed." *Id.* Confidential Witness 1 also recalled that by around mid-2019, MWI had taken on so much extra inventory that MWI had to rent warehouse space and use tractor-trailers in Amarillo, Texas to store the surplus product MWI purchased from Elanco.

On August 13, 2019, Elanco announced its second quarter 2019 financial results, reporting a revenue increase of one percent to $781.6 million, with four percent constant currency rate revenue growth. Simmons stated the company was "encouraged by the 9 percent constant currency growth in our targeted growth categories." *Id.* ¶ 156. However, Elanco again reduced its 2019 financial guidance, lowering the top end of the revenue range by $20 million, "primarily [from] the increased headwind from [the] African Swine

Fever and anticipated supply disruption of certain injectable cattle products." Docket No. 38-5, at 8. Revenue for the Companion Animal Disease Prevention category grew six percent from both volume and price. Revenue for Companion Animal Therapeutics increased twenty-six percent, with twenty-one percent of the growth attributable to increased sales volume. Young explained on the earnings call that day that this "growth is driven by demand for products across the therapeutics portfolio, primarily the continued uptake for Galliprant in the U.S. and now a strong launch in Europe as well." Compl. ¶ 158. Future Protein and Health's revenue grew seven percent, but Food Animal Ruminants & Swine's revenue was down nine percent, with unfavorable purchasing patterns for Rumensin in the United States, and the continued impact from external factors such as the African Swine Fever on Elanco's international business, particularly in Asia. Docket No. 38-5, at 7. Moreover, during that same earnings call, Young discussed the recent approval of a generic version of Rumensin as well as the pending launch of a competitor to two of Elanco's best-performing Companion Animal Disease Prevention products.

### iii.  THIRD QUARTER PERFORMANCE

Confidential Witness 3 recalled a telephone conversation occurring in September of 2019 with Shriver, in which Shriver told him or her that during a meeting Shriver had with Simmons at Elanco's headquarters, Simmons told him to "make the quarter, no matter what." Compl. ¶ 63.  In or around that same time, Confidential Witness 3 also recalled Shriver telling them that Simmons was particularly worried about the

introduction of a generic form of Rumensin and was thus eager to push out Elanco's Rumensin inventory. Shriver directed Confidential Witness 3 to sell an additional $5 million for the third quarter among MWI, Covetrus, and Patterson, even though each customer was already "bursting" with inventory. *Id.* In September of 2019, Shriver also directed Confidential Witness 3 to push an extra $10 million in cattle feed additives— including Rumensin—to meet Elanco's third quarter 2019 revenue forecast. Confidential Witness 3 recalled that a fellow Account Manager, using the 10% rebate incentive Elanco offered to distributors purchasing in the last week of a quarter, managed to sell an extra $20 million of inventory to Nutra Blend.

On November 6, 2019, Elanco announced its third quarter 2019 financial results, reporting a revenue increase of one percent to $771.3 million, and core revenue at constant currency rates which had grown four percent. Companion Animal Disease Prevention revenue had increased ten percent for the quarter, driven by continued uptake of products and an initial stocking for a new customer agreement. Companion Animal Therapeutics revenue had increased nine percent for the quarter, driven by continued uptake of Galliprant, initial stocking for a new customer agreement, and sales of two products from the acquisition of Aratana. Food Animal Future Protein & Health revenue had increased eighteen percent for the quarter, driven in part by the "sale of the remaining inventory of a product that will be phased out in China and purchasing patterns in the prior year that created a favorable comparison for poultry products." *Id.* ¶ 173. In contrast, Food Animal Ruminants & Swine revenue was down twelve percent, driven by "softness in swine products due to African Swine Fever across Asia, a disruption in

global supply of certain third-party produced injectable cattle products, reduced U.S. producer use of Paylean, changes in distributor purchasing for Rumensin as anticipated and the impact from the Australian drought, partially offset by revenue generated from Posilac as a result of the revised commercial agreement entered into in the third quarter of 2019." Docket No. 38-6, at 6.

On an earnings call conducted that same day, Young explained that the company now expected a "range of $3.07 billion to $3.085 billion, a narrowing of the range, and a $10 million reduction in the low end of the range." Compl. ¶ 175. Simmons discussed the generic competition for Rumensin, explaining that "we see a strong brand loyalty among our customers for Rumensin, and we are very pleased with the durability and end-user demand." *Id.* ¶ 180. "As we expected, in the distribution channel, we've seen some changes in purchasing as they assess the environment." *Id.* Simmons also explained that they had "modeled that there's an erosion in the first couple of years, a mix between price and volume . . . in the neighborhood of 30% over that first couple of years." *Id.* Simmons reported that Elanco was "tracking at those expectations or even better and feeling very good about it." *Id.* Finally, Simmons said the downward alteration in expected revenue "is really just a supply chain assessment that typically happens when you bring a generic to the market where people's levels of inventories may change a little bit as they are assessing the marketplace." *Id.*

In its SEC filings reflecting third quarter 2019 performance, Elanco revised the description of its typical payment terms from "payment terms in most of our major jurisdictions typically range from 30 to 100 days from date of shipment" to "payment

terms in most of our major jurisdictions typically range from 30 to 120 days from date of shipment." *Id.* ¶¶ 75−76. For the end of 2019, Elanco stated in SEC filings: "[w]e have extended our payment terms in the past in certain customer situations and may need to continue this practice going forward as a result of competitive pressures and the need for certain inventory levels at our channel distributors to avoid supply disruptions." Confidential Witness 1 stated that one of the special incentives offered to his or her accounts was "extended payment terms of 120 days—30 days more than the 90-day payment term typically offered," *id.* ¶ 59, but it is unclear when these offers were made.

### iv.   FOURTH QUARTER AND YEAR END PERFORMANCE

According to Confidential Witness 4, Elanco's "employment of a technique called 'pre-sale,' whereby Elanco would pull sales from future quarters into the current quarter by selling extra inventory to distributors, become progressively worse in 2019, with Elanco hitting its peak" during the fourth quarter of 2019. *Id.* ¶ 67. According to Confidential Witness 2, by the fourth quarter of 2019, MWI had purchased so much excess Elanco inventory that it was holding approximately 100 to 120 days of inventory of Companion Animal products. According to Confidential Witness 4, monthly financial meetings hosted by Young included a review of the relevant sales data, during which Confidential Witness 4 "saw a consistent delta between dispensing numbers and selling numbers." *Id.* ¶ 69. During these meetings in 2019, "senior executives challenged Simmons on Elanco's apparent channel stuffing," which Confidential Witness 4 understood to reflect "the numbers, consumption, … what the distributors [were] selling

and what [we sold] them." *Id.* It is unclear from the parties' submissions precisely when these meetings took place during 2019.

In Elanco's SEC filings for the third quarter of 2019, it had added the risks of "increased or decreased sales to our channel distributors resulting in higher or lower inventory levels held by them in advance of or trailing actual customer demand, which could lead to variations in quarterly revenue results" and "[i]ncreases or decreases in inventory levels at our channel distributors can positively or negatively impact our quarterly and annual revenue results, leading to variations in quarterly revenues." *Id.* ¶¶ 78–79. At some point during the fourth quarter of 2019, Elanco made the decision to consolidate its United States distributors for Companion Animal products from eight to four.[5] Sometime in November 2019, Elanco also switched its sales model back to the "move out" model. Because Plaintiffs describe the "move out" strategy as an effort to "balance sales to end-user demand," as opposed to the "move in" strategy, which "incentivizes excess purchases by distributors in excess of demand," we understand November of 2019 to be the end point of the alleged "channel stuffing" system. *Id.* ¶ 190. Around the same time, Elanco reduced its base margins offered on products sold. Confidential Witness 4 stated that "[t]he distributors that got eliminated first that had inventory kept selling until they ran out." *Id.* ¶ 74. As a result of the eliminated

---

[5] It is unclear when precisely during the fourth quarter this decision actually occurred. Plaintiffs allege that Defendants "slipped in" these "subtle" changes in the third quarter SEC filings "just prior to the time that it cut its distributors from eight to four, Compl. ¶¶ 75–79, 91, and Simmons allegedly said on an earnings call that Elanco "at the start of 2020, we consolidated our US companion animal distributors from eight to four." Docket No. 38-13, at 5.

distributors still offloading their excess supply, "[t]he pick up [by remaining distributors] was delayed," creating an "accumulation of inventory" that was a "compounding factor" in the fourth quarter. *Id.*

On December 10, 2020, Elanco announced its financial guidance for 2020, explaining that, while the audit for 2019 was not yet complete, "the anticipated results are consistent with the November guidance, trending toward the low end" of the updated ranges. Elanco's strength in its targeted growth categories was "offset by nearly $100 million of revenue headwinds from environmental issues that arose during the year, including African Swine Fever, the Australian drought and others." *Id.* ¶ 191. On an investor call occurring that same day, Simmons stated Elanco "is a resilient, diverse and durable business that grew in 2019 despite significant environmental pressures, including one of the most significant animal disease epidemics in decades." *Id.* Simmons was "pleased with Rumensin's performance in the initial months since a generic has been available in the US." *Id.* ¶ 192. "The strength of our cattle portfolio, customer relationships, and value beyond product offerings are supporting Rumensin's sales at a higher level than our original erosion assumptions." *Id.* Thus, Elanco predicted a lower decline in 2020 than previously estimated, but "these competitive events [still] represent[ed] approximately $60 million to $90 million of revenue headwind, or 2% to 3% of growth." *Id.*

On February 19, 2020, Elanco announced its fourth quarter and year end 2019 financial results, reporting that fourth quarter revenue had decreased two percent to $787 million, with core revenue for the quarter growth of one percent on a constant currency basis. For the year, revenue was flat compared to 2018 at $3.1 billion, with core revenue

on a constant currency basis growing three percent. Full year earnings per share was
$0.18 as reported, or $1.06 as adjusted. Product returns comprised a total of 0.2% of net
revenue in 2019, down from 0.6% of net revenue in 2018. Docket No. 38-8, at 8. The
deduction for estimated rebates and discounts in the United States was $316 million in
2019. *Id.* Elanco's growth categories—Companion Animal Disease Prevention,
Companion Animal Therapeutics, and Food Animal Future Protein and Health—
accounted for sixty-one percent of Elanco's revenue for the year, while Food Animal
Ruminants and Swine accounted for thirty-six percent.

On the earnings call conducted that same day, Simmons stated that "2019 was a
challenging year with a number of external events that emerged throughout the year
including African Swine Fever, supply challenges, drought, changing producer use of
certain products from policy and trade, and the entrant of a new generic competitor."
Docket No. 38-10, at 5. Revenue from Companion Animal Disease Prevention declined
fourteen percent in the fourth quarter, as "several factors in the prior year [created] a
challenging comparison in this category," such as "increased customer purchases of
disease prevention products to achieve desired incentive levels across all of Companion
Animal since the supply of Galliprant was constrained." *Id.* at 7. Companion Animal
Therapeutics revenue had increased thirty-four percent for the quarter, "driven by the
continued uptake of Galliprant and a favorable comparison from the prior year due to
Galliprant backorders in 2018, as well as the additional sales for Entyce and Nocita from
Aratana." *Id.* Food Animal Future Protein and Health revenue had grown two percent,
while Food Animal Ruminants and Swine revenue increased three percent, driven by "the

sales of Posilac inventory and partial resumption of sales for a sterile injectable product, which had been suspended due to quality issues of the contract manufacturer." *Id.* But this growth was "partially offset by the continued impact of African Swine Fever in Asia, changing US producers use of Paylean, and to a lesser extent, decreased Rumensin sales." *Id.* When asked about changes to the distributors and any potential disruption from that, Simmons explained that "we've been public about this that we have prioritized and cut distribution down to four major distributors," primarily in the Companion Animal market in the United States. Compl. ¶ 204. The company had "a very targeted approach . . . set up for this year with these key distributors" and Simmons assured investors it would "continue to monitor [distributors] month to month as we go through the quarter." *Id.*

## F.  ELANCO'S 2020 FINANCIAL PERFORMANCE

According to Confidential Witness 3, at least one distributor, Nutra Blend, began to push back sometime during the first quarter of 2020, reportedly saying, "we're not doing this anymore." (It is unclear what "this" refers to). Also, as previously mentioned, Confidential Witness 3's job description did not include working with Nutra Blend; in fact, Confidential Witness 3's employment at Elanco ended in January of 2020.

On January 10, 2010, Elanco announced its 2020 financial guidance, estimating revenue of between $3.05 billion and $3.11 billion, and earnings per share in the range of $0.04 to $0.16 on a reported basis and $1.09 to $1.16 on an adjusted basis. On March 24, 2020, Elanco announced a business update, as the "situation around the COVID-19 pandemic [was] rapidly evolving," prompting Elanco to withdraw its previously

announced 2020 revenue and earnings per share guidance." *Id.* ¶ 214. The announcement

explained that the company was "monitoring several global dynamics, from changing

foreign currency rates and a dynamic animal protein market to declining veterinary clinic

visits, the growing use of direct-to-consumer shipping, and sales through ecommerce and

other alternative channels." *Id*. Elanco also explained that "[m]uch like the human health

system, the American Veterinary Medical Association, along with industry organizations

across Europe and other countries, has recommended limiting patient care to acutely ill

animals and emergencies, rescheduling annual exams and elective procedures."[6] *Id*. "This

guidance increases the importance of telemedicine, direct shipment and alternative

channels, while underscoring the significance and value of Elanco's pending acquisition

of Bayer AG's animal health business." *Id.* Elanco further explained that it was executing

---

[6] One of the exhibits attached to Defendants' Motion to Dismiss was the full COVID-19
Guidance from the American Veterinary Medical Association, referenced here in the complaint.
*See* Docket No. 38-15. In reviewing alleged securities violations, "courts must consider the
complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule
12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by
reference, and matters of which a court may take judicial notice." *Tellabs II*, 551 U.S. at 322.
Plaintiffs have moved to have this exhibit stricken because it is not incorporated by reference,
which occurs when documents are "referred to in the plaintiff's complaint and [are] central to his
claim.'" *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) (quoting
*Wright v. Assoc. Ins. Companies. Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994)). "This rule is a liberal
one—especially where, as here, the plaintiff does not contest the validity or authenticity of the
extraneous materials." *Mueller v. Apple Leisure Corp.*, 880 F.3d 890, 895 (7th Cir. 2018). We
view this document as incorporated by reference, allowing us to consider it in full. *See Sheridan
v. Marathon Petroleum Co.*, 2007 WL 2900556, at *5 (S.D. Ind. Sept. 28, 2007) (Barker, J.),
*aff'd*, 530 F.3d 590 (7th Cir. 2008) (considering a "Handbook" referenced in a lease provision
quoted in the complaint on a motion to dismiss). Plaintiffs also challenge three other exhibits
relating to the financial situations of three of Elanco's distributors, but because we do not rely on
these exhibits on ruling on this Motion to Dismiss, we need not determine whether they are
incorporated by reference or subject to judicial notice.

an "omnichannel approach with respect to companion animal health and determining the best methods for reaching pet owners and veterinarians." *Id.*

On May 7, 2020, Elanco announced its first quarter 2020 financial results, reflecting a ten percent decline in total revenue "due to a reduction of approximately $60 million in channel inventory driven by factors resulting from the COVID-19 pandemic." *Id.* ¶ 239. Simmons explained that "the COVID-19 pandemic created working capital pressures across our commercial value chain and dampened assumptions about near-term demand from end users of our products." *Id.* "These factors coupled with our recent evaluation of distributor performance has prompted us to tighten our approach across many facets of our distributor relationships." *Id.* Elanco's "relationship with [its] commercial partners ha[d] evolved significantly over the last 13 years and while distribution will continue to play a role in the future, [its] analysis shows our internal demand generation efforts are superior to distributors and higher inventory levels are not driving demand as it had in the past." *Id.* Elanco "made initial progress to meaningfully reduce channel inventory, primarily in [its] U.S. companion animal business, and we expect to further tighten channel inventory across all business areas, primarily in the second quarter." *Id.* While this decrease in channel inventory and other actions Elanco was taking with its commercial partners would negatively impact their sales performance in the short term, Simmons anticipated that the changes would "strengthen [Elanco's] position, optimize [its] promotional approach and enable [them] to direct investment to the internal commercial activities that drive demand for our products over the long term." *Id.*

On the earnings call conducted that same day, Simmons stated:

Recall at the start of 2020, we consolidated our U.S. Companion Animal distributors from eight to 4, and we instituted specific targets for them to generate end-customer demand. I also personally established a monthly review meeting with each of them. . . . As the Elanco demand creation was increasing, we were seeing less impact directly by distributors in today's environment. Furthermore, the volume of product being held by distributors was not impacting their ability to create demand. This is an insight and a change from our historical experience. The COVID pandemic also impacted the inventory shift from our distributor consolidation. We expected the four remaining distributors would need to increase their inventory levels to handle the larger volume going through their operations, offsetting the inventory drawdown in the eliminated distributors. With the liquidity and working capital pressure from COVID, the distributors are managing their inventory more tightly. Consequently, in Q1, we reduced the amount of product and distributor inventory by approximately $60 million, mainly in the U.S. companion animal space. And we expect to further reduce an additional $80 million to $100 million, mainly in the second quarter, as we apply these new tactics across our business and geographies.

*Id.* ¶ 240. By the close of the stock market that day, Elanco's stock value dropped from $22.93 to $19.88 per share. Within days of this drop, this lawsuit was filed.

## II.    DISCUSSION AND DECISION

"Greater precomplaint investigation is warranted in fraud cases," the Seventh Circuit has advised, "because public charges of fraud can do great harm to the reputation of a business firm or other enterprise (or individual)" and "because fraud is frequently charged irresponsibly by people who have suffered a loss and want to find someone to blame for it." *Ackerman v. Northwestern Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999). The securities statutes authorize private securities fraud actions, "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 345 (2005). While "greater clairvoyance" in 2020 might have led to Elanco's

realization of a looming global pandemic that ultimately shut down great swathes of the world's economy, "failure to make such perceptions does not constitute fraud," there is no "fraud by hindsight." *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978).

We are not the first court to consider such claims as are alleged here. Though Elanco initially "bathe[d] itself in a favorable light," later it found itself having to "disclose[] that things are less rosy." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). Plaintiffs contend in their complaint that "the difference must be attributable to fraud." "Must be" is the critical phrase here, "for the complaint offers no [explanatory] information other than the differences between the two statements of the firm's condition." *Id.* "Because only a fraction of financial deteriorations reflects fraud, plaintiffs may not proffer the different financial statements and rest." *Id.* "Investors must point to some facts suggesting that the difference is attributable to fraud." *Id.* As we explain below, that ingredient is missing in the Plaintiffs' Amended Complaint. They are able to muster only conclusory accusations, each reflecting merely the benefit of hindsight.

### A.  STANDARDS OF REVIEW

The standards of our review of Plaintiffs' claims are set by the Federal Rules of Civil Procedure 8, 9(b), and 12(b)(6) as well as the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b). Under Rule 8, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has interpreted Rule 8 to require plaintiffs to plead "enough

facts to state a claim to relief that is plausible on its face" to avoid dismissal under Rule 12(b)(6). *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plausibility requires "more than a sheer possibility" of unlawful conduct; the well-pleaded facts of a complaint must allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions." *Twombly*, 550 U.S. at 555 (internal quotation marks and citations omitted). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Rule 9(b)'s "particularity requirement has been rigorously applied in securities fraud cases." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir. 1997). "Rule 9(b) requires a plaintiff to provide 'precision and some measure of substantiation' to each fraud allegation." *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 338 (7th Cir. 2019) (quoting *United States ex rel. Presser v. Acacia Mental Health Clinic*, LLC, 836 F.3d 770, 776 (7th Cir. 2016)). Put more simply, a plaintiff must plead "the who, what, when, where, and how" of the alleged fraud. *DiLeo*, 901 F.2d at 627.

In addition to the requirements imposed by Rules 12(b)(6) and 9(b), the PSLRA further heightens the pleading standards for securities fraud claims as a "check against abusive litigation by private parties." *Tellabs II*, 551 U.S. at 313. The PSLRA mandates

that the complaint "specify each statement alleged to have been misleading" and "reasons

why the statement is misleading," and 15 U.S.C. § 78u–4(b)(1). And for each act or

omission, a plaintiff must "state with particularity facts giving rise to a strong inference

that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(1)−(2).

"The interplay between Rule 12(b)(6), and Rule 9(b) and the PSLRA is important,"

because "[f]ailure to meet the threshold pleading requirements demanded by the latter

provisions justifies dismissal apart from Rule 12(b)(6)." *Cal. Public Emp. Ret. Sys. v.

Chubb Corp.*, 394 F.3d 126, 145 (3d Cir. 2004). PSLRA's heightened standards "further

increase plaintiffs' pre-complaint duty to investigate and further discourage claims of so-

called 'fraud by hindsight.'" *Schleicher v. Wendt*, 529 F. Supp. 2d 959, 969 (S.D. Ind.

2007); *Arazie v. Mullane*, 2 F.3d 1456, 1467–68 (7th Cir. 1993) ("fraud by hindsight" is

not actionable; temporal proximity between positive statements stressing a firm's

strengths and announcements of poor economic performance do not create an inference

that the earlier statements were fraudulent).

## B.  SECTION 10(B) OF THE SECURITIES EXCHANGE ACT

Section 10(b) of the Securities Exchange Act forbids the "use or employ, in

connection with the purchase or sale of any security ... [of] any manipulative or deceptive

device or contrivance in contravention of such rules and regulations as the [Securities

Exchange Commission] may prescribe as necessary or appropriate in the public interest

or for the protection of investors." 15 U.S.C. § 78j(b). In order to successfully assert a

claim for federal securities fraud, a plaintiff must adequately plead the following six

elements: (1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. *Dura*, 544 U.S. at 341. As noted previously, Section 10(b) claims must satisfy the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the PSLRA. *See Cornielsen v. Infinium Cap. Mgmt., LLC*, 916 F.3d 589, 598 (7th Cir. 2019). Defendants contend the Plaintiffs have failed to adequately plead three elements: an actionable misstatement or omission, scienter, and loss causation. Because our analysis leads us to agree that Plaintiffs have failed to plead an actionable misstatement or omission, we address that issue first and most thoroughly.

## i.  ACTIONABLE MISSTATMENT OR OMISSION

Defendants initially argue that Plaintiffs' Section 10(b) claim must be dismissed because Plaintiffs have not identified with sufficient particularity any misleading affirmative statements made by Defendants. We repeat: the PSLRA requires that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if [such allegation] is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). As characterized by Defendants, "Plaintiffs have employed a 'puzzle pleading' method, which improperly 'places the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts.'" *In re Guidant Corp. Sec. Litig.*, 536 F. Supp. 2d 913, 926 (S.D. Ind. 2008)

(Barker, J.) (quoting *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 514 (S.D.N.Y 2005).

"This method is deficient under the pleading standards." *Alcatel*, 382 F. Supp. 2d at 514.

The scope of the First Amended Complaint "tips the scales" at one-hundred and

fourteen pages. *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1073

(N.D. Cal. 2001). Sixty of those pages, and one-hundred and twenty-two of those three

hundred paragraphs of averments are devoted to a section entitled "Defendants'

Materially False and Misleading Statements and Omissions In Violation of the Exchange

Act." Compl. ¶ 94. These statements—along with major portions of other sections of the

First Amended Complaint—are set forth in single-spaced pages excerpted from press

releases and periodic SEC reports, "recited in near entirety, along with lengthy

conference call transcripts." *In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d 969,

984 (E.D. Wis. 2009). Often no specific part of any of these lengthy block quotes is

identified as misleading; more often, Plaintiffs highlight every single mention of growth,

revenue, and executive confidence as misleading. Each allegedly "misleading statement"

is followed by the same—and frequently identical—conclusory assertion: that "these

lengthy statements 'were false and misleading when issued' because the defendants failed

to disclose certain material facts known to them at the time." *Id.*

In short, plaintiffs have left the onerous task of trying to figure out exactly what the

misleading statements are up to the defendants and the court, as well as of matching the

statements up with the reasons they are false or misleading. *See In re Autodesk, Inc. Sec.

Litig.,* 132 F. Supp. 2d 833, 841 (N.D. Cal. 2000). "Judges are not like pigs, hunting for

truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).

"The predictable demands of reviewing such a complaint abuse judicial resources."

*Wenger v. Lumisys, Inc.*, 2 F. supp. 2d 1231, (N.D. Cal. 1998). Because following our

ruling here, Plaintiffs will have the opportunity to seek leave to amend the pleading

deficiencies in an amended complaint, we shall address the many substantive pleading

deficiencies, despite the difficulties in doing so. Defendants maintain that "Plaintiffs fail

to plead an actionable misstatement or omission because the primary basis for labeling

them false and misleading—undisclosed channel-stuffing—is unsupported by the specific

allegations of the [First Amended Complaint]." Docket No. 37, at 15. Further, Plaintiffs'

challenges to certain statements also fail, Defendants argue, because: (1) statements

concerning Elanco's financial guidance and future expectations are forward-looking

statements protected by the PSLRA's safe harbor provision; (2) statements reflecting

Defendants' beliefs in Elanco's growth and performance are opinions that Plaintiffs fail to

plead are actionable, and (3) a variety of optimistic statements about Elanco's business

constitute mere "puffery" that is immaterial as a matter of law. *Id.* Before turning to

Defendants' arguments, we address Plaintiffs' challenged public statements.

## 1.  PUBLIC STATEMENTS

As previously noted, Plaintiffs assert similar grounds for challenging all of

Defendants' allegedly fraudulent statements: namely, that the statements or documents at

issue were rendered misleading because they failed to disclose material information about

Defendants' channel-stuffing practices and consolidation of distributors from a total of

eight to four. We reiterate Plaintiffs' challenged statements in Elanco's IPO Registration

Statement to illustrate the challenges of their puzzle pleading. Plaintiffs have identified the allegedly misleading and/or materially false statements by underscoring them, although their first challenged statement based on the IPO Registration Statement contains no such underscored portion:

> For the six months ended June 30, 2018 and 2017, our revenue was $1.5 billion and $1.4 billion, respectively, and for each of the years ended December 31, 2017, 2016 and 2015, our revenue was $2.9 billion. For the six months ended June 30, 2018 and 2017, our net income (loss) was $9.9 million and $(128.5) million, respectively, our adjusted EBITDA was $306.2 million and $278.4 million, respectively, and our adjusted net income was $219.0 million and $156.4 million, respectively.

Compl. ¶ 94. Plaintiffs stop short of providing an explanation of what portion of this statement is misleading, nor why this statement is misleading and/or materially false.

Next, Plaintiffs challenge the following statement as misleading:

> **Our Targeted Value-Generating Strategies**
>
> We intend to <u>continue to grow our business and create value for our shareholders through a targeted value-generating strategy with three key pillars:</u> a Portfolio Strategy for our marketed products, an Innovation Strategy for our R&D pipeline and a Productivity Strategy for our margin expansion initiatives.
>
> * * *
>
> ***Portfolio Strategy***
>
> ***Invest in categories with the greatest potential for growth***. We are focusing the majority of our resources, including more than 75% of our R&D funding, on our three targeted growth categories: CA Disease Prevention, CA Therapeutics and FA Future Protein & Health, where we believe <u>we are well positioned to grow faster than the market</u>. These categories represented 54% of our revenue in 2017.
>
> - CA Disease Prevention — Parasiticides and vaccines are fundamental to preventing disease in companion animals. We have a strong

vaccines portfolio as well as products that protect pets from a broad spectrum of parasites, such as fleas, ticks, heartworms, roundworms, hookworms, whipworms and tapeworms. We believe we are well positioned to drive additional growth through continued product innovation and sales channel expansion.

- CA Therapeutics — Pets are living longer and owners increasingly seek treatments for chronic diseases in their pets. To capitalize on these trends, we are focused on driving growth in our CA Therapeutics category by building on our broad base of pain and osteoarthritis products.

- FA Future Protein & Health — We expect to drive revenue growth through our poultry and aquaculture portfolios. Poultry and aquaculture are expected to be among the fastest growing animal health protein sources over the next 10 years. We also are focused on nutritional health products and antibiotic stewardship that address market trends in this category.

**_Reinforce our strong presence in our FA Ruminants & Swine category_**. We plan to continue fortifying our long-standing FA Ruminants & Swine category to meet our customers' needs through targeted product investment and by continuing to strengthen our deep business-to-business relationships through sales force excellence and leadership in industry coalitions. We also plan to continue to utilize analytics, social media and other support to provide value to our customers beyond our products.

Compl. ¶ 95. Plaintiffs argue these highlighted statements regarding Elanco's financial results and growth strategies are materially false or misleading because:

(i) Defendants misrepresented and failed to disclose that during the six months ending June 30, 2018, *Elanco had implemented systematic and undisclosed channel stuffing practices* that misleadingly inflated the Company's revenue, net income, and appearance of year-over-year growth; and (ii) to meet its financial targets and market expectations for the IPO, *Elanco was reliant upon undisclosed and risky channel stuffing practices*, practices that Defendants knew or recklessly ignored had the effect of both artificially inflating the Company's immediate financial results and risking substantial negative impact on the Company's sales and growth going forward.

Compl. ¶ 96 (emphasis added).

Without identifying any specific segment or words or phrase(s) in the following block quotes as misleading, Plaintiffs maintain that the IPO Registration Statement also contained the following misleading and incomplete "risk factors" section:

> ***For our companion animal products, increased use of alternative distribution channels, or changes within existing distribution channels, could negatively impact our market share, margins and distribution of our products***.
>
> * * *
>
> In addition, if one or more of our companion animal distributors discontinues or modifies their relationship with us, our business, financial condition and results of operations may be materially adversely affected. For example, in 2017, a change in our U.S. inventory management practices resulted in a revenue lag as existing inventory was sold down, which management estimates decreased our revenue by approximately $35 million.
>
> . . .
>
> ***Our results of operations are dependent upon the success of our top products.*** If any of our top products experience issues, such as disruptive innovations or the introduction of more effective competitive products, negative publicity, changes to veterinarian or customer preferences, loss of patent protection, material product liability litigation, new or unexpected side effects, manufacturing disruptions and/or regulatory proceedings, our revenue could be negatively impacted, perhaps significantly. Our top five products, *Rumensin*, *Trifexis*, *Maxiban*, *Denagard* and *Tylan Premix*, contributed approximately 29% of our revenue in 2017. Any issues with these top products, particularly *Rumensin*, which contributed approximately 10% of our revenue in 2017, could have a material adverse effect on our business, financial condition and results of operations.

Compl. ¶¶ 97–98. Plaintiffs describe the foregoing statements as materially false and/or misleading in the following fashion:

> (i) Defendants misrepresented and failed to disclose that during the run-up to the IPO in 2018, Elanco had already *materially changed its distribution sales*

*strategy to a model that inflated sales far in excess of end-user demand*, implementing practices that Defendants knew or recklessly ignored had the effect of both artificially inflating the Company's immediate financial results and risking substantial negative impact on the Company's sales and growth going forward; (ii) specifically, that *beginning in early 2018* and continuing in the months running up to the IPO, *Elanco materially changed its model from the 2017 "move out" model that sought to balance sales to end-user demand, to instead implement a "move in"* model that incentivized sales to distributors far in excess of end-user demand with *the effect of "over-stuffing" the sales channels*; and, (iii) as a result of the foregoing, sales of its top products were at significant risk going forward.

Compl. ¶ 99 (emphasis added).

Plaintiffs also have challenged the following statement:

> **Product Development and New Product Launches**
> A key element of our targeted value creation strategy is to drive growth through portfolio development and product innovation, primarily in our three targeted growth categories. Our nine product launches between 2015 and 2017 have had a significant positive impact on our revenue over those periods, and we expect new products and innovation will continue to have a positive impact on our revenue in the future. Revenue from these product launches contributed $143.8 million to revenue for the year ended December 31, 2017 and $136.6 million to revenue for the six months ended June 30, 2018. We continue to pursue the development of new chemical and biological molecules through our approach to innovation. Our future growth and success depends on both our pipeline of new products, including new products that we may develop through joint ventures and products that we are able to obtain through license or acquisition, and the expansion of the use of our existing products. We believe we are an industry leader in animal health R&D, with a track record of product innovation, business development and commercialization.

Compl. ¶ 100. Plaintiffs characterize this statement as materially false or misleading

because:

> Defendants failed to disclose that during the run-up to the IPO in 2018, Elanco had *implemented systematic channel stuffing practices that misleadingly inflated the Company's appearance of growth*; and (ii) Defendants knew or recklessly ignored that *Elanco's undisclosed and risky channel stuffing practices had the effect of both artificially inflating the*

> *Company's immediate financial results* and risking substantial negative impact on the Company's sales and growth going forward.

Compl. ¶ 101 (emphasis added).

Plaintiffs' final challenge is to the IPO Registration Statement based on its alleged failure to provide material information as required by Item 303 of SEC Regulation S-K, which mandates that Elanco disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). That regulation also requires that registration statements disclose events the registrant knows would "cause a material change in the relationship between costs and revenues" and "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected." 17 C.F.R. §229.303(a)(3)(i), (ii). Plaintiffs cite the IPO Registration Statement's failure to disclose:

> the following known adverse trends and/or uncertainties that Defendants were required to disclose under Item 303, including: (i) beginning in early 2018 and continuing in the months running up to the IPO, *Elanco materially changed its distribution sales model from the 2017 "move out" model that sought to balance sales to end-user demand, to instead implement a "move in" model that incentivized sales to distributors far in excess of end-user demand with the effect of "over-stuffing" the sales channels*; and (ii) Elanco's reliance on systemic and undisclosed channel stuffing practices, would, or was reasonably expected to, have a material negative impact on the Company's sales, revenues, and/or results of operations going forward.

Compl. ¶ 102 (emphasis added). We need not specifically reference all the statements referenced by Plaintiffs, along with their identical reasons as to why such statements were misleading.[7]

## 2.  CHANNEL STUFFING AND CONSOLIDATION OF ELANCO'S DISTRIBUTORS

---

[7] Plaintiffs make essentially identical arguments that Elanco's channel stuffing and/or change in distribution models rendered the following statements misleading and/or materially false:

- Elanco's 2018 Third Quarter Form 8-K, press release, and earnings call,
- Elanco's 2018 Third Quarter Form 10-Q;
- Elanco's 2019 Financial Guidance Form 8-K, press release, and earnings call;
- Elanco's 2018 Fourth Quarter and Year End Form 8-K, press release, and earnings call;
- Elanco's 2018 Form 10-Q;
- Elanco's 2019 First Quarter Form 8-K, press release, and earnings call;
- Elanco's 2019 First Quarter Form 10-Q;
- Elanco's Merger Documents for the Aratana acquisition;
- Elanco's 2019 Second Quarter Form 8-K, press release, and earnings call;
- Elanco's 2019 Second Quarter Form 10-Q;
- Simmons' Statement at the Morgan Stanley Global Healthcare Conference;
- Elanco's 2019 Third Quarter Form 8-K, press release, and earnings call;
- Elanco's Third Quarter 2019 Form 10-Q;
- Elanco's 2020 Financial Guidance Form 8-K, press release, and earnings call,
- Simmons' Statement at the JP Morgan Healthcare Conference;
- Elanco's 2019 Fourth Quarter and Year End Form 8-K, press release, and earnings call;
- Elanco's 2019 Fourth Quarter and Year End Form 10-Q; and
- Elanco's COVID-19 Business Update.

As we have found in other similar cases, "Plaintiffs assert similar grounds for challenging [all] of Defendants' allegedly fraudulent statements: that the statements or documents at issue were rendered misleading because they failed to disclose material information," in this instance, about Defendants' alleged channel stuffing scheme and the consolidation of Elanco's distributors. *Guidant* at 536 F. Supp. 2d at 927. "As to each of these allegations, Plaintiffs allege that Defendants had a duty to disclose their knowledge of the defects to investors." *Id*. "A firm generally has no independent duty to disclose all information that might influence the price of its stock." *Id.* at 926−927 (citing *Gallagher v. Abbott Laboratories*, 269 F.3d 806, 808 (7th Cir. 2001)). Instead, "firms are entitled to keep silent (about good news as well as bad news) unless positive law creates a duty to disclose." *Gallagher*, 269 F.3d at 808.  "A duty to disclosure is created when additional information is necessary to rectify 'incomplete disclosures' or 'half-truths.'" *Gaines*, 2004 WL 2538374 at *11 (quoting *Schlifke v. Seafirst Corp.,* 866 F.2d 935, 944 (7th Cir. 1989)).

To sufficiently frame a securities fraud claim on grounds of channel stuffing, Plaintiffs must allege that Defendants "engaged in fraudulent channel stuffing" and "made misstatements or omissions about it." *W. Palm Beach Firefighters Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 2d 622, 640 (N.D. Ill. 2020). We repeat: the term "channel stuffing" refers to "shipping to one's distributors more of one's product than one thinks one can sell." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 709 (7th Cir. 2008) ("*Tellabs III*"). However, channel stuffing is not inherently fraudulent, a "certain amount of channel stuffing could be innocent and might not even mislead—a

seller might have a realistic hope that stuffing the channel of distribution would incite his distributors to more vigorous efforts to sell the stuff lest it pile up in inventory." *Id.* "Channel stuffing becomes a form of fraud only when it is used . . . to book revenues on the basis of goods shipped but not really sold because the buyer can return them." *Id.* "This practice creates a short-term illusion of increased demand between the time when the company sends the extra product down the line and the time when the distributors return the unwanted excess." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 598 (7th Cir. 2006) ("*Tellabs I*"), *rev'd on other grounds, Tellabs II*, 551 U.S. 308. These sales are "in effect sales on consignment, and such sales cannot be booked as revenue because "[n]either condition of revenue recognition has been fulfilled—ownership and its attendant risks have not been transferred." *Tellabs III*, 513 F.3d at 709 (internal quotation marks and citation omitted).

In the *Tellabs* decisions, plaintiffs "provided sufficient detail of channel stuffing to overcome the PSLRA's material falsity hurdle." *Tellabs I*, 437 F.3d at 598. Plaintiffs alleged Tellabs had been "flooding its customers with tens of millions of dollars worth of [product] that the customers had not requested." *Tellabs III*, 513 F.3d at 706. Verizon's chairman allegedly "asked Tellabs to stop providing Verizon, Tellabs's largest customer, with products that Verizon did not request or require." *Tellabs I*, 437 F.3d at 598. And Tellabs allegedly "had to lease extra storage space . . . to accommodate the large number of returns." *Id.* "The huge number of returns" of product was "evidence that the purpose of the stuffing was to conceal the disappointing demand for the product rather than to prod distributors to work harder to attract new customers." *Tellabs III*, 513 F.3d at 710.

The facts alleged in the case at bar differ drastically from the particularized facts mustered by the plaintiffs in *Tellabs*. First and perhaps most important, Plaintiffs here do not allege *any* accounting violations. This is a critical failure because the *only* type of channel stuffing that is fraudulent is when it is used to "book revenues on the basis of goods shipped but not really sold because the buyer can return them." *Tellabs III,* 513 F.3d at 709. There also are no allegations that Elanco was shipping to distributors unordered products, nor that distributors were returning "huge" amounts of products based either on their not ordering them or not being able to sell them. Instead, Plaintiffs simply and repeatedly allege that Elanco's sales practices induced distributors to purchase "far in excess of demand" and in excess of their "needed inventory." Compl. ¶¶ 57, 77, 99, 102, 109, 112, 127, 130, 137, 139, 144, 154, 155, 161, 163, 170, 172, 181, 190, 203, 213, 215. The First Amended Complaint also lacks any statistics or data to place the allegations of "excess demand" or "excess inventory" in context—an omission that hinders a finding that the defendants issued false and misleading statements. *Harley-Davidson*, 660 F. Supp. 2d at 986.

The only relevant statistics cited to the court are the small numbers of returns—0.2% of net revenue in 2019 and 0.6% of net revenue in 2018—which actually reflect a decrease as the class period progressed. Docket No. 38-8, at 8. And the return numbers during the class period are even less than the amount of returns—less than two percent of Elanco's net revenue between January 1, 2017, and June 30, 2018—before the start of the

alleged channel stuffing.[8] Docket. No. 38-1, at 48. Plaintiffs repeated assertions that sales exceeded demand or needed inventory without any contextual information are merely generalized assertions that do not meet the stringent requirements of the PSLRA and Rule 9(b). Even if Plaintiffs have adequately plead high channel inventory, "that is, even if the distribution channels were completely 'stuffed,'" it still would not follow that Elanco committed fraud. *City of Birmingham Ret. & Relief Sys. v. A.O. Smith Corp.*, 468 F. Supp. 3d 1048, 1058 (E.D. Wis. 2020). "Channel stuffing is fraudulent only when the company recognizes revenue on products shipped to its distributors that it expects the distributors to return in future reporting periods," and Plaintiffs have not alleged this. *Id.*

There are in truth many contradictions between Plaintiffs' theory of channel stuffing and the facts plead. We begin with Plaintiffs' confidential witnesses, on which most of Plaintiffs' allegations rely. In *Higginbotham v. Baxter International Inc.*, the Seventh Circuit explained that "allegations from 'confidential witnesses' must be 'discounted' rather than ignored," and "[u]sually that discount will be steep." 495 F.3d 753, 757 (7th Cir. 2007). In that case, the Seventh Circuit discounted allegations attributed to five "confidential witnesses"—three ex-employees of the Defendants, and two consultants. *Id.* at 756−757. In addition, there was no other base for the alleged fraud besides the confidential sources, which was "a very different case" from *Tellabs III*, which involved twenty-seven confidential witnesses that from the "description of their jobs were in a

---

[8] If "an exhibit attached to or referenced by the complaint contradicts the complaint's allegations, the exhibit takes precedence." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013) (citation omitted).

position to know at first hand the facts to which they are prepared to testify." 513 F.3d at 712. "The information that the confidential informants are reported to have obtained is set forth in convincing detail, with some of the information, moreover, *corroborated by multiple sources*." *Id.* (emphasis added). Plaintiffs must "describe their sources with sufficient particularity" and "significant detail" to "support the probability that a person in the position occupied by the source would possess the information alleged, or in the alternative provide other evidence to support their allegations." *Tellabs I*, 437 F.3d at 596 (internal citation and quotation marks omitted). "If the descriptions indicate that the sources would not have access to, or knowledge of, the facts underlying the allegations, the allegations would be insufficient." *Id.* It follows then that "contradictions" between confidential witness allegations and descriptions "severely undermine the[ir] reliability." *In re Downey Sec. Litig.*, 2009 WL 2767670, at *10 (C.D. Cal. Aug. 21, 2009).

In describing Confidential Witness 1, was described as reporting to Shriver, the Director of *Food Animal* Channel & Distribution, who reported to the Senior Director of Channel Strategy and Sales Force Excellence for North America, Julia Loew, who reported to Vice President, *Companion Animal US*, Shawn McKee. This corporate hierarchy is complicated by Confidential Witness 2's description as a Corporate Account Manager in Elanco's *Companion Animal* division, who also reported to Shriver, the Director of *Food Animal* Channel & Distribution. Confidential Witness 1 alleged that "MWI would typically purchase approximately $12 million in feed additive on a *monthly* basis," but he or she then alleged that at the end of the second quarter in 2019, Shriver directed Confidential Witness 1 to "sell an additional $10 million that *quarter* on top of

MWI's normally scheduled $9-$10 million purchase." Compl. ¶¶ 60−61 (emphasis added). These numbers contradict themselves and the referenced time periods of the purchases conflict as well.

Confidential Witness 3 was described as National Accounts Manager in Elanco's Food Animal Division and was responsible for Elanco's relationships with MWI, Covetrus, and Patterson. But during an unidentified quarter in 2019, Confidential Witness 3 is alleged to have given Nutra Blend—a distributor not in their job description—a twenty percent rebate. And Confidential Witness 3 stated that Nutra Blend pushed back sometime in the first quarter of 2020, saying, "we're not doing this anymore." It is unclear what "this" refers to, especially considering the alleged channel stuffing system ended in the previous quarter.

Confidential Witness 4 was described as the Global Head of Animal Care Expansion, Business Development & Licensing and Alternate Innovation from September of 2018 to January of 2020, and then a Vice President from January of 2020 until July of 2020. Confidential Witness 4's responsibilities are described as "driving revenue and improving Elanco's profitability of its Companion Animal and Food Animal business lines of vaccines and feed additives." Compl. ¶ 37. But beyond the problems from this vague job description, *see In re Career Educ. Corp. Sec. Litig.*, 2006 WL 999988, at *4 (N.D. Ill. Mar. 28, 2006) (confidential witness testimony unreliable when plaintiff provided no description of "job duties"), Confidential Witness 4 offers allegations dating to events occurring well before the described employment period. Confidential Witness 4 believed channel stuffing to be occurring because they "saw a consistent delta between dispensing

numbers and selling numbers," and "based on the numbers, consumption, … what the distributors [were] selling and what [we sold] them." Compl. ¶ 69. No data was proffered that would contextualize these assertions, no details provided as to when these meetings actually occurred or what quarters of sales they referenced, nor any other corroboration based on internal documents, for example. Merely "affixing the phrase 'former employees have stated' to [an] otherwise totally unparticularized allegation does not transform it into an allegation that meets the particularity requirements of the PSLRA." *Gavish v. Revlon, Inc.*, 2004 WL 2210269, at \*14 (S.D.N.Y. Sept. 30, 2004). Nor have they met the requirements of Rule 9 of "provid[ing] 'precision and some measure of substantiation' to each fraud allegation." *Menzies*, 943 F.3d at 338 (quoting *Presser*, 836 F.3d at 776).

"'[S]pecific transactions, specific shipments, specific customers, specific times, or specific dollar amounts,' are the types of corroborating details a plaintiff needs to include to support a 'channel stuffing' theory at the pleading stage." *Waterford Twp. Police & Fire Ret. Sys. v. Mattel, Inc.*, 321 F. Supp. 3d 1133, 1147 (C.D. Cal. 2018) (quoting *In re ICN Pharm., Inc.*, 299 F. Supp. 2d 1055, 1061−62 (C.D. Cal. 2004)). The First Amended Complaint lacks almost entirely these necessary corroborating details in favor of generalized allegations, and the few transactions described with some—but never sufficient—particularity merely recount sales and promotional practices that are "legitimate and used by most companies." *A.O. Smith Corp.*, 468 F. Supp. 3d at 1058. These sales practices are "illegitimate only when a company uses incentives to pull forward revenues from future fiscal periods and then touts the higher revenues as reflecting increased demand." *Id.* "The lack of adequate allegations of fraudulent channel

stuffing is fatal to the claim that Defendants' otherwise accurate statements of historical fact were false or misleading." *Conagra*, 2465 F. Supp. 3d at 643. Because Plaintiffs have failed to plead a channel stuffing scheme, we need not consider whether they adequately plead that Defendants "made misstatements or omissions about it." *Id.* at 640. That said, we do note that Defendants repeatedly discussed and disclosed information about their distributors' inventory, sales practices, rebates, and the consolidation of its distributors—the opposite of an undisclosed scheme to defraud shareholders. Because "Plaintiffs have not adequately alleged any channel stuffing (much less fraudulent channel stuffing), they likewise have not alleged that Defendants had a duty to disclose [it] as a 'known trend'" under SEC regulations. *Conagra*, 495 F. Supp. 3d at 647.

### 3.  PUFFERY AND FORWARD-LOOKING STATEMENTS

As we have previously explained, "puffery and 'optimistic rhetoric' generally cannot provide a basis for a securities fraud action." *Gaines*, 2204 WL 2538374 at *18 (collecting cases). "We note also that several of the statements disputed by Plaintiffs can be understood as immaterial, non-actionable corporate puffery."[9] *Guidant*, 536 F. Supp. 2d at 928. Many of Plaintiffs' challenged statements also qualify for the PSLRA's safe harbor protection for forward-looking statements.[10] Even before the PSLRA's enactment,

---

[9] Though we need not definitively classify specific statements as puffery, we note for purposes of illustration the following statements: "we're excited for the continued potential in this portfolio of products" and "I remain confident in Elanco's long-term strategy." Compl. ¶¶ 120, 214.

[10] Again, though we need not definitively classify specific statements as puffery, we note for purposes of illustration the following statements: "2019 revenue expectations in the range of $3.10 billion to $3.16 billion" and "we're on track for our projected 4% to 6% core revenue growth for 2019. Compl. ¶¶ 113, 120.

"the Seventh Circuit described the standard for forward-looking statements as a 'safe harbor,' requiring plaintiffs to allege 'specific facts' illustrating that the predictions 'lacked a reasonable basis.'" *Conagra*, 495 F. Supp. 3d at 648 (citing *In re HealthCare Compare Corp. Sec. Litig.*, 75 F.3d 276, 281 (7th Cir. 1996)); *see also Arazie v. Mullane*, 2 F.3d 1456, 1468 (7th Cir. 1993) ("[P]redictions of future performance are inevitably inaccurate because things almost never go exactly as planned.").

The PSLRA has created a statutory safe harbor for certain "forward-looking statements," which are statements "containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items." 15 U.S.C. § 78u–5(i)(1)(A)). "The safe harbor provision applies to two types of forward-looking statements: (1) those 'identified as a forward-looking statement and accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement,' and (2) statements that the plaintiff fails to prove were made with actual knowledge that they were false or misleading." *Waterford*, 321 F. Supp. 3d at 1149−1150 (quoting 15 U.S.C. § 78u-5(c)(1)). Elanco's statements repeatedly warned investors with what were clearly meaningful, cautionary statements, identifying such as forward-looking statements entitled to the PSLRA's safe harbor protection. A projection is "not rendered false when the world turns out otherwise." *Gallagher*, 269 F.3d at 810. For these reasons, we hold that Plaintiffs have failed to plead a fraudulent channel stuffing scheme embedded in any

corresponding misstatement or omission that escapes the PSLRA protections. Accordingly, their Section 10(b) claim must be dismissed.

### ii. SCIENTER

"The parties also dispute whether Plaintiffs have pled particularized facts [sufficient to] create a 'strong inference' of scienter." *Guidant*, 536 F. Supp. 2d at 929. As previously noted, the PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). This requisite scienter, or "required state of mind" has been described as "an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham,* 495 F.3d at 756. The Supreme Court has advised that the strength of an inference of scienter "cannot be decided in a vacuum." *Tellabs II*, 551 U.S. at 323. Instead, "the court must take into account plausible opposing inferences." *Id.* The inference of scienter "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Id.* at 324. A complaint will only survive if a "reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

In assessing scienter, the Seventh Circuit has "rejected the 'group pleading doctrine,' a judicial presumption that statements in group-published documents are attributable to officers who have daily involvement in company operations; thus, the plaintiffs must create a strong inference of scienter with respect to each individual defendant." *Pugh v.*

*Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008) (citing *Tellabs II*, 513 F.3d at 710). Most of Plaintiffs' scienter allegations center on statements made in previously discussed public statements, coupled with a few confidential source allegations. "It is hard to see how information from anonymous sources could be deemed 'compelling' or how we could take account of plausible opposing inferences." *Higginbotham*, 495 F.3d at 757. "Perhaps these confidential sources have axes to grind." *Id.* "Perhaps they are lying." *Id.* "Perhaps they don't even exist." *Id.* "It is possible to imagine situations in which statements by anonymous sources may corroborate or disambiguate evidence from disclosed sources," but "[n]o decision of which we are aware concludes that anonymous accusers can demonstrate that scienter is 'at least as [likely] as any opposing inference one could draw from the facts alleged.'" *Id.* Anonymity "conceals information that is essential to the sort of comparative evaluation required by *Tellabs."* *Id.* "To determine whether a 'strong' inference of scienter has been established, the judiciary must evaluate what the complaint reveals and disregard what it conceals." *Id.*

Only Confidential Witness 4 is alleged to have worked directly with Simmons and Young, while the other three confidential witnesses had multiple layers of reporting between them and Simmons and Young. The previously discussed contradictory allegations and descriptions of the confidential witnesses earn a steep discount to their already sparse scienter allegations. Confidential Witness 1 alleged that "Simmons knows the companion animal side very well, but he knows the large animal side even better. Having massive jumps in buy-ins from [Elanco's] distributors, [Simmons] would have noticed." Compl. ¶ 222. And Confidential Witness 4 recalled that "Simmons and Young

participated in monthly 'financial meetings' during which sales data, prepared by Young, was discussed." *Id.* Confidential Witness 4 "further recalled that Simmons was challenged on Elanco's apparently [sic] channel stuffing practices by other executives during such meetings in 2019." *Id.* These allegations reflect the epitome of "the 'must have known' allegations" prohibited as actionable by the PSLRA. *In re Bally Total Fitness Sec. Litig.*, 2007 WL 551574, at *8 (N.D. Ill. Feb. 20, 2007). Plaintiffs have simply alleged that Defendants "must have known" about a fraud they failed to adequately plead.

Plaintiffs also have included in the first Amended Complaint detailed information about executive bonuses at Elanco, without ever pleading that Defendants were motivated by their compensation structure to engage in fraud. Even if they had plead this claim, a "generalized motive . . . common to all corporate executives" would be insufficient. *Pension Trust Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 939-40 (7th Cir. 2018). Plaintiffs have not "pled facts rendering an inference of scienter *at least as likely as* any plausible opposing inference," thus, their Section 10(b) claim must be dismissed on this ground as well. *Tellabs II*, 551 U.S. at 323 (emphasis added).

### iii.  LOSS CAUSATION

Finally, we find that Plaintiffs have failed to adequately plead loss causation, which requires that Plaintiffs aver and be prepared to establish that the alleged misstatements "inflated" Elanco's stock price, and the inflation in value was lost when "the truth was revealed." *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 415 (7th Cir. 2015).

Put another way, Plaintiffs "must show both that the defendants' alleged misrepresentations artificially inflated the price of the stock and that the value of the stock declined once the market learned of the deception." *Ray v. Citigroup Glob. Mkts., Inc.*, 482 F.3d 991, 995 (7th Cir. 2007); *see also Dura*, 544 U.S. at 343 (a lower stock price may result from "changed economic circumstances . . . new industry-specific or firm-specific facts, conditions or other events," rather than the fraud).

For channel stuffing to be actionable, "logically it must be a short-lived scheme in which the wrongdoer attempts to capitalize on artificially increased sales *before* the resulting drop in sales." *ICN*, 299 F. Supp. 2d at 1062. In the *Tellabs* decisions, the Court confronted an increase of Defendants' sales of forty-two percent in one quarter, and thereafter, when the stock fell, it declined by more than seventy-five percent. *Johnson v. Tellabs*, Inc., 303 F. Supp. 2d 941 (N.D. Ill. 2004), *rev'd on other grounds, Tellabs I*, 437 F.3d 588. In the case before us, Plaintiffs allege that Defendants' scheme spanned almost two years, and that they ceased channel stuffing in November of 2019. Yet, there was no sharp growth in any one quarter during the peak of the alleged scheme, according to the facts alleged here; similarly, no sharp decline in sales occurred in the last quarter of 2019. Indeed, the evidence before us reflects that Elanco reported a one percent decline in revenue in the first quarter of 2019, a one percent increase in sales in the second quarter, one percent increase in 2019, and a two percent decrease in the fourth quarter. For the year 2019, revenue growth was flat compared to 2018. The sales drop, minor as it was, occurred midst the fallout from the COVID-19 pandemic, about which Elanco had already warned investors as to its anticipated negative consequences and also reduced its

financial guidance in light of it. "The number of dots the Court must connect to produce an adequate theory of loss causation are too numerous and attenuated to succeed." *In re Francesca's Holdings Corp. Sec. Litig.*, 2015 WL 1600464, at *22 (S.D.N.Y. Mar. 31, 2015). We hold, accordingly, that Plaintiffs have failed to adequately plead this element, thus providing an additional basis for dismissal of their Section 10(b) claims.

## C.  SECTION 20(A) OF THE SECURITIES EXCHANGE ACT

Section 20(a) of the Exchange Act provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person . . . " 15 U.S.C. § 78t(a). To prevail on a Section 20(a) claim, a plaintiff must establish a primary violation of Section 10(b) and further show that the "control person" actually exercised control over the operations of the entity principally liable and had the power or ability—regardless of whether it was exercised—to control the specific transaction or activity upon which the primary violation was predicated. *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992). Accordingly, a claim pursuant to Section 20(a) is "cognizable only where there has been an underlying primary violation of the Exchange Act." *Guidant*, 536 F. Supp. 2d at 933. Because Plaintiffs have not adequately alleged such a violation, their Section 20(a) claim necessarily fails. *See Davis v. SPSS*, 431 F.Supp.2d 823, 833 (N.D. Ill. 2006).

## D.  SECTIONS 11 and 12(A) OF THE SECURITIES ACT

Section 11 of the Securities Act "allows purchasers of a registered security to sue certain enumerated parties in a registered offering when false or misleading information is included in a registration statement" filed with the SEC. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381 (1983). Specifically, Section 11 provides a private remedy when the registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). And Section 12(a)(2) of the Securities Act prohibits the sale of securities using a prospectus containing a material misstatement. 15 U.S.C. § 77l(a)(2). Plaintiffs' Section 11 and Section 12(a)(2) claims both arise out of the documents filed in conjunction with the Elanco-Aratana merger. Defendants argue that Plaintiffs' Sections 11 and 12 claims fail because Plaintiffs have not alleged an actionable misstatement or omission and because they have not pleaded the underlying fraud with particularity. We address each of these contentions below in turn.

Unlike Section 10(b), Sections 11 and 12 do "not require a plaintiff to prove that the defendant acted fraudulently." *Friedman v. Rayovc Corp.*, 295 F. Supp. 2d 957, 977 (W.D. Wis. 2003). And because Section 11 imposes "strict liability for all false and misleading statements made in a particular context; generally, there is no mental state requirement." *Id.* at 977; *see also Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983) ("Liability against the issuer of a security is virtually absolute, even for innocent misstatements."). While Sections 11 and 12 claims generally need only satisfy Rule 8's pleading requirements, a "claim that 'sounds in fraud'—in other words, one that is

premised upon a course of fraudulent conduct—can implicate Rule 9(b)'s heightened pleading requirements." *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (citing *Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004)). While the Seventh Circuit has not specifically applied Rule 9(b) to Securities Act claims, it has previously explained that "Rule 9(b) applies to 'averments of fraud,' not claims of fraud, so whether the rule applies will depend on the plaintiffs' factual allegations." *Id.*; *see also Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1161 (9th Cir. 2009) (applying Rule 9(b) to Section 11 claims that "sounds in fraud"). District Courts in this Circuit routinely apply Rule 9(b) to Securities Act claims grounded in fraud. *See, e.g., Greer v. Advanced Equities, Inc.*, 683 F. Supp. 2d 761, 767 (N.D. Ill. 2010) (applying Rule 9(b) to a Section 12(a)(2) claim that was "based on alleged fraud").

Plaintiffs claims under the Securities Act do "expressly exclude[] and disclaim[] any allegation of fraud or intentional or reckless conduct." Compl. ¶¶ 266, 272. However, "courts generally look beyond such disclaimers to determine whether a Securities Act claim sounds in fraud." *West Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 636 (N.D. Ill. 2020). For the Securities Act claims, Plaintiffs here have merely repeated and re-alleged large sections of this complaint that describe the "ongoing fraudulent scheme" of Elanco's systemic and undisclosed channel stuffing practices. Compl. ¶ 218. *See also Schaufenbuel v. InvestForClosures Fin., LLC*, 2009 WL 3188222 at *3 (N.D. Ill. September 30, 2009) (Securities Act claim sounds in fraud when underlying conduct described as "fraudulent scheme"). "Where as here, however, a complaint employs the exact same factual allegations to allege violations of section 11 as

it uses to allege fraudulent conduct under section 10(b) of the Exchange Act, we can assume that it sounds in fraud." *Rubke*, 551 F.3d at 1161. For all the reasons previously explained, Plaintiffs have not sufficiently alleged a channel stuffing scheme or any material misstatements or omissions. Even if we were to evaluate Plaintiffs' claims under Rule 8, it still would not pass muster; Rule 8 does not "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678−79; *see also Vallabhaneni v. Endocyte*, 2016 WL 51260 at *21 (S.D. Ind. January 4, 2016) ("Regardless of whether this Court views the . . . Section 11 claim through the lens of Fed. R. Civ. P. 8 or 9(b) . . . Plaintiff has not sufficiently pled the requisite material misstatement or omission").

### E.  SECTION 15 OF THE SECURITIES ACT

Section 15 of the Securities Act provides secondary liability for controllers of those companies found to have committed primary violations. *See* 15 U.S.C. §§ 77o(a). "Without a claim for primary liability under Sections 11 or 12(a)(2), there can be no control liability claim under Section 15." *Conagra*, 495 F. Supp. 3d at 673. Because we have held that Plaintiffs have failed to plead a primary violation, their Section 15 claim must be dismissed as well.

### III.    CONCLUSION

Defendants moved for a dismissal of this lawsuit with prejudice, we view that level of finality as inappropriate at this time. The Seventh Circuit has "repeatedly [] said that 'a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be

given at least one opportunity to try to amend her complaint before the entire action is

dismissed.'" *Pension Trust Fund for Operating Engineers v. Kohl's Corp.*, 895 F.3d 933,

941 (quoting *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786

F.3d 510, 519 (7th Cir. 2015)). "This admonition carries special weight in securities fraud

cases because '[i]n this technical and demanding corner of the law, the drafting of a

cognizable complaint can be a matter of trial and error.'" *Id.* (quoting *Eminence Capital,

LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003)); *see also Wade v. Wellpoint*,

740 F. Supp. 994 (S.D. Ind. 2010) (Barker, J.) (dismissing a securities fraud complaint

without prejudice and allowing the plaintiff to seek leave to amend the pleading

deficiencies in its complaint).

Accordingly, we **GRANT** Defendants' Motion to Dismiss [Docket No. 36] and

**DISMISS** the Plaintiffs' First Amended Complaint [Docket No. 34] without prejudice.

Plaintiffs are allowed 45 days to seek leave to amend their complaint to conform to these

rulings. Failure either to seek leave or to conform to the rulings set forth here in a

proposed Second Amended Complaint shall result in the entry of final judgment with

prejudice as to all claims.

IT IS SO ORDERED.

Date:    8/17/2022

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Justin D. D'Aloia
Weil Gotshal & Manges LLP
justin.daloia@weil.com

Gena L. Gonzales
WEIL GOTSHAL MANGES LLP
gena.gonzales@weil.com

Offer Korin
Stoll Keenon Ogden PLLC
offer.korin@skofirm.com

Emanuel McMiller
Faegre Drinker Biddle & Reath LLP
manny.mcmiller@faegredrinker.com

Stacy Nettleton
WEIL GOTSHAL MANGES LLP
stacy.nettleton@weil.com

John A. Neuwirth
WEIL GOTSHAL MANGES LLP
john.neuwirth@weil.com

Pavithra Rajesh
GLANCY PRONGAY & MURRAY LLP
prajesh@glancylaw.com

Gregory S. Silbert
WEIL GOTSHAL MANGES LLP
gregory.silbert@weil.com

Paul A. Wolfla
FAEGRE DRINKER BIDDLE & REATH LLP (Indianapolis)
paul.wolfla@faegredrinker.com

Kara M. Wolke
GLANCY BINKOW & GOLDBERG LLP
kwolke@glancylaw.com

Melissa C. Wright
GLANCY PRONGAY & MURRAY LLP
mwright@glancylaw.com