UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| SANDRA HUNTER Individually and on behalf of all others similarly situated, MARLA STRAPPE, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 1:20-cv-01460-SEB-MG |
| ELANCO ANIMAL HEALTH INCORPO-RATED, JEFFREY N. SIMMONS, TODD S. YOUNG, JAMES M. MEER, R. DAVID HOOVER, KAPILA K. ANAND, JOHN P. BILBREY, ART A. GARCIA, MICHAEL J. HARRINGTON, DEBORAH T. KOCHEVAR, LAWRENCE E. KURZIUS, KIRK MCDONALD, DENISE SCOTS-KNIGHT, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**ORDER DENYING PLAINTIFFS' MOTION FOR LEAVE TO AMEND THEIR COMPLAINT AND DISMISSING THE CASE**

Now before the Court is Plaintiffs' Motion for Leave to File a Second Amended Complaint. Dkt. 68. Plaintiffs' motion comes in response to the Court's prior order dismissing the First Amended Complaint ("FAC") without prejudice. Dkt. 62. At that time, we held that the FAC fell short of the heightened pleading requirements applicable to securities fraud litigation, and we granted Plaintiffs forty-five days within which to seek leave to amend the FAC to conform to our ruling. *See Hunter v. Elanco Animal Health Inc.*, 2022

1

WL 3445173 (S.D. Ind. Aug. 17, 2022) ("*Hunter I*"). Plaintiffs have petitioned for such relief, dkt. 68, but Defendants rejoin that Plaintiffs' Proposed Second Amended Complaint ("PSAC"), dkt. 70-1, fails to remedy the FAC's deficiencies, rendering leave to amend futile, dkt. 71.

## ALLEGATIONS OF FACT[1]

### I.     BACKGROUND & PARTIES

Lead Plaintiff, Sandra Hunter, and Plaintiff Marla Strappe ("Plaintiffs") filed this class action complaint alleging that Elanco, its Chief Executive Officer Jeffery N. Simmons ("Mr. Simmons"), and its Chief Financial Officer Todd S. Young ("Mr. Young") made fraudulent misrepresentations through dozens of public statements by omitting material information about Elanco's reliance on "systemic and undisclosed channel stuffing practices," which caused distributors to purchase inventory "far in excess of demand." Plaintiffs maintain that these omissions rendered Elanco's growth and revenue figures throughout the class period materially misleading. Plaintiffs also allege that Elanco's Chief Account Officer James M. Meer ("Mr. Meer") and the nine members of Elanco's Board of Directors, by omitting information regarding channel stuffing from the offering materials for Elanco's

---

[1] Many of the underlying facts of this case are detailed in the Court's Order of Dismissal, dkt. 62, and Plaintiffs' PSAC, dkt. 70-1. Given that the instant motion requires us to test the sufficiency of Plaintiffs' factual allegations as a whole, we restate those facts to the extent they are relevant and add those that are newly alleged.

merger with Aratana Therapeutics ("Aratana"), rendered the growth and revenue calculations within these documents materially misleading.[2]

Formerly a business unit of Eli Lilly and Company ("Eli Lilly"), Elanco was spun-off into a standalone, public company after its initial public offering ("IPO") on September 20, 2018. Elanco develops, manufactures, and markets animal health products for both companion animals, such as dogs and cats, and food animals, i.e., cattle and poultry. Elanco structures its product lines for companion animals and food animals into four categories: Companion Animal Disease Prevention; Companion Animal Therapeutics; Food Animal Future Protein and Health; and Food Animal Ruminants & Swine.

Elanco generates revenue primarily through product sales to customers, who are generally not end-users, but rather third-party wholesale distributors of Elanco's products. These distributors, in turn, sell to customers such as veterinary clinics for companion animal products, or cattle and dairy farms for food animal products. From the beginning of the class period through 4Q 2019, Elanco's major distributors were: MWI Animal Health ("MWI"); Covetrus, Inc.; Patterson Veterinary; Midwest Veterinary Supply; K+K Vet Supply Inc.; Penn Veterinary Supply, Inc.; Victor Medical Company; Veterinary Service, Inc.; and Nutra Blend LLC.

---

[2] The individual Defendants from the Elanco's Board of Directors are Chairman R. David Hoover, Kapila K. Anand, John P. Bilbrey, Art A. Garcia, Michael J. Harrington, Deborah T. Kochevar, Lawrence E. Kurzius, Kirk McDonald, and Denise Scots-Knight.

Consistent with generally accepted accounting principles ("GAAP"), Elanco recognizes revenue when products are shipped to customers. Dkt. 38-1 at 46.[3] Leading into its IPO, Elanco disclosed that payment terms "differ[ed] by jurisdiction and customer," but the typical payment terms were "30 to 100 days from date of shipment." *Id.* at 47. Elanco's contracts with "direct and indirect customers [also] provide[d] for various rebates and discounts that . . . differ[ed] in each contract." *Id.* To determine the appropriate transaction price, Elanco "estimate[d] any rebates or discounts that ultimately w[ould] be due to the direct customer and other customers in the distribution chain under the terms of [their] contracts." *Id.* "The rebate and discount amounts [we]re recorded as a deduction to [calculate] net product sales." *Id.*

## II.   PRE-CLASS PERIOD

Though Plaintiffs have now shortened the class period from September 20, 2018, through May 6, 2020, to May 9, 2019, through May 6, 2020, we recount the following preclass period events, which Plaintiffs reallege in their PSAC, for context.

### A.   Elanco's Growth Strategies

In anticipation of its IPO, Elanco intended to "continue to grow [its] business and create value for . . . shareholders through a targeted value-generating strategy with three

---

[3] Docket 38-1 is Elanco's Form S-1 Registration Statement, which was one of the publicly filed SEC filings attached to Elanco's Motion to Dismiss. In ruling on the motion to dismiss, we properly considered and judicially noticed many of these documents, and Plaintiffs have never contested the authenticity of these documents. *Hunter I*, 2022 WL 3445173, at *2 n.3 (citing *In re Guidant Corp. Sec. Litig.*, 536 F.Supp.2d 913, 921 (S.D. Ind. 2008) (Barker, J.), *aff'd sub nom. Fannon v. Guidant Corp.*, 583 F.3d 995 (7th Cir. 2009)). We continue to include these facts from *Hunter I* that were obtained from Elanco's judicially noticed documents.

key pillars: a Portfolio Strategy for our marketed products, an Innovation Strategy for [the] [Research & Development ("R&D")] pipeline, and a Productivity Strategy for our margin expansion initiatives." *Hunter I*, 2022 WL 3445173, at *4; *see also* dkt. 38-1 at 7. Elanco promised to focus "the majority of [its] resources, including more than 75% of [the] R&D funding, on . . . three targeted growth categories": Companion Animal Disease Prevention, Companion Animal Therapeutics and Food Animal Future Protein & Health, where Elanco believed it was "well positioned to grow faster than the market." *Hunter I*, 2022 WL 3445173, at *4. For its Companion Animal Disease Prevention category, Elanco sought additional growth through "continued product innovation and sales channel expansion." *Id.* "For its well-established Food Animal Ruminants & Swine category, Elanco expected to 'continue to be a leader,' believing it had 'created long-standing customer relationships [that] provide[d] an important revenue source for [the] business and for investment capital to support future growth.' " *Id.* (quoting dkt. 38-1 at 7).

Elanco's Innovation Strategy included "strong" in-house R&D capabilities in addition to product acquisitions or venture capital investment. Dkt. 38-1 at 8. "This inclusive approach to innovation allow[ed] [Elanco] to identify, attract, fund, and develop new ideas in a manner that enhance[d] [the] pipeline while . . . reducing the risk associated with an in-house only innovation model." *Id*. Pursuant to this strategy, Elanco launched nine products between 2015 and 2017, which delivered revenue of $24.7 million in 2015, $97.9 million in 2016, and $143.8 million in 2017, and $136.6 million during the first half of 2018. Elanco believed its new products would continue to be an "important source of revenue." *Id.*

Elanco also cautioned investors before the IPO that generic competitors were "becoming more aggressive in terms of launching products before patent rights expire, and, because of attractive pricing, sales of generic products [we]re an increasing percentage of overall animal health sales in certain regions." *Id.* at 12. Accordingly, Elanco "disclosed that approximately seventy-five percent of its revenue in 2017 came from products that did not have patent protection, including revenue from some of its top products like Rumensin," a medicated feed additive for cattle. *Id.* at 16. Because Elanco had already competed with lower-priced generics and other alternatives products, Elanco also warned about continued competition in the future.

Elanco's Productivity Strategy focused, in part, on sales growth, which entailed plans to augment operating margins by increasing productivity in its sales force. To accomplish this growth, Elanco would rely on both its strong customer relationships and strategic distributor partnerships to efficiently grow product demand. *Id.* at 10. In identifying risk factors to the Companion Animal division, Elanco listed an increased use of alternative distribution channels, changes within existing distribution channels, and changes within its existing distributor relationships. *Hunter I*, 2022 WL 3445173, at *4. Elanco similarly disclosed that in 2017 a change in its inventory management practices resulted in a revenue lag as existing inventory was sold down, which management estimated decreased revenue by approximately $35 million. *Id.*

## B.    Elanco's Pre-IPO Sales Practices

As an Eli Lilly business unit in 2017, Elanco employed a "move out" style business model, which, according to Confidential Witness 1 ("CW1"), "create[ed] incentives and

6

opportunities to increase sales by distributors to the ultimate end-users." PSAC ¶ 54. CW1 was described as a Corporate Account Manager in Elanco's Food Animal division who managed Elanco's relationship with four distributors—MWI, Midwest, K+K, and Veterinary Service, Inc. *Id.* ¶ 37. CW1 reported to Courtney Shriver ("Ms. Shriver"), who oversaw both Elanco's Food Animal and Companion Animal channel distribution. *Id.* Ms. Shriver reported to Senior Director of Channel Strategy and Sales Force Excellence for North America Julia Loew ("Ms. Loew"), who reported to Vice President, Shawn McKee ("Mr. McKee"). *Id.*

According to Confidential Witness 2 ("CW2"), in 4Q 2017, Elanco transitioned to a "move in" sales model,[4] which used a "sliding scale of margins, adjusted quarterly, based on the amount of product purchased" to incent distributor purchases. *Id*. ¶ 55. CW2, a Corporate Account Manager in Elanco's Companion Animal division, oversaw contract negotiations and day-to-day management of MWI's account. *Id.* ¶ 38. CW2 also reported to Ms. Shriver. In describing Elanco's shift to the "move in" model, CW2 stated, "MWI was held to a certain amount of buy from us, and if they didn't make it, then their margin dropped." *Id.* ¶ 55. According to CW2, "[n]obody does this. You should be able to give your client at least annually [sic] visibility" on their margins. *Id.* When making a presentation on this sliding scale at a Florida conference in 2018, CW2 recalled that MWI executives' "jaws dropped" at "the amount of inventory Elanco expected MWI to buy." *Id.*

---

[4] While accepting as true Plaintiffs' factual allegation that Elanco switched sales models, we again sidestep their highly editorialized description of the 'move in' sales model. *Hunter I*, 2022 WL 3445173, at *3 n.4.

Leading up to Elanco's September 2018 IPO, CW2 disclosed that Elanco's top management became so consumed with hitting sales numbers to meet market expectations that they ramped up the pressure to "stuff the channel." *Id.* ¶ 56. CW1 recounted that Ms. Shriver "analyzed the sales forecasts for all Elanco products to identify monthly and quarterly sales shortfalls, which then dictated the amount of inventory in excess of demand Elanco needed to sell to distributors in any given month or quarter." *Id.* ¶ 57. When Ms. Shriver identified shortfalls in Elanco's non-Food Animal business units, she would ask CW1 to sell excess Food Animal products to Elanco's clients, like MWI, "to make up for th[e] gap." *Id.* For example, in February 2018, CW1 recalled being asked by Ms. Shriver "to bring in a million here, an extra $2 million there, to close the gap on another business segment that wasn't doing well." *Id*. Ms. Shriver also directed CW2 to "figure out which products [MWI could] take and stuff it in," elaborating that "it doesn't matter how you get it in." *Id*. ¶ 58. Ultimately, Ms. Shriver directed CW2 to "stuff the MWI channel with an additional $3 million of Interceptor Plus and Trifexus, two popular Companion Animal medications . . . , even though MWI was already holding 75-80 days of both products." *Id.* (The industry standard, we are told, is to hold between 45 and 60 days' worth of inventory. *Id.* ¶ 64.) To accomplish this directive from Ms. Shriver, CW2 increased MWI's margin on Trifexus from 18 to 20 percent. *Id.* ¶ 58.

During this time, Confidential Witness 4 ("CW4") recalled that "[w]hen 'move out' started to come short of projections, that's when [Elanco] start [sic] to 'move in' more." *Id.* ¶ 55. CW4 was identified as the Global Head of Animal Care Expansion, Business Development & Licensing and Alternate Innovation from September 2018 to January 2020, and

then a Vice President from January 2020 until July 2020. *Id.* ¶ 40. CW4 began work at Eli Lilly in August 2017, prior to Elanco's spin off, as Global Head of the over-the-counter business unit. According to CW4, Elanco's "move in" model reached "full force" by late 2018, when Elanco was offering discounts, additional rebates, and extended payment terms to induce distributors to purchase more inventory. *Id.* ¶ 60. CW4 described these sales incentives as "pre-sales," whereby Elanco pulled sales from future quarters into the current quarter by selling extra inventory to distributors. *Id.*

Though Elanco ordinarily offered all its distributors of companion animal products a one to three percent rebate, CW2 related that Elanco would also offer a rebate of two to four percent of the net revenue, paid annually, from a companion animal purchase. *Id.* ¶ 61. These "additional rebates," CW2 reported, encouraged customers to purchase more product and "essentially ignore end-user demand." *Id.* ¶ 62. And even if distributors "did not need to purchase additional inventory," they also " 'didn't want to leave money [i.e., the promised rebate] on the table.' " *Id.* (quoting CW1). Confidential Witness 3 ("CW3"), a National Accounts Manager in the Food Animal division, added that purchases made in the last week of a quarter were rewarded with a ten percent rebate, and Elanco also offered a five percent rebate when a distributor's inventory remained unsold after ninety days. *Id.* ¶ 63. CW3 worked in partnership with CW1, negotiating contracts and overseeing the day-to-day management of MWI, Covetrus, Inc., and Patterson Veterinary.

## C.    3Q 2018

On November 6, 2018, Elanco announced its third quarter 2018 financial results, reporting that revenue had grown nine percent—as compared to the third quarter of 2017—

to $761.1 million. Revenue from the Companion Animal Disease Prevention and Thera-
peutics categories grew thirty-four and twenty-seven percent, respectively, which Elanco
attributed to increased volume and price. Food Animal Ruminants & Swine increased eight
percent for the quarter, while Food Animal Future Protein & Health grew two percent for
the quarter. Elanco advised that actual product returns comprised approximately one per-
cent of net revenue for the first nine months of 2018 and had "not fluctuated significantly
as a percentage of revenue." Dkt. 38-25 at 6.

### D. 4Q & Year End 2018

During the fourth quarter of 2018, Ms. Shriver directed CW1 to push $10 to $12
million worth of excess feed additive and vaccine inventory onto MWI, in addition to
MWI's typical monthly purchase of $12 million in feed additive. PSAC ¶ 66. By the 4Q
2018, CW1 recalled that inventory levels of feed additives and vaccines at Elanco's major
distributors were at 120 days, which was double the industry standard. *Id.*

On February 6, 2019, Elanco announced its financial results for both the fourth quar-
ter and the full year of 2018, reporting revenue growth of six percent, to $799.3 million
and $3.1 billion, respectively. Net income and earnings per share reached $86.5 million
and $0.28, respectively. Dkt. 38-3 at 9. For the year, the deduction for estimated rebates
and discounts totaled $221 million. Dkt. 38-11 at 6. Elanco also reported that actual product
returns had been approximately one percent of net revenue during both 2017 and 2018, and
still "ha[d] not fluctuated significantly as a percentage of revenue." *Id.* These results, ac-
cording to Elanco, reflected "strong volume growth and the execution of the company's
targeted, three-pillar strategy focused on Portfolio, Innovation and Productivity" as well as

a "strong full year performance in its three targeted growth categories." Dkt. 38-3 at 6. Food Animal Ruminants & Swine accounted for thirty-eight percent of Elanco's revenue for the year, with Food Animal Future Protein & Health accounting for twenty-three percent, Companion Animal Disease Prevention accounting for twenty-six percent, and Companion Animal Therapeutics accounting for just nine percent. PSAC ¶ 49.

For 4Q 2018, Companion Animal Disease Prevention revenue was up forty-three percent for the quarter, which "improved in comparison to [the] prior year due to a reduction in channel inventory in the fourth quarter of 2017." Dkt. 38-3 at 8. However, Elanco reported that revenue for Companion Animal Therapeutics had decreased by six percent due to the timing and availability of Galliprant[5] shipments. *Id.* Elanco attributed this decline to "a planned shipment in late 2018 [that] was delayed until early 2019 to appropriately complete the quality release process" and demand for Galliprant that had exceeded supply capacity "resulting in Galliprant backorders at the end of the year." *Id.* Elanco was "working diligently to expand production and expect[ed] to clear remaining backorders by late first quarter or early second quarter 2019." *Id.* Food Animal Future Protein & Health revenue had increased eight percent, driven by volume and increased price. *Id.* Food Animal Ruminants & Swine revenue had decreased by eight percent, driven by "softness in swine antibiotics, particularly in Asia, and a stock-outage of Micotil, an injective treatment for Bovine Respiratory Disease, now resolved." *Id.*

---

[5] Galliprant is "a nonsteroidal anti-inflammatory drug for canine osteoarthritis" that Elanco licensed from Aratana. PSAC ¶ 46.

### E.    1Q 2019

According to Elanco's 2019 financial guidance, released on December 18, 2018, Elanco expected annual revenue between $3.10 and $3.16 billion and earnings per share between $0.36 to $0.48 on a reported basis and between $1.02 to $1.12 on an adjusted basis. *Hunter I*, 2022 WL 3445173, at *5.

At some point during the quarter, Ms. Shriver directed CW3 to sell an additional $2 million of Food Animal products to CW3's distributors, which "excess sales CW3 completed." PSAC ¶¶ 70, 112.

On May 9, 2019, Elanco announced its 1Q 2019 financial results, reporting that revenue declined one percent to $731.1 million. Dkt. 38-4 at 6. The company also reduced its revenue expectations for the year to a range of $3.08 and $3.14 billion. *Id.* Companion Animal Disease Prevention revenue was down eight percent for the quarter, while Companion Animal Therapeutics revenue was up thirty-one percent, "primarily driven by sales of Galliprant" as "backorders in the channel were resolved and the product was launched in several European markets." *Id.* at 7. Food Animal Future Protein & Health revenue was flat for the quarter, while Food Animal Ruminants & Swine decreased three percent as growth from the resolution of certain backorders and favorable purchasing patterns in cattle products was offset by other external factors such as the African Swine Fever. *Id.* On an earnings call conducted on May 9, 2019, Mr. Simmons addressed the company's sale performance for the quarter, explaining that, notwithstanding some "key variables," like the African Swine Fever, "the fundamentals of [Elanco's] business [we]re strong" and tracking to goals. Dkt. 38-9 at 5.

Later in the earnings call, Mr. Young explained that there was considerable variability in distributor stocking dynamics, especially between the Companion Animal Therapeutics and Companion Animal Disease Prevention categories. *Id.* at 11. He further explained that incentives were in place for distributors to buy more vaccines and parasiticides to meet the tiering incentives in 4Q 2018, so "they were pretty fully stocked on those," compared to 1Q when "the incentive was to buy Galliprant given [Elanco had] resolved all the backorders and had lots of production on that side." *Id.* Mr. Young emphasized that he felt "very good about the underlying demand at the vet channel," and, while the sixteen percent six-month growth rate was "certainly not . . . project[ed] for the full year," he did "feel very good about [Elanco's] position with [its] companion animal portfolio for the rest of 2019." *Id.*

## III.   THE CLASS PERIOD

### A.   2Q 2019

The putative class period began in 2Q 2019 on May 9, 2019. During 2Q, but before the class period formally began, Elanco had announced on April 26, 2019, that it planned to acquire Aratana, the pet therapeutics company from whom Elanco had previously licensed Galliprant. *Hunter I*, 2022 WL 3445173, at *6. Plaintiffs allege that by May 9, 2019, "Elanco had, for the better part of a year, been heavily relying on 'move in' sales tactics of dramatically increased rebates, discounts, and extended payment terms to boost sales and incentivize distributors to take on large amounts of excess inventory, with the result of Elanco's channel inventory being 'stuffed' far in excess of demand." PSAC ¶ 68. Plaintiffs allege that these practices "cannibalized" Elanco's ability to make future sales because, as

recounted by CW2, "when you stuff the channel, the following quarter you're not gonna [sic] make it." *Id.* According to CW4, " '[y]ou post a good quarter, some of which is pre-sale'—referring to pulling future sales into the current quarter—but eventually 'your growth rate suffers.' " *Id.*

At some point during the quarter, Ms. Shriver directed CW3 to sell an additional $5 million of large animal products to CW3's distributors, "in excess of [their] requested orders." *Id.* ¶ 70. At the end of the second quarter, when MWI was already holding more than 60 days of inventory for feed additives, Ms. Shriver directed CW1 to "sell an additional $10 million in feed additives that quarter-end on top of MWI's already committed $9-$10 million purchase for the month of June 2019." *Id.* ¶ 72. "To convince MWI to make such a large additional purchase," CW1 "initially offered an additional rebate of 3%, which grew to an additional 5% on top of Elanco's standard rebate as the year progressed." *Id.* CW1 also recalled that by around mid-2019, MWI had taken on so much extra inventory that it "often ha[d] to lease warehouse space or store [surplus products] on semis" located in Amarillo, Texas. *Id.* ¶ 73.

On August 13, 2019, Elanco announced its second quarter 2019 financial results, reporting a revenue increase of one percent to $781.6 million, with four percent constant currency rate revenue growth. Dkt. 38-5 at 5. Mr. Simmons stated the company was "encouraged by the 9 percent constant currency growth in our targeted growth categories." *Id.* However, Elanco again reduced its 2019 financial guidance, lowering the top end of the revenue range by $20 million, "primarily [from] the increased headwind from [the] African Swine Fever and anticipated supply disruption of certain injectable cattle products." *Id.* at

8. Revenue for the Companion Animal Disease Prevention category grew six percent from both volume and price. Revenue for Companion Animal Therapeutics increased twenty-six percent, with twenty-one percent of the growth attributable to increased sales volume "driven by increased demand for products across the therapeutics portfolio, including the continued uptake of Galliprant" in the United States, along with the product's "strong demand" in Europe. *Id.* at 6. Future Protein and Health's revenue grew seven percent, but Food Animal Ruminants & Swine's revenue was down nine percent, with unfavorable purchasing patterns for Rumensin in the United States, and the continued impact from external factors such as the African Swine Fever on Elanco's international business, particularly in Asia. *Id.* at 7.

**B.     3Q 2019**

CW3 recalled a telephone conversation occurring in September 2019 with Ms. Shriver, in which Ms. Shriver mentioned that during a meeting at Elanco's headquarters, Mr. Simmons wanted to "make the quarter, no matter what." PSAC ¶ 74. Around that same time, CW3 also recalled Ms. Shriver saying that Mr. Simmons was particularly worried about the introduction of a generic form of Rumensin and thus was eager to push out Elanco's Rumensin inventory. *Id.* Ms. Shriver directed CW3 to sell an additional $5 million among MWI, Covetrus, and Patterson, even though each customer was already "bursting" with inventory. *Id.*

In September 2019, Ms. Shriver also directed CW1 to push an extra $10 million in cattle feed additives, including Rumensin, to meet Elanco's third quarter 2019 revenue forecast. *Id.* ¶ 75. When CW1 called to ask MWI to buy this $10 million in inventory, the

MWI representative allegedly said to CW1: "you gotta [sic] be kidding me." *Id.* In the last week of the third quarter, CW3 recalled that a fellow Account Manager used a 10 percent rebate incentive, which Elanco offered to distributors purchasing in the last week of a quarter, and thus managed to sell an extra $20 million of inventory to Nutra Blend. *Id.* ¶ 76.

On November 6, 2019, Elanco announced its third quarter 2019 financial results, reporting a revenue increase of one percent to $771.3 million, and core revenue at constant currency rates that had grown four percent. Dkt. 38-6 at 5. Companion Animal Disease Prevention revenue had increased ten percent for the quarter, driven by continued uptake of products and an initial stocking for a new customer agreement. *Id.* at 6. Companion Animal Therapeutics revenue had increased nine percent for the quarter, driven by continued uptake of Galliprant, initial stocking for a new customer agreement, and sales of two products from the acquisition of Aratana. *Id.* Food Animal Future Protein & Health revenue had increased eighteen percent for the quarter, driven in part by the "sale of the remaining inventory of a product that will be phased out in China and purchasing patterns in the prior year that created a favorable comparison for poultry products." *Id*. In contrast, Food Animal Ruminants & Swine revenue was down twelve percent, driven by "softness in swine products due to African Swine Fever across Asia, a disruption in global supply of certain third-party produced injectable cattle products, reduced U.S. producer use of Paylean, changes in distributor purchasing for Rumensin as anticipated and the impact from the Australian drought, partially offset by revenue generated from Posilac as a result of the revised commercial agreement entered into in the third quarter of 2019." *Id.*

On an earnings call also on November 6, 2019, Mr. Young explained that the company now expected a "range of $3.07 billion to $3.085 billion, a narrowing of the range, and a $10 million reduction in the low end of the range." Dkt. 38-7 at 9. Mr. Simmons discussed the generic competition for Rumensin, explaining that "we see a strong brand loyalty among our customers for Rumensin, and we are very pleased with the durability and end-user demand." *Id.* at 6. "As we expected, in the distribution channel, we've seen some changes in purchasing as they assess the environment." *Id.* Mr. Simmons also explained that they had "modeled that there's an erosion in the first couple of years, a mix between price and volume . . . in the neighborhood of 30% over that first couple of years." *Id.* at 11. Mr. Simmons reported that Elanco was "tracking at those expectations or even better and feeling very good about it." *Id.* Finally, Mr. Simmons said the downward alteration in expected revenue "is really just a supply chain assessment that typically happens when you bring a generic to the market where people's levels of inventories may change a little bit as they are assessing the marketplace." *Id.*

In its SEC filings reflecting third quarter 2019 performance, Elanco revised the description of its typical payment terms from a "range [of] 30 to 100 days from date of shipment" to a "range [of] 30 to 120 days." PSAC ¶¶ 87−88. For the end of 2019, Elanco stated in SEC filings: "[w]e have extended our payment terms in the past in certain customer situations and may need to continue this practice going forward as a result of competitive pressures and the need for certain inventory levels at our channel distributors to avoid supply disruptions." *Id.* ¶ 89 (quoting Elanco's 2019 Form 10-K). CW1 stated that one of the special incentives offered to his or her accounts was "extended payment terms of 120

days—30 days more than the 90-day payment term typically required," but the record is unclear as to when these offers were made. *Id.* ¶ 65.

### C.    4Q & Year End 2019

According to CW4, Elanco's reliance on "pre-sales" became progressively worse in 2019, with the "peak" of Elanco's use of this practice occurring in the fourth quarter of 2019. *Id.* ¶ 78. In 2019, CW4 attended monthly financial meetings with Mr. Simmons and Mr. Young, during which CW4 reviewed "relevant sales data" (prepared by Mr. Young) and "saw a consistent delta between dispensing numbers and selling numbers." *Id.* CW4 apparently "discerned that Elanco's channel inventory was maxed out in 2019," though the details of such discernment remain unknown, at least to us. Senior executives also challenged Mr. Simmons on Elanco's apparent channel stuffing, which CW4 understood to be "based on the numbers, consumption . . . , what the distributors [were] selling[,] and what [we sold] them." *Id.* "It is [still] unclear from the parties' submissions precisely when these meetings took place during 2019." *Hunter I*, 2022 WL 3445173, at *8. According to CW2, by the fourth quarter of 2019, MWI had purchased so much excess Elanco inventory that it was holding approximately 100 to 120 days of inventory of Companion Animal products. *Id.* ¶ 79.

In Elanco's SEC filings for the third quarter of 2019, the risks of "increased or decreased sales to our channel distributors resulting in higher or lower inventory levels held by them in advance of or trailing actual customer demand, which could lead to variations in quarterly revenue results" had been added as well as a statement that "[i]ncreases or decreases in inventory levels at our channel distributors can positively or negatively impact

18

our quarterly and annual revenue results, leading to variations in quarterly revenues." *Id.* ¶¶ 90–91. At some point during the fourth quarter of 2019, Elanco made the decision to consolidate the number of its United States distributors for Companion Animal products from eight to four. In November 2019, Elanco also switched its sales model back to the "move out" model. Given Plaintiffs' description of the "move out" strategy as an effort to "balance sales to end-user demand," as opposed to the "move in" strategy, which "incentivizes excess purchases by distributors in excess of demand," we understand November 2019 to be the end point of the alleged "channel stuffing" scheme. *Id.* ¶ 84–86. Around the same time, Elanco reduced its base margins offered on products sold. CW4 stated that "[t]he distributors that got eliminated first that had inventory kept selling until they ran out." *Id.* ¶ 85. As a result of the eliminated distributors still offloading their excess supply, "[t]he pick up [by remaining distributors] was delayed," creating an "accumulation of inventory" that was a "compounding factor" in the fourth quarter. *Id.*

On February 19, 2020, Elanco announced its fourth quarter and year end 2019 financial results, reporting that fourth quarter revenue had decreased two percent to $787 million, with core revenue for the quarter growth of one percent on a constant currency basis. For the year, revenue was flat compared to 2018 at $3.1 billion, with core revenue on a constant currency basis growing three percent. Full year earnings per share were $0.18 as reported, or $1.06 as adjusted. Product returns comprised a total 0.2% of net revenue in 2019, down from 0.6% of net revenue in 2018. Dkt. 38-8 at 8. The deduction for estimated rebates and discounts in the United States was $316 million in 2019. *Id.* Elanco's growth categories—Companion Animal Disease Prevention, Companion Animal Therapeutics,

and Food Animal Future Protein and Health—accounted for sixty-one percent of Elanco's revenue for the year, while Food Animal Ruminants and Swine accounted for thirty-six percent.

On the earnings call conducted that same day, Mr. Simmons stated that "2019 was a challenging year with a number of external events that emerged throughout the year including African Swine Fever, supply challenges, drought, changing producer use of certain products from policy and trade, and the entrant of a new generic competitor." Dkt. 38-10 at 5. Revenue from Companion Animal Disease Prevention declined fourteen percent in the fourth quarter, as "several factors in the prior year [created] a challenging comparison in this category," such as "increased customer purchases of disease prevention products to achieve desired incentive levels across all of Companion Animal since the supply of Galliprant was constrained." *Id.* at 7. Companion Animal Therapeutics revenue had increased thirty-four percent for the quarter, "driven by the continued uptake of Galliprant and a favorable comparison from the prior year due to Galliprant backorders in 2018, as well as the additional sales for" Aratana products. *Id.* Food Animal Future Protein and Health revenue had grown two percent, while Food Animal Ruminants and Swine revenue increased three percent, driven by "the sales of Posilac inventory and partial resumption of sales for a sterile injectable product, which had been suspended due to quality issues of the contract manufacturer." *Id.* But this growth was "partially offset by the continued impact of African Swine Fever in Asia, changing US producers use of Paylean, and to a lesser extent, decreased Rumensin sales." *Id.*

When asked about changes to the distributors and any potential disruption, Mr. Simmons explained that "we've been public about this that we have prioritized and cut distribution down to four major distributors," primarily in the Companion Animal market in the United States. *Id.* at 17. The company had "a very targeted approach . . . set up for this year with these key distributors" and Mr. Simmons assured investors Elanco would "continue to monitor [distributors] month to month as we go through the quarter." *Id.*

### D.    1Q 2020

In January 2020, Elanco issued 22.7 million shares of common stock at $32.00 per share and 11 million tangible equity units in a concurrent public offering to finance a portion of Elanco's acquisition of Bayer Animal Health's ("Bayer") animal health business, which it had publicized in August 2019. At some unknown point in the quarter, CW3 recounted that Nutra Blend, who was not one of CW3's distributors, began to "push back," stating that it was "not doing this anymore." PSAC ¶ 80.

Elanco announced its 2020 financial guidance on January 10, 2020, estimating revenue of between $3.05 billion and $3.11 billion, and earnings per share in the range of $0.04 to $0.16 on a reported basis and $1.09 to $1.16 on an adjusted basis. Dkt. 38-12 at 7. But by March 24, 2020, Elanco released a business update, announcing that the "situation around the COVID-19 pandemic [was] rapidly evolving," prompting Elanco to withdraw its previous 2020 revenue and earnings per share guidance." *Hunter I*, 2022 WL 3445173, at *10 (quoting FAC ¶ 214). The announcement explained that the company was "monitoring several global dynamics, from changing foreign currency rates and a dynamic animal

protein market to declining veterinary clinic visits, the growing use of direct-to-consumer shipping, and sales through ecommerce and other alternative channels." *Id*.

On May 7, 2020, Elanco announced its 1Q 2020 financial results, reflecting a ten percent decline in total revenue "due to a reduction of approximately $60 million in channel inventory driven by factors resulting from the COVID-19 pandemic." PSAC ¶ 93. Mr. Simmons explained that "the COVID-19 pandemic created working capital pressures across our commercial value chain and dampened assumptions about near-term demand from end users of our products." *Id*. "These factors coupled with our recent evaluation of distributor performance has prompted us to tighten our approach across many facets of our distributor relationships." *Id*. Elanco's "relationship with [its] commercial partners ha[d] evolved significantly over the last 13 years and while distribution w[ould] continue to play a role in the future, [Elanco's] analysis show[ed] [its] internal demand generation efforts are superior to distributors and higher inventory levels are not driving demand as [they] had in the past." *Id*.

Elanco "made initial progress to meaningfully reduce channel inventory, primarily in [its] U.S. companion animal business," and it "expect[ed] to further tighten channel inventory across all business areas, primarily in the second quarter." *Id*. While this decrease in channel inventory and other actions Elanco was taking with its commercial partners would negatively impact their sales performance in the short term, Mr. Simmons anticipated that the changes would "strengthen [Elanco's] position, optimize [its] promotional approach and enable [it] to direct investment to the internal commercial activities that drive demand for our products over the long term." *Id*.

## LEGAL DISCUSSION & DECISION

The Seventh Circuit commands "greater pre-complaint investigation . . . in fraud cases," both "because public charges of fraud can do great harm to the reputation of a business firm or other enterprise (or individual)" and "because fraud is frequently charged irresponsibly by people who have suffered a loss and want to find someone to blame for it." *Ackerman v. Northwestern Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999). Federal securities statutes authorize private securities fraud actions, "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 345 (2005). While "greater clairvoyance" in 2020 might have prompted an earlier realization that a looming global pandemic would ultimately shut down great swathes of the world's economy, "failure to make such perceptions does not constitute fraud" because there is no "fraud by hindsight." *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978).

"Though Elanco initially 'bathe[d] itself in a favorable light,' later it found itself having to 'disclose[ ] that things are less rosy.' " *Hunter I*, 2022 WL 3445173, at *11 (quoting *DiLeo*, 901 F.2d 624, 627 (7th Cir. 1990)). Plaintiffs contend, once again, that this "must be attributable to fraud." *DiLeo*, 901 F.2d at 627. As explained below, the ingredients of fraud are still missing from Plaintiffs' PSAC, and their reliance on mere conclusory accusations and hindsight proves unavailing in establishing a claim upon which relief can be granted.

## I.   STANDARDS OF REVIEW

"Federal Rule of Civil Procedure 15 provides that, as a general rule, a court 'should freely give leave [to amend] when justice so requires.' " *Gonzalez-Koeneke v. West*, 791 F.3d 801, 807 (7th Cir. 2015) (quoting Fed. R. Civ. P. 15(a)(2)). Leave to amend is not granted automatically. *Innovative Water Consulting, LLC v. SA Hosp. Acquisition Grp., LLC*, No. 1:22-CV-00500-TWP-DLP, 2022 WL 18540496, at *1 (S.D. Ind. Sep. 30, 2022) (citing *Crest Hill Land Dev., LLC v. City of Joliet*, 396 F.3d 801, 804 (7th Cir. 2005)). District courts "have broad discretion to deny leave to amend where there is undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice to the defendants, or where the amendment would be futile." *Arreola v. Godinez,* 546 F.3d 788, 796 (7th Cir. 2008). "District courts may refuse to entertain a proposed amendment on futility grounds when the new pleading would not survive a motion to dismiss." *Gandhi v. Sitara Cap. Mgmt., LLC*, 721 F.3d 865, 869 (7th Cir. 2013).

To survive a motion to dismiss, Plaintiffs' PSAC must satisfy the standards of Federal Rules of Civil Procedure 8, 9(b), and 12(b)(6), as well as the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b). Under Rule 8, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has interpreted Rule 8 to require "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Facial plausibility requires "more than a sheer possibility" of unlawful conduct; instead, the well-pleaded facts of a complaint must allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009). Put differently, "plaintiff[s] must do better than putting a few words on paper that, in the hands of an imaginative reader, might suggest that something has happened to [them] that might be redressed by the law." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 403 (7th Cir. 2010) (italics omitted).

In a fraud action, the Federal Rules demand particularity. Fed. R. Civ. P. 9(b); *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir. 1997) (Rule 9(b)'s "particularity requirement [is] rigorously applied in securities fraud cases."). A plaintiff in a securities fraud action must, therefore, "provide 'precision and some measure of substantiation' to each fraud allegation." *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 338 (7th Cir. 2019) (quoting *United States ex rel. Presser v. Acacia Mental Health Clinic*, LLC, 836 F.3d 770, 776 (7th Cir. 2016)). In effect, a plaintiff's burden is to plead "the who, what, when, where, and how" of the alleged fraud. *DiLeo*, 901 F.2d at 627.

The PSLRA further heightens the pleading standards for securities fraud claims as a "check against abusive litigation by private parties." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) ("*Tellabs II*"). The PSLRA mandates the complaint to "specify each statement alleged to have been misleading" and to explain "why the statement is misleading," 15 U.S.C. § 78u–4(b)(1). For each act or omission, the complaint must "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(1)−(2) (emphasis added).

"The interplay between Rule 12(b)(6), and Rule 9(b) and the PSLRA is important," because "[f]ailure to meet the threshold pleading requirements demanded by the latter provisions justifies dismissal apart from Rule 12(b)(6)." *Cal. Public Emp. Ret. Sys. v. Chubb*

*Corp.*, 394 F.3d 126, 145 (3d Cir. 2004). The PSLRA's heightened standards enhance "plaintiffs' pre-complaint duty to investigate and further discourage claims of so-called 'fraud by hindsight.' " *Schleicher v. Wendt*, 529 F. Supp. 2d 959, 969 (S.D. Ind. 2007); *see also Arazie v. Mullane*, 2 F.3d 1456, 1467–68 (7th Cir. 1993) ("fraud by hindsight" is not actionable; temporal proximity between positive statements stressing a firm's strengths and announcements of poor economic performance do not create an inference that the earlier statements were fraudulent).

## II.    SECTION 10(B) OF THE SECURITIES EXCHANGE ACT

Section 10(b) of the Securities Exchange Act forbids the "use or employ, in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange Commission ("SEC")] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Under Rule 10b-5, the SEC further prohibits "a company or an individual 'to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.' " *Makor Issues & Rights, Ltd. v. Tellabs, Inc*., 513 F.3d 702, 704 (7th Cir. 2008) ("*Tellabs III*") (quoting 17 C.F.R. § 240.10b-5(b)). To assert a claim for federal securities fraud, a plaintiff must adequately plead the following six elements: (1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. *Dura*, 544 U.S. at 341. As noted previously, Section 10(b) claims must satisfy the heightened pleading requirements of Rule 9(b) of the Federal Rules

of Civil Procedure and the PSLRA. *See Cornielsen v. Infinium Cap. Mgmt., LLC*, 916 F.3d 589, 598 (7th Cir. 2019).

In *Hunter I*, we concluded that Plaintiffs' FAC failed to plead three requisite elements of a Section 10(b) claim: (1) an actionable misstatement or omission, (2) scienter, and (3) loss causation. *Hunter I*, 2022 WL 3445173, at *12. We granted Plaintiffs forty-five days to seek leave to amend their complaint in conformity with our decision, warning that failure to seek leave or to conform with the rulings would result in the entry of final judgment with prejudice as to all claims. *Id.* at *23. In response to the Plaintiffs' PSAC, Defendants argue that Plaintiffs have not cured their complaint's deficiencies and that their proposed changes " 'add little, if anything, of substance' to the allegations this Court already held were insufficient." Dkt. No. 71, at 11 (quoting *Coleman v. Ramada Hotel Operating Co.*, 933 F.2d 470, 473 (7th Cir. 1991)). For the reasons explained below, we agree.

### A.    Actionable Misstatement or Omission

In *Hunter I*, we dismissed Plaintiffs' First Amended Complaint, in part, based on its improper "puzzle pleading," which burdened the defendants and the court with the "onerous task of trying to figure out exactly what the misleading statements are . . . and [trying to] match[ ] the statements up with the reasons they are false or misleading." *Hunter I*, 2022 WL 3445173, at *13 (internal citations omitted). Plaintiffs have reduced the number of their averments from three hundred paragraphs over one-hundred and fourteen pages to two hundred and forty-four paragraphs over seventy-six pages. Despite this significant pruning, the PSAC repeats "the many substantive pleading deficiencies" we identified in our order of dismissal, adding few—but still insufficient—factual allegations. *Id.*

27

1.    <u>Channel Stuffing</u>

Plaintiffs challenge Elanco's public disclosures on now familiar grounds: "that the statements or documents at issue were rendered misleading because they failed to disclose material information," in this instance, information about Elanco's alleged channel stuffing scheme and the consolidation of its distributors. *Guidant*, 536 F. Supp. 2d at 927. The PSAC claims that Elanco's alleged misstatements artificially inflated its stock price and that when Elanco announced its operating results on May 7, 2020, which fell short of pre-COVID-19 expectations, the apparent "truth" of the underlying channel stuffing scheme was revealed,  and Elanco's stock price dropped. PSAC ¶¶ 8–9, 93–100, 183–84. In *Hunter I*, we held that Plaintiffs' FAC failed to plead an actionable misstatement or omission because it did not establish that Defendants operated a fraudulent channel stuffing scheme and had made misstatements or omissions about it. *Hunter I*, 2022 WL 3445173, at *13. Plaintiffs' factual allegations were insufficient to establish fraudulent channel stuffing because no evidence was referenced to show that Elanco committed any accounting violations, shipped unordered products to distributors, or received large numbers of product returns. Plaintiffs' PSAC returns to us bearing these same fatal defects.

To frame a securities-fraud claim on grounds of channel stuffing, Plaintiffs must allege that Elanco "engaged in fraudulent channel stuffing" and "made misstatements or omissions about it." *W. Palm Beach Firefighters Pension Fund v. Conagra Brands, Inc.*, 495 F.Supp.3d 622, 640 (N.D. Ill. 2020). We reiterate: "channel stuffing" refers to "shipping to one's distributors more of one's products than one thinks one can sell." *Tellabs III*, 513 F.3d at 709. But channel stuffing is not inherently fraudulent. In fact, it "could be

innocent and might not even mislead," for "a seller might have a realistic hope that stuffing the channel of distribution would incite his [or her] distributors to more vigorous efforts to sell the stuff lest it pile up in inventory." *Id.*

Channel stuffing transforms into revenue recognition fraud "*only* when it is used . . . to book revenues on the basis of goods shipped but not really sold because the buyer can return them." *Id.* (emphasis added). "This practice creates a short-term illusion of increased demand between the time when the company sends the extra product down the line and the time when the distributors return the unwanted excess." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 598 (7th Cir. 2006) ("*Tellabs I*"), *rev'd on other grounds*, *Tellabs II*, 551 U.S. 308.

In the *Tellabs*' decisions, the plaintiffs overcame the PSLRA's material falsity hurdle in response to a motion to dismiss claims attacking the defendant's channel stuffing scheme, whereby the defendant had shipped unordered products to its customers. *Tellabs I*, 437 F.3d at 598; *Tellabs IV*, 735 F.Supp.2d 856, 903 (N.D. Ill. 2010) (restating that plaintiffs' other allegations "regarding pulling sales forward, accelerating sales, [and] incentivizing sales did not withstand the motion to dismiss"). There, the plaintiffs alleged that Tellabs, a manufacturer of fiber optic equipment, had "flood[ed] its customers with tens of millions of dollars' worth of [product] that the customers [never] requested." *Tellabs III*, 513 F.3d at 706. At one point, the chairman of Verizon, who was Tellabs's largest customer, allegedly "asked Tellabs to stop providing Verizon with products that [it] did not request or require." *Tellabs I*, 437 F.3d at 598. In forcing unordered products downstream, Tellabs had "created a short-term illusion of increased demand," but when customers began

returning their "unwanted excess," Tellabs "had to lease extra storage space . . . to accommodate the large number of returns." *Id.* The large quantity of product returns suggested "that the purpose of the stuffing was to conceal the disappointing demand for the product rather than to prod distributors to work harder to attract new customers . . . ." *Tellabs III*, 513 F.3d at 710; *Tellabs IV*, 735 F.Supp.2d at 904 n.20 (disregarding evidence of certain transactions on summary judgment motion because the plaintiffs "d[id] not even argue that Tellabs ever shipped unordered products to th[ose] customers").

Here, in contrast, Plaintiffs still have not mustered particularized facts sufficient to survive a motion to dismiss. Not only do they allege no accounting violations, they also do not allege that Elanco shipped unordered products to its distributors. Similarly, Plaintiffs have not averred that distributors retained the absolute right to return unwanted products, nor does the record before us reveal that distributors ever did return a "huge" number of products, based either on their not ordering them or not being able to sell them. In fact, the relevant statistics continue to show only a small number of returns—0.2% of net revenue in 2019. Dkt. 38-8 at 8.

These omissions are critical under Seventh Circuit precedent because only fraudulent channel stuffing is actionable—meaning that the company used channel stuffing to "book revenues on the basis of goods shipped but not really sold because the buyer can return them." *Tellabs III*, 513 F.3d at 709. Plaintiffs again simply and repeatedly allege that Elanco's sales practices induced distributors to purchase "far in excess of demand" and in excess of "needed inventory." PSAC ¶¶ 5, 57, 59, 63, 68–71, 80, 89, 103, 148, 151, 153, 156, 160, 175, 199. These sparse allegations yield no details of "specific transactions,

specific shipments, specific customers, specific times, or specific dollar amounts" to cor-

roborate them. *In re ICN Pharm., Inc.*, 299 F.Supp.2d 1055, 1061−62 (C.D. Cal. 2004).

The few transactions that are cited are described with only partial—but never sufficient—

particularity; instead, Plaintiffs again recount sales and promotional practices that are "le-

gitimate and used by most companies." *A.O. Smith Corp.*, 468 F.Supp.3d at 1058 (listing

higher rebates on sales volumes and reduced interest rates as examples of legitimate sales

practices).

Plaintiffs argue that they need not allege fraudulent channel stuffing *per se* because,

in their view, a claim under Rule 10b-5(b) survives without allegations of an underlying

fraudulent or illegal scheme. Dkt. 72 at 7. They theorize that Elanco misled investors about

the true drivers of Elanco's financial results, rendering their public disclosures misleading.

They cite the Second Circuit's decision in *In re Hain Celestial Group, Inc. Securities Liti-*

*gation*, wherein the court held that a violation of Rule10b-5 "does not depend on whether

the alleged channel stuffing practices themselves were fraudulent or otherwise illegal," to

buttress their claim. 20 F.4th 131, 136–37 (2d Cir. 2021).[6]

Contrary to Plaintiffs' contentions, their reliance on *Hain* illustrates the manner in

which their allegations are again insufficient. In *Hain*, the defendant health food manufac-

turer, Hain, boosted quarterly sales figures using purportedly fraudulent and illegal channel

---

[6] The Second Circuit vacated the district court's order of dismissal and remanded the case for further consideration, and it remains pending as of the date of this Order. A magistrate judge has, however, issued a Report and Recommendation, stating that the case should be dismissed with prejudice. *In re Hain*, No. 2:16-CV-04581-JS-LGD, 2022 WL 18859055, at *3, *11 (E.D.N.Y. Nov. 4, 2022).

stuffing. *Id.* at 133. The channel stuffing scheme involved cash incentives, product discounts, extended payment terms, and "most significantly," according to the Second Circuit, "an absolute right to return unsold product." *Id.* These "extra-contractual" concessions to Hain's largest distributors "were not adequately documented or reflected in Hain's books and records." *Id.* The channel stuffing scheme "ended only when distributors refused to take additional inventory[,] and Hain opened an internal investigation into its financial reporting." *Id.* at 134.

Plaintiffs before us have not alleged facts with anything close to the same degree of particularity as did the plaintiffs in *Hain*. Here, Plaintiffs never allege specific instances of accounting violations or fictitious sales. Furthermore, their still-vague factual references are missing the "most significant[ ]" factor—an absolute right to return unsold product. *Id.* at 133. Plaintiffs' limited factual support points to real revenues from real sales, which are, contrary to Plaintiffs' contentions, not the ingredients of channel-stuffing fraud.

### 2. Confidential Witnesses

In *Hunter I*, we reminded Plaintiffs of the steep discount afforded to confidential witnesses. 22022 WL 3445173, at *18 (citing *Higginbotham*, 495 F.3d at 757). We questioned the confidential witnesses' reliability because their testimony contained "many contradictions" and because Plaintiffs had not "describe[d] their sources with sufficient particularity' and 'significant detail' to 'support the probability that a person in the position occupied by the source would possess the information alleged . . . .' " *Id.* (quoting *Tellabs I*, 437 F.3d at 596). By reciting mostly identical confidential witness allegations (all without meaningful improvements), Plaintiffs have not remedied the plethora of concerns we

previously highlighted for them. Their few revisions regarding their confidential witnesses and their addition of a fifth confidential witness fail to buttress or even substantiate their allegations of Elanco's purported channel stuffing.

At first glance, Plaintiffs' new complaint apparently irons out Elanco's corporate hierarchy—albeit by simply deleting contradictory portions of certain Elanco job titles. Originally, CW1 was described as a Corporate Accounts Manager in Elanco's "large animal division," who reported to the Director of *Food Animal* Channel & Distribution, Ms. Shriver, who then reported to Senior Director of Channel Strategy and Sales Force Excellence for North America Ms. Loew, who in turn reported to Vice President, *Companion Animal* US Mr. McKee. *Hunter I*, 22022 WL 3445173, at *19. In the PSAC, Plaintiffs clarify that CW1 was a Corporate Accounts Manager in the *Food Animal* division and that Ms. Shriver oversaw both *Food Animal* and *Companion Animal* channel distributions. PSAC ¶ 37. Plaintiffs modify Mr. McKee's title by simply deleting the words "Companion Animal" from his position. *Id.* These changes address in part our earlier confusion about Elanco's corporate structure, but Plaintiffs still do not detail CW1's job description beyond "managing Elanco's relationship with four distributors." FAC ¶ 34; PSAC ¶ 37 (same). We therefore have not been presented with facts sufficient to support an inference that CW1's position exposed him or her to the information alleged.

Additionally, CW1 continues to allege contradicting numbers regarding MWI's "excess inventory." *Id.* CW1 first alleges that in 4Q 2018 (now outside the class period), Ms. Shriver directed CW1 to sell "$10-$12 million in additional inventory above the approximate $12 million purchase of feed additives and vaccines that MWI already made on a

regular monthly basis," PSAC ¶ 66, but then CW1 reasserts that in June 2019, he or she was directed to sell "$10 million in feed additives . . . on top of MWI's already committed $9-$10 million purchase for the month." *Id.* ¶ 72. In light of these contradictory numbers, Plaintiffs have not explained the standard for MWI's purchases, nor do they provide any context or data to support their conclusion that these purchases were "above and beyond what MWI actually needed to fulfill demand." *Id.* ¶ 123.

The remaining confidential witness testimonies reflect an insufficient particularity, such that the factual allegations, as they stand, neither overcome the heightened pleading standards nor support an inference of fraud. For example, CW1 recounts the "special incentives," such as "extended payment terms of 120 days," offered to Elanco's customers to induce "excess inventory purchases" prior to the IPO in September 2018. FAC ¶ 59; PSAC ¶ 65. We noted in *Hunter I* that "it is unclear when these offers were made," and the PSAC has provided no answer. 22022 WL 3445173, at *8. CW2, a Corporate Accounts Manager in the Companion Animal division, also reasserts pre-class period events, describing that during 1Q 2018, Ms. Shriver instructed CW2 to "figure out which products [MWI could] take and stuff it in." PSAC ¶ 58. In compliance with Ms. Shriver's directions, CW2 sold an additional $3 million of two Companion Animal medications to MWI, "even though MWI was already holding 75-80 days of" product. *Id.* During the pre-IPO period, CW2 recounts that Elanco offered discounts "in the range of 1% to 3%" and rebates of "2% to 4% of the net revenue, paid annually, from a distributor's companion animal purchase." *Id.* ¶ 61. These additional rebates, according to CW2, enticed "customers to purchase more product[,] essentially ignoring end-user demand." *Id.* ¶ 62. However, as we have previously

noted, these sales incentives are not inherently fraudulent, and Plaintiffs have not paired these alleged business practices with allegations that Elanco recognized revenue on products it anticipated distributors would return in future reporting periods. *See A.O. Smith Corp.*, 468 F.Supp.3d at 1058.

Still problematic, too, are CW3's allegations about Nutra Blend, the distributor that "began to push back [against excess inventory purchases] in the first quarter of 2020, saying, 'we're not doing this anymore.' " PSAC ¶ 80. Plaintiffs have clarified that "this" refers to "purchas[ing] inventory in excess of demand," but the allegation remains suspect because, as we noted in *Hunter I*, CW3's "job description did not include working with Nutra Blend," and, in any case, CW3's employment ended sometime in January 2020. *Hunter I*, 2022 WL 3445173, at *10, *19. The PSAC confirms that "a fellow National Account Manager"—not CW3—proffered an additional rebate to Nutra Blend during a still-unidentified quarter in 2019. PSAC ¶ 71. What's more, Plaintiffs have not explained the relevance of these allegations, as the alleged channel stuffing scheme ended in the previous quarter. 2022 WL 3445173, at *19. Ultimately, these attenuated, second-hand allegations lack the reliability and particularity demanded by the PSLRA. *See Plumbers & Pipefitters Loc. Union v. Zimmer*, 673 F.Supp.2d 718, 737 (S.D. Ind. 2009), *aff'd sub nom. Plumbers & Pipefitters Loc. Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952 (7th Cir. 2012); *see also In re Zumiez Inc. v. Sec. Litig.*, 2009 WL 901934, at *8–*9 (W.D. Wash. Mar. 30, 2009) (confidential witness statements broadly describing company health were not supported with specific facts about witnesses' reliability and personal knowledge).

Plaintiffs have supplemented CW4's job history timeline, stating that CW4 began working for Eli Lilly in August 2017 as Global Heath of the over-the-counter business unit, and, when Elanco became an independent publicly traded company in September 2018, CW4 joined Elanco as Global Head of Animal Care Expansion, Business Development & Licensing and Alternate Innovation. PSAC ¶ 40. From January 2020 to July 2020, CW4 was a Vice President "responsible for driving revenue and improving Elanco's profitability of its Companion Animal and Food Animal business lines of vaccines and feed additives." *Id.*; FAC ¶ 37 (same). We noted previously that CW4's allegations "dat[ed] events occurring well before the described employment period," *Hunter I*, 2022 WL 3445173, at *19, but even in knowing now that CW4's employment stretched back to 2017, Plaintiffs have not described CW4's job responsibilities pre-January 2020 to show that CW4 was ever able to actually know of Elanco's sales practices. *E.g.*, PSAC ¶ 54 (CW4 providing that in 2017, Elanco "focused on balancing channel inventory sale to end-user demand"); *id.* ¶ 59 (by mid-2018, Elanco's practice of selling as much product as possible, regardless of end-user demand, had "started again"). Similarly, CW4 restates that through the course of "monthly management meetings" in 2019, CW4 observed "a consistent delta between dispensing numbers and selling numbers." *Id.* ¶ 78.Yet Plaintiffs again proffer no data to contextualize CW4's assertions, no details about when these meetings occurred, nor which quarter sales CW4 is referencing. *Hunter I*, 2022 WL 3445173, at *19.

The introduction of CW5 has improved nothing in terms of overcoming pleading deficiencies. CW5 started with Elanco in January 2017 as a District Sales Manager, and in March 2020, CW5 became a Senior District Sales Manager, and then, from April 2020 to

April 2021—after the class period—CW5 was a National Account Manager. Beyond these titles, Plaintiffs fail to explain how CW5's position as a mid-level sales manager exposed him or her to the limited information that CW5 contributes. Namely, CW5 adds that MWI began "working down [its] inventory" in 1Q 2020, which allegation CW5 extrapolated from a comparison of MWI's purchase patterns in the year prior. PSAC ¶ 81. Nor do Plaintiffs connect CW5's allegations to the channel stuffing scheme; thus, CW5's addition to the claims in the PSAC provides little, if any, substance.

Notwithstanding the overall questionable reliability of the confidential witnesses, the substantive allegations recite nothing more than various sales incentives and arms-length negotiations that Elanco utilized to encourage distributors to purchase more product. These efforts to incent more sales become "illegitimate only when a company uses [them] to pull forward revenues from future fiscal periods and then touts the higher revenues as reflecting increased demand." *A.O. Smith Corp.*, 468 F.Supp.3d at 1085. Where Plaintiffs reference CW4's allegations that Elanco used " 'pre-sales' to pull sales from future quarters into the current quarter by selling extra inventory," it omits any facts—much less particularized facts—to explain how this practice improperly inflated earnings.

Without adequate factual allegations of fraudulent channel stuffing, Plaintiffs' claim that Elanco's "accurate statements of historical fact were false or misleading" fails. *Conagra*, 495 F.Supp.3d at 643. Having failed to plead a channel stuffing scheme, we need not consider whether Plaintiffs adequately plead that Defendants "made misstatements or omissions about it." *Id.* at 640. That said, we repeat our observation from *Hunter I* that Elanco "repeatedly discussed and disclosed information about [its] distributors'

inventory, sales practices, rebates, and the consolidation of its distributors—the opposite of an undisclosed scheme to defraud shareholders." 2022 WL 3445173, at *19. Because "Plaintiffs have not adequately alleged any channel stuffing (much less fraudulent channel stuffing), they likewise have not alleged that Defendants had a duty to disclose [it] as a 'known trend' " under SEC regulations. *Conagra*, 495 F. Supp. 3d at 647.

### 3.   Puffery & Forward-Looking Statements

In dismissing Plaintiffs' FAC, we noted that several of Plaintiffs' disputed statements were best understood as "immaterial, non-actionable corporate puffery" and that other challenged statements qualified as forward-looking statements under the PLSRA. *Hunter I*, 2022 WL 3445173, at *20. The safe harbor provision applies to (1) forward-looking statements accompanied by meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the forward-looking statement and (2) statements that the plaintiff fails to show were made with actual knowledge that they were false or misleading. *Id.* (citing 15 U.S.C. § 78u-5(c)(1)).

Corporate puffery and optimistic rhetoric are inactionable and "generally cannot form the basis of a securities fraud action." *Gaines v. Guidance Corp.*, No. 1:03-CV-00892-SEB-WTL, 2004 WL 2538374, at *18 (S.D. Ind. Nov. 8, 2004) (Barker, J.). Here, statements regarding Elanco's "strong fundamentals," "underlying volume growth," and "solid underlying demand," PSAC ¶¶ 111–51, qualify as precisely the kind of non-specific corporate statements that do not support allegations of securities fraud.[7] *Eisenstadt v. Centel*

---

[7] Plaintiffs challenge the following statements that Defendants were "confident in the growth of [their] underlying business," PSAC ¶ 120; "we feel very good about the fundamentals of Elanco's

*Corp.*, 113 F.3d 738, 746 (7th Cir.1997) (stating "[m]ere sales puffery is not actionable under SEC Rule 10b–5"); *Searls v. Glasser*, 64 F.3d 1061, 1066 (7th Cir.1995) (indefinite statements of "growth" are best described as corporate puffery).

The PSAC also challenges several forward-looking statements as misleading. Specifically, Plaintiffs identify: (1) Mr. Simmons's statement during the February 2020 earnings call that, despite the decision to "cut distribution down to 4 major distributors," "[w]e do not see disruption in the year," PSAC ¶¶ 142–43; and (2) Elanco's statement from its April 2019 Annual Report[8] providing that "[w]e expect to see continued growth from recently launched products," *id.* ¶¶ 145–46. As required by the PSLRA, both statements were paired with appropriate cautionary language. At the top of the February 2020 earnings call, Elanco's head of investor relations explained that "we anticipate making projections and forward-looking statements based on our current expectations" and that the actual "results could differ materially due to a number of factors[,] including those listed on [a] slide [prepared for the earnings call] and those outlined in our latest [SEC filing]." Dkt. 38-10 at 2. When Mr. Simmons mentioned that he did not anticipate disruptions from the change in distributors, he repeated twice that Elanco would be "monitoring this month to month." *Id.*

---

business," *id.* ¶ 124; "we are confident in our growth because of the fundamentals driving this growth," *id.* ¶ 136; "the underlying performance across our categories is on track with our expectations," *id.* ¶ 140; and "[o]ur growth is durable and resilient," *id.*

[8] Elanco's 2019 Annual Report is available at https://s1.q4cdn.com/466533431/files/doc_financials/annual/Elanco_Annual-Report-2019_Letter-and-10k_041020.pdf. Citations to the Annual Report will refer to page numbers in the PDF file. Plaintiffs incorporated the Annual Report by reference in the PSAC ¶¶ 145–46. Accordingly, we properly consider it in ruling on Plaintiffs' Motion for Leave to Amend. *United States v. Wood*, 925 F.2d 1580, 1582 (7th Cir. 1991) (stating that district court may take judicial notice of documents incorporated by reference and of matters of public record).

at 16. Similarly, the Annual Report expressly stated that it contained "forward-looking statements" that were subject to various risk factors. Elanco, *2019 Annual Report* 33–34, 51–81, 158 (2019). Such forewarned risks included (but certainly were not limited to) the highly competitive animal health industry, the impact of fluctuating channel sales on inventory levels, changing market demand, and the consolidation of distributors. *Id.* at 33. The PLSRA consequently protects Elanco's forward-looking statements because they were accompanied by meaningful, cautionary statements.

Elanco's forward-looking statements are also independently protected by the second prong of the PLRSA's safe harbor provision because Plaintiffs have not pled that any statements were made with actual knowledge of their falsity. Pleading actual knowledge requires plaintiffs to assert "with particularity facts giving rise to a strong inference that the defendant had actual knowledge of the falsity of the statements." *Alizadeh v. Tellabs, Inc.*, No. 13 C 537, 2015 WL 557249, at *9 (N.D. Ill. Feb. 9, 2015). As we explain throughout this Order, Plaintiffs have not alleged the particularized facts necessary to push Defendants' statements beyond the PLRSA's protection.

Relatedly, the challenged statements regarding Defendants' beliefs about Elanco's business and growth are mere statements of opinion, and Plaintiffs have not contested that the opinions were not honestly held.[9] *Omnicare, Inc. v. Laborers Dist. Council Const.*

---

[9] By way of example, such statements include "we feel very good about the underlying demand in the vet channel," PSAC ¶ 115; "we feel very good about the fundamentals of Elanco's business, *id.* ¶ 124; and "we feel very good about market shares, underlying fundamentals of the market[,] and growth," *id.* ¶ 133.

*Indus. Pension Fund*, 575 U.S. 175, 186 (2015).[10] Unlike statements of fact, statements of opinion do not "express[ ] certainty about a thing." *Id.* at 183. And because "it is hard to express certainty about the future," predictions are best understood as statements of opinion. *Conagra*, 495 F.Supp.3d at 468. Thus, a statement of opinion is only actionable when "the speaker did not hold the belief [he or] she professed" or otherwise omitted a material fact, which rendered the statement misleading. *Omnicare*, 575 U.S. at 185–86. In the case before us, Plaintiffs plead no specific information contradicting Defendants' stated beliefs about Elanco's business or suggesting a material omission, so we view Defendants' "subjective and uncertain assessments" as inactionable opinion statements. *Id.* at 186.

For these reasons, Plaintiffs have failed to demonstrate that Defendants engaged in fraudulent channel stuffing and made misstatements or omissions about it in violation of Section 10(b). *Conagra*, 495 F.Supp.3d at 640.

## B.    Scienter

The requisite scienter is "an intent to deceive, [as] demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham*, 495 F.3d at 756. Likewise, a strong inference of scienter must exist "with respect to each individual defendant." *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir.

---

[10] The *Omnicare* decision discusses Section 11 of the Securities Act, and the Seventh Circuit has not yet rendered an opinion about whether *Omnicare*'s reasoning also applies to claims under Section 10(b). *Conagra*, 495 F.Supp.3d at 648. Here, neither party objects to *Omnicare*'s application. We also echo the observation articulated in *Conagra* that Sections 10(b) and 11 "contain virtually identical prohibitions against untrue statements of material fact and omissions of material fact necessary to ensure a statement is not misleading." *Id.* Accordingly, we find *Omnicare* applicable to the case before us.

2008) (citations omitted). This "inherently comparative" inquiry into corporate scienter requires courts to "take into account plausible opposing inferences" to determine whether the plaintiffs' allegations of scienter are "powerful or cogent." *Tellabs II*, 551 U.S. at 323. A complaint survives "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

Plaintiffs' only new scienter allegation is that Defendants acted with an intent to deceive investors when they announced Elanco's 1Q 2020 financial results. Specifically, Defendants stated that Elanco had to "meaningfully reduce channel inventory," which Plaintiffs surmise as proof that Elanco had "meaningfully" *inflated* channel inventory in 2019 and 2018. PSAC ¶ 168. Though Defendants explained at the time that the reduction in channel inventory was a result of the COVID-19 pandemic, "former employees" allege that Elanco had already begun reducing its sales incentives by 4Q 2019. Furthermore, Plaintiffs aver, the COVID-19 pandemic did not "begin to widely impact the U.S. economy until mid-to-late March 2020." *Id.* Therefore, the 1Q 2020 inventory drawdown was merely a convenient explanation for the inventory drawdown.

But Plaintiffs' inference is not at least as compelling—and certainly is not *more* compelling—than the opposing inference, namely, that Elanco's decision to reduce channel inventory was the product of a global pandemic. Mr. Simmons began addressing coronavirus developments as early as February 19, 2020, stating that although the coronavirus had not yet "material impact[ed]" Elanco, "the situation remain[ed] fluid[,] and it transcend[ed] [the] industry." Dkt. 38-10 at 8. By March 24, 2020, Elanco had withdrawn its

2020 revenue guidance due to the uncertainty posed by the pandemic. FAC ¶ 214 (citing Form 8-K and press release titled "Elanco Provides Business Update Related to COVID-19"). That Elanco reduced channel inventory in an early response to a global pandemic, even if occurring before the economic repercussions "fully" unfolded, is significantly more compelling an explanation than Plaintiffs' unsupported scienter allegations.

We also explained in *Hunter I* that Plaintiffs' already-sparse scienter allegations "earn[ed] a steep discount" for their reliance on unpersuasive confidential witness testimony. 2022 WL 3445173, at *21. Plaintiffs have reasserted the allegations we already identified as insufficient. *Compare* FAC ¶ 222 (CW1 providing that Mr. Simmons knew "the companion animal side very well" and the "large animal side even better," so he "would have noticed" any "massive jumps in buy-ins from distributors"), *with* PSAC ¶ 162 (same); *and* FAC ¶ 222 (CW4 stating that during the 2019 financial meetings, Mr. Simmons "was challenged on Elanco's apparently [sic] channel stuffing practices"), *with* PSAC ¶ 162 (same). These statements amount to the "epitome" of what the PSLRA categorizes as inactionable: to wit, that Defendants "must have known" about underlying fraud that Plaintiffs still fail to plead adequately. *Hunter I*, 2022 WL 3445173, at *21 (internal quotations and citations omitted).

Plaintiffs' addition of CW5 evinces no scienter. CW5 neither worked with Elanco's distributors during the relevant time frame nor is alleged to have observed any channel stuffing or have had any contact with Messrs. Simmons and Young. Except for this "ancillary" change, we cannot ignore the inescapable inadequacy of Plaintiffs' scienter allegations. *Wade*, 892 F.Supp.2d at 1130.

Plaintiffs argue that Defendants were "highly motivated" by their 2019 bonus structure to hit quarterly revenue targets. PSAC ¶ 180. Additionally, Plaintiffs contend that Defendants had a motive to mislead investors because they needed to keep share prices and reported revenue high while consummating (1) the stock-only purchase of Aratana in July 2019, (2) the common stock and tangible equity units offering in January 2020 to fund the Bayer acquisition, and (3) the cash and stock acquisition of Bayer in mid-2020. *Id.* ¶ 174. However, "generalized motive[s] common to all corporate executives [are] not enough to establish scienter." *Pension Tr. Fund for Operating Engineers v. Kohl's Corp.*, 895 F.3d 933, 939–40 (7th Cir. 2018). Desires to increase officer compensation or to keep a company appearing profitable are precisely the types of "generalized motives" insufficient to support a finding of scienter. *Davis v. SPSS, Inc.*, 385 F.Supp.2d 697, 714 (N.D. Ill. 2005). For these motives to suffice, Plaintiffs would need to be able to plead facts "support[ing] the notion that the individual defendants personally benefitted . . . to a degree outside the accepted range for corporate executives of similarly sized companies." *Id.* As they stand, these allegations "do not even remotely suggest fraudulent motivation." *Stavros v. Exelon Corp.*, 266 F.Supp.2d 833, 848 (N.D. Ill. 2003) (internal citations omitted).

## C.    Loss Causation

Loss causation "requires a plaintiff to show that a misrepresentation that affected the integrity of the market price *also* caused a subsequent economic loss." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 812 (2011). That the stock purchase price was " 'inflated because of a misrepresentation' does not necessarily mean that the misstatement was the cause of a later decline in value." *Id.* (quoting *Dura Pharmaceuticals*, 544 U.S. at

342). "[O]ther intervening causes, such as 'changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events' " could plausibly cause a drop in stock prices. *Id.* at 812–13 (quoting *Dura Pharmaceuticals*, 544 U.S. at 342–43). "If *one* of those factors were responsible for the loss or part of it, a plaintiff would not be able to prove loss causation . . . ." *Id.* at 813 (emphasis added).

In the case before us, Plaintiffs' recycled allegations of loss causation establish neither a sharp growth in any one quarter nor a sharp decline that can be attributed to an exposure of Elanco's purported deception. *Compare* FAC ¶¶ 237–41, *with* PSAC ¶¶ 181–84. According to the record before us, Elanco's revenue fell one percent in 1Q 2019; grew one percent in 2Q 2019; grew one percent in 3Q 2019; and *fell* two percent in 4Q 2019 (i.e., the "peak" of Elanco's alleged channel stuffing). True as it is that Elanco's stock value fell by thirteen percent in 1Q 2020, following a nine percent drop in revenue and a $60 million reduction in channel inventory, Plaintiffs do not explain how this minor decline is inconsistent with the economic reality of a developing global pandemic. Plaintiffs offer no sound basis for finding loss causation, and in this respect, their Section 10(b) claim also fails.

## II.   SECTION 20(A) OF THE SECURITIES EXCHANGE ACT

Under Section 20(a) of the Exchange Act, "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person . . . ." 15 U.S.C. §78t(a). A successful Section 20(a) claim requires

45

plaintiffs to establish a violation of Section 10(b) and "that the 'control person' actually exercised control over the operations of the entity principally liable and had the power or ability—regardless of whether [such power] was exercised—to control the specific transaction or activity upon which the primary violation was predicated." *Hunter I*, 2022 WL 3445173, at *22 (citing *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992)). Because Plaintiffs have not established an underlying violation of Section 10(b), their Section 20(a) claim necessarily fails again. *Id.*; *see also Pugh*, 521 F.3d at 693 ("[T]o state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of . . . § 10(b) and Rule 10b-5."); *Heavy & General Laborers' Local 472 & 172 Pension & Annuity Funds v. Fifth Third Bancorp*, No. 20 C 2176, 2022 WL 1642221, at * (N.D. Ill. May 24, 2022) (failure to plead violation of § 10(b) means § 20(a) claim also fails).

## III.   SECTIONS 11 AND 12(A) OF THE SECURITIES ACT

Plaintiffs' claims under Sections 11 and 12(a) of the Securities Act repeat allegations that Elanco's public filings, which effectuated the June 2019 Elanco-Aratana merger, contained "materially untrue statements or omissions of material fact." PSAC ¶¶ 190–200. They argue that Elanco failed to disclose its increasing reliance on systematic and undisclosed channel stuffing practices, which inflated financial results and risked future sales. *Id.* ¶¶ 196, 198–99.

Notwithstanding Plaintiffs' renunciation of "any allegations of fraud, scheme, or intentional conduct" as part of their Securities Act claims, *id.* ¶ 190, their factual allegations are bestrewn with "averments of fraud." *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007). Plaintiffs' allegations must therefore satisfy Rule 9(b)

pleading requirements. *Id.*; *Hunter I*, 2022 WL 3445173, at *22. For the reasons explained above, Plaintiffs have not sufficiently alleged a channel stuffing scheme nor any material misstatements or omissions under Rule 9(b), which consequently dooms their claims under Sections 11 and 12(a) of the Securities Act.[11]

## IV.    SECTION 15 OF THE SECURITIES ACT

Without viable claims under Sections 11 or 12(a), Plaintiffs cannot establish a claim under Section 15, which otherwise provides secondary liability for controllers of companies responsible for primary violations. 15 U.S.C. §§ 77o(a). Plaintiffs have failed to plead violations of Sections 11 and 12(a); thus, their Section 15 claim fails as well.

## CONCLUSION

For all the reasons discussed in this entry, we conclude that the allegations in Plaintiffs' Proposed Second Amended Complaint are redundant, immaterial, and unresponsive to the instructions issued in our August 2022 order dismissing Plaintiffs' First Amended Complaint. Granting Plaintiffs leave to amend, as the current proposed version of the Complaint stands, would therefore be futile. "However much Plaintiff[s] may believe [they] deserve[ ] a third bite of the proverbial apple, [they] ha[ve] not satisfied the pleading standards imposed by the federal securities laws and the Federal Rules of Civil Procedure." *Wade*, 892 F.Supp.2d at 1138. Consequently, Plaintiffs' Motion for Leave to File a Second

---

[11] We commented in *Hunter I* that, even if evaluated under Rule 8, Plaintiffs' claims would still not survive the pleading stage because Plaintiffs have not sufficiently pled the requisite material misstatements or omissions. 2022 WL 3445173, at *22 (citing *Iqbal*, 556 U.S. at 678–79 and *Vallabhaneni v. Endocyte*, 2016 WL 51260 at *21 (S.D. Ind. January 4, 2016)). The substance of Plaintiffs' factual allegations remains largely untouched, so we find again that Rule 8 offers no refuge.

Amended Complaint, dkt. 68, is **DENIED**. Final judgment in favor of Defendants shall issue accordingly.

IT IS SO ORDERED.

Date: _____9/27/2023_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Matthew Thomas Albaugh
Taft Stettinius & Hollister LLP
malbaugh@taftlaw.com

Justin D. D'Aloia
Weil Gotshal & Manges LLP
jdaloia@pomlaw.com

Gena L. Gonzales
WEIL GOTSHAL MANGES LLP
gena.gonzales@weil.com

Offer Korin
Stoll Keenon Ogden PLLC
offer.korin@skofirm.com

Emanuel McMiller
Faegre Drinker Biddle & Reath LLP
manny.mcmiller@faegredrinker.com

Stacy Nettleton
WEIL GOTSHAL MANGES LLP
stacy.nettleton@weil.com

John A. Neuwirth
WEIL GOTSHAL MANGES LLP
john.neuwirth@weil.com

Pavithra Rajesh
GLANCY PRONGAY & MURRAY LLP
prajesh@glancylaw.com

Gregory S. Silbert
WEIL GOTSHAL MANGES LLP
gregory.silbert@weil.com

Wendy J. Wildung
FAEGRE DRINKER BIDDLE & REATH LLP (Minneapolis)
wendy.wildung@faegredrinker.com

Paul A. Wolfla
FAEGRE DRINKER BIDDLE & REATH LLP (Indianapolis)
paul.wolfla@faegredrinker.com

Kara M. Wolke
Glancy Prongay & Murray LLP
kwolke@glancylaw.com

Melissa C. Wright
GLANCY PRONGAY & MURRAY LLP
mwright@glancylaw.com